UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHEET METAL WORKERS LOCAL 32 PENSION FUND and IRONWORKERS ST. LOUIS COUNCIL PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) | No. 09-cv-02083-RNC<br><br>CLASS ACTION<br><br>CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS (CORRECTED)[1] |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| TEREX CORPORATION, RONALD M. DEFEO, PHILIP WIDMAN, THOMAS J. RIORDAN, TIM FORD, and JONATHAN D. CARTER, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

---

[1] This corrected version of the Consolidated Class Action Complaint for Violations of Securities Laws filed November 18, 2010 is being re-filed at the direction of the Clerk of the Court solely for the purpose of correcting the caption of the case.

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................1

III.    PARTIES ............................................................................................................2

IV.     CLASS ACTION ALLEGATIONS ....................................................................3

V.      CONFIDENTIAL SOURCES ............................................................................5

VI.     SUBSTANTIVE ALLEGATIONS ...................................................................18

     A.    The Company and Its Business..............................................................18

     B.    Unbeknownst to Investors, Terex Experiences Dramatically Declining
          Demand for Its Products ........................................................................19

     C.    In Order to Mask Declining Demand and the True Condition of Its
          Business, Terex Engages in Improper Accounting Practices ...............23

VII.    MATERIALLY FALSE AND MISLEADING  ISSUED STATEMENTS
     DURING THE CLASS PERIOD .....................................................................44

VIII.   TEREX'S FALSE AND MISLEADING FINANCIAL REPORTING ..........80

     A.    Defendants' Intentional Scheme to Manipulate Reported Revenues ...83

     B.    Defendants' Overstatement of Goodwill ..............................................88

     C.    Defendants' Financial Manipulations Were Material............................93

     D.    Terex's Failure to Maintain Adequate Controls Over Its Financial
          Reporting and Disclosures Violated Applicable Accounting Principles and
          SEC Regulations ...................................................................................95

IX.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE:  FRAUD ON
     THE MARKET DOCTRINE..............................................................................98

X.      LOSS CAUSATION...........................................................................................99

XI.     NO SAFE HARBOR ........................................................................................104

XII.    COUNT I:  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE
     ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL
     DEFENDANTS .................................................................................................104

XIII.   COUNT II:  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE
        ACT AGAINST THE INDIVIDUAL DEFENDANTS ..................................................108

XIV.   JURY TRIAL DEMANDED ..........................................................................................109

Lead Plaintiffs Sheet Metal Workers Local 32 Pension Fund and Ironworkers St. Louis District Council Pension Fund, and additional plaintiff Sheet Metal Workers Local #218(S) Pension Fund (collectively "Plaintiffs"), allege the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Terex Corporation ("Terex" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews with former employees of Terex and media reports about the Company, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of a proposed class (the "Class") of all purchasers of Terex common stock between February 20, 2008, through and including February 11, 2009 (the "Class Period"), against Terex and certain of its senior officers and directors seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## II.  JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Terex's principal place of business is in this District and many of

the acts and transaction in furtherance of the alleged fraud and/or the effects of the fraud occurred within this District.

     5.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

     6.     Lead Plaintiff Sheet Metal Workers Local 32 Pension Fund purchased shares of Terex common stock during the Class Period, as set forth in its certification previously filed with the Court and incorporated herein by reference, and was damaged thereby.

     7.     Lead Plaintiff Ironworkers St. Louis District Council Pension Fund purchased shares of Terex common stock during the Class Period, as set forth in its certification previously filed with the Court and incorporated herein by reference, and was damaged thereby.

     8.     Plaintiff Sheet Metal Workers Local #218(S) Pension Fund purchased shares of Terex common stock during the Class Period, as set forth in its certification which is attached hereto as *Exhibit A* and incorporated herein by reference, and has been damaged thereby.

     9.     Defendant Terex, a Delaware corporation, maintains its principal place of business at 200 Nyala Farm Road, Westport, CT 06880.  The Company is a diversified global manufacturer operating in four business divisions: Aerial Work Platforms ("AWP"), Construction, Cranes, and Materials Processing and Mining ("Mining").

     10.     Defendant Ronald M. DeFeo ("DeFeo") served as the Company's Chairman and Chief Executive Officer ("CEO") during the Class Period.

     11.     Defendant Philip Widman ("Widman") served as the Company's Senior Vice President and Chief Financial Officer ("CFO") during the Class Period.

2

12.     Defendant Thomas J. Riordan ("Riordan") served as the Company's President and Chief Operating Officer ("COO") during the Class Period.

13.     Defendant Tim Ford ("Ford") served as the President of the Company's AWP division during the Class Period.

14.     Defendant Jonathan D. Carter ("Carter") served as the Company's Vice President, Controller and Chief Accounting Officer ("Principal Accounting Officer") during the Class Period.

15.     Defendants DeFeo, Widman, Riordan, Ford and Carter are sometimes referred to herein as the "Individual Defendants".

## IV.     CLASS ACTION ALLEGATIONS

16.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased Terex common stock during the Class Period.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

17.     Because Terex has tens of millions of shares of common stock outstanding, and because the Company's shares were actively traded on the NYSE, members of the Class are so numerous that joinder of all members is impracticable.  According to Terex's SEC filings, as of February 19, 2009 (shortly after the close of the Class Period), Terex had more than 95 million shares of common stock outstanding.  While the exact number of class members can only be determined by appropriate discovery, Plaintiffs believe class members number at least in the thousands and that they are geographically dispersed.

18.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

19.     Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and securities fraud litigation. Plaintiffs have no interests contrary to or in conflict with the members of the Class they seek to represent.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

21.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants violated the federal securities laws as alleged herein;

(b)     Whether Defendants publicly disseminated press releases and statements during the Class Period that omitted and/or misrepresented material facts;

(c)     Whether Defendants breached any duty to disclose material facts;

(d)     Whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts;

(e)     Whether the market prices of Terex common stock were artificially inflated during the Class Period due to the material nondisclosures and/or misrepresentations complained of herein; and

4

(f)     Whether Plaintiffs and members of the Class sustained damages as a result of the decline in value of Terex common stock when the truth was revealed and the artificial inflation came out and, if so, what is the appropriate measure of damages.

## V.     CONFIDENTIAL SOURCES

22.     Plaintiffs make the allegations herein, except as to allegations specifically pertaining to Plaintiffs and their counsel, based upon the investigation undertaken by Plaintiffs' counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Terex, interviews of former employees of Terex, press releases and other public statements issued by the Company, and media reports about the Company and believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

23.     Moreover, the allegations made herein are supported by the first-hand knowledge of thirty-one (31) confidential witnesses ("CWs").  These informants include many former employees of Terex who were employed during the Class Period and provided facts from various departments of the Company.  As detailed below, the CWs each served in positions at Terex which provided them with access to the information they are alleged to possess.

24.     Confidential Witness 1 ("CW 1") worked for the Company from July 2006 through September 2008 as the former Director of Operations for the Terex Roadbuilding division in Terex's manufacturing facility in Oklahoma City, Oklahoma.  CW 1 initially reported to Vice President and General Manager of Roadbuilding Dale Jones ("Jones"), who reported to President of Roadbuilding Chris Ragot ("Ragot").  After Jones departed Terex around March 2008, he was replaced as Vice President and General Manager of Roadbuilding by George Ellis ("Ellis").  When Ellis replaced Jones as Vice President and General Manager of Roadbuilding, Ellis began reporting directly to Defendant Riordan.  CW 1 was responsible for all manufacturing, maintenance, facilities,

purchasing, procurement and logistics in Oklahoma City as well as purchasing at the Company's Cedar Rapids, Iowa facility.  As such, CW 1 has knowledge regarding the efforts to sell the Roadbuilding division, the decline of sales in the division, manipulation of the sales numbers, product returns, and the sale, valuation and depreciation of excess inventory during the Class Period.

25.     Confidential Witness ("CW 2") worked for Terex from 2003, when Terex purchased Genie Industries ("Genie"), until mid-September 2009.  CW 2, who began working at Genie in 1985, was the Global Director of Marketing for the AWP division, reporting to Vice President of Marketing and Product Management Linda Mayer ("Mayer").  Mayer reported to Genie President Ford.  In approximately September 2008, CW 2 was moved to a new position as Global Brand Marketing Leader for AWP.  In that role, CW 2 reported to Director of Marketing Mike Samora ("Samora") who reported to Mayer.  CW 2 had various marketing and brand management duties, including working with an outside marketing firm in Seattle to develop the Terex logo and marketing for the Construction division.  Among other things, CW 2 has knowledge concerning the decline of sales in the AWP and Construction divisions during the Class Period.

26.     Confidential Witness 3 ("CW 3") was employed with Terex as an Accounts Receivable and Collections Specialist at its Glen Allen, Virginia facility from August 2008 through May 2009.  CW 3 reported to Assistant Controller Sherry Whitney ("Whitney").  The Glen Allen facility where CW 3 built utility trucks with lifting arms and buckets that utility workers used to work on power lines.  CW 3 has knowledge concerning quality control problems with Terex's trucks and the Company's accounting violations, specifically concerning the write-off of losses at year-end during the Class Period.

27.     Confidential Witness CW 4 worked for the Company as a Kanban Coordinator, which is analogous to a commodities buyer.[2] CW 4 worked at the Rock Hill, South Carolina facility from December 2004 until October 2008 and reported to a Materials Manager who reported to Plant Manager Steve Hueser ("Hueser"). The Rock Hill facility built cranes and aero lifts. CW 4's duties included ordering materials for production for two aerial crane models, the TZ34 and TZ50. These two models were part of the Crane and AWP divisions. CW 4 had to ensure there were adequate materials for construction of the cranes, including wiring, paint, fill, and any other commodities needed. The Rock Hill facility built equipment for the domestic and international markets, including shipments to Germany and other parts of Europe. CW 4 has knowledge regarding the slow down in production, the excess inventory growing in the Crane division, and the return of crane units during the Class Period.

28.     Confidential Witness 5 ("CW 5") worked as a Cost Accountant at the Advance Mixer plant in Fort Wayne, Indiana from March 2008 through April 2009, and reported to Controller Fred Lesser ("Lesser"), until Lesser retired and was replaced by William "Bill" Williams ("Williams"). Prior to being hired by Terex, CW 5 was an experienced accountant for a manufacturing company. CW 5 was hired to try to get control of what it cost the Company to build vehicles and was also responsible for accounting of inventory and reconciliation of bank accounts. As such, CW 5 has knowledge concerning the Company's drop in production, declining sales and excess inventory, Terex's lack of standardized costs and pricing of cement mixers, as well as problems and errors in accounting for the plants monthly, quarterly and yearly financial results during the Class Period.

---

[2] Kanban is an inventory control system for tracking the flow of in-process materials through the various operations of a just-in-time production process.

29.     Confidential Witness 6 ("CW 6") worked for CMI Corporation from 1977 through Terex's acquisition of CMI in 2001, and remained an employee at Terex after the acquisition of CMI through October 2009.  Initially, a Vice President of Sales for CMI, during the last two to three years at the Company, CW 6 was the Marketing Director for the Roadbuilding group within the Roadbuilding division.  As part of CW 6's duties as Marketing Director for Roadbuilding, CW 6 worked on developing a direction for the Roadbuilding division.  CW 6 reported to a series of managers of the Roadbuilding division, including Jones, Ellis and the manager the Cedar Rapids Terex paver facility Mark Hunt ("Hunt").  Hunt reported to General Manager of Roadbuilding Don Anderson ("Anderson").  CW 6 has knowledge concerning the dramatic slowdown in mixer truck and truck part sales beginning in late 2007 as well as the Company's reduction in production of mixers during the Class Period.

30.     Confidential Witness 7 ("CW 7") worked for Terex as a Senior Buyer at the Company's Cement Mixer facility in Fort Wayne, Indiana from April 2008 through December 2009, and was in charge of keeping track of production schedules relating to the assembly lines.  CW 7 reported to the facility General Manager Mohammad Nadeem ("Nadeem"), who joined Terex around July 2008.  Nadeem reported to Ellis.  Among other things, CW 7 has knowledge concerning the lack of orders for cement mixers as well as the drop in sales and revenue in the cement mixer business during the Class Period.

31.     Confidential Witness 8 ("CW 8") worked for Terex from September 1999 until June 2008 in the Redmond, Washington Terex facility.  CW 8 spent the first six years of her/his employment at Genie (which was later acquired by Terex), through approximately 2005, as a Cost Accountant.  In 2005, CW 8 moved to a position in Purchasing as a Material Cost Analyst.  In this role, CW 8 reported to Director of Procurement Joe Heim ("Heim") who reported to Vice President

of Procurement Jerome "Jerry" Knolls ("Knolls").   As a Cost Accountant, one of CW 8's responsibilities was valuing inventory and performing asset valuation in the General Ledger.  As a Material Cost Analyst in Purchasing, CW 8 worked on budgeting, forecasting for materials and attempting to reduce the cost of materials.  CW 8 has knowledge regarding the growth of finished goods inventory in the AWP division beginning in 2007 and the decision to store the excess inventory in warehouses and parking lots as additional goods were produced and sales declined during the Class Period.

32.     Confidential Witness 9 ("CW 9") worked for Terex for almost thirteen years, through January 2008.   CW 9 was the Human Resources Director for the Utilities portion of the Roadbuilding division.  For the last two years of her/his employment, CW 9 was based with the Paving Group in the Oklahoma City, Oklahoma facility as a salesperson of trash compactors sold by the Roadbuilding division, reporting to Director of the Landfill Compaction Group George Denny ("Denny").  CW 9 was assigned to the waste piece of the product line, which was sold through a network of distributors.  The Roadbuilding division sold landfill compactors through Pacific Utility Company, which was based in Portland, Oregon and owned by Terex.  CW 9 eventually became the regional sales manager for the region west of the Mississippi up to Alaska and Hawaii, and also including Wisconsin, Iowa and Illinois.  Among other things, CW 9 has knowledge concerning the failure of sales representatives to meet assigned sales quotas and the lack of profit in the Roadbuilding division during the Class Period.

33.     Confidential Witness 10 ("CW 10") worked for Terex from 2007 to 2009 in the Westport, Connecticut headquarters as the Director of Global Sourcing for Mechanical Products, reporting to Senior Vice President of Purchasing Tim Fiore ("Fiore").  This former employee's position was cross-divisional, meaning that she/he was tasked with setting up processes to allow all

five divisions of Terex to purchase components for building products under contracts she/he negotiated with component suppliers. As such, CW 10 has knowledge regarding excess component and finished inventory buildup in all of the Terex divisions during the Class Period.

34. Confidential Witness 11 ("CW 11") worked as a Marketing Product Manager for the Terex Roadbuilding division in Oklahoma City, Oklahoma for fifteen years until October 2009. Originally, CW 11 worked for CMI in Oklahoma City, and continued working there after Terex acquired CMI as part of its Roadbuilding division. CW 11 began as a Project Engineer for asphalt plants, but then, a year after Terex acquired CMI in approximately late 2001, became a Manufacturing Engineer. As a Manufacturing Engineer, her/his duties included processing component materials, designing the manufacturing process and routing the materials through the assembly process. Among other things, CW 11 has knowledge concerning the build up of excess inventory at the Oklahoma City facility and the movement of inventory offsite to local truck stops in order to hide the inventory from auditors at the end of fiscal quarters or years during the Class Period.

35. Confidential Witness 12 ("CW 12") worked for the Terex AWP division – following the Terex acquisition of Genie Industries – from approximately 2002 through 2009. CW 12 was the Operations Director for Genie in South Carolina, reporting to General Manager of the South Carolina AWP facility Brad Allen ("Allen"), who was also the Director of AWP Power Products. The South Carolina facility built power products and other AWP models. CW 12 also reported to Vice President of Operations Paul Caldarazzo ("Caldarazzo"). CW 12 has knowledge concerning slowing sales in the AWP division and the resulting glut of inventory in both the Redmond, Washington and South Carolina AWP division locations during the Class Period.

36.     Confidential Witness 13 ("CW 13") worked as a Marketing Director for the Terex Construction division from mid-2008 through April 2009.  CW 13 was hired to focus on marketing Terex Construction products in emerging markets, specifically China and India.  CW 13 reported to Vice President of Marketing Tony Chang ("Chang"), who reported to then-President of Construction Bob Isaman ("Isaman").  CW 13 has knowledge concerning the slowdown of business in the Construction division during the Class Period.

37.     Confidential Witness 14 ("CW 14") worked for Terex as a Regional Sales Manager in the Roadbuilding division from Spring 2003 through September 2009, primarily selling Terex cement mixers built in Fort Wayne, Indiana.  Throughout CW 14's employment, she/he reported to Vice President of Sales Steve Howard ("Howard"), and General Manager of Fort Wayne Jones, who started with the Company in Spring of 2004.  Later, Jones became President of all of Terex Roadbuilding and moved to Oklahoma City at the former CMI facility there.  CW 14 has knowledge concerning the dramatic decrease in cement mixers sales, the improper pre-booking of sales and the premature delivery of unfinished or poorly finished trucks during the Class Period as a means to boost sales.

38.     Confidential Witness 15 ("CW 15") worked from August 2006 through April 2009 as a Logistics Coordinator in the Company's Roadbuilding facility in Oklahoma City, Oklahoma, initially reporting to a Warehouse Manager and subsequently reporting to former Director of Operations Mark Saffell ("Saffell").  Saffell reported to Director of Customer Service Larry Meyer ("Meyer") who reported to President of Roadbuilding Jones, who was later replaced by Ellis.  As a Logistics Coordinator, CW 15 witness was tasked with international shipment and transport of freight, as well as recording inventory transfers and tracking manufacturing work orders and shipments.  CW 15 also assisted in the shipment of sales orders and worked with couriers, including

entering courier charges into Terex's accounting system and paying freight bills.  Like many other corroborating confidential witnesses, CW 15 observed revenue recognition violations at the Company, including the Company's practice of moving inventory to off-site locations, such as truck stops, in order to improperly book sales and meet quarterly revenue and sales targets during the Class Period.

39.     Confidential Witness 16 ("CW 16") worked as an Inventory Analyst in Terex's Roadbuilding division from 2004 through August 2009, tracking Terex's use of raw materials at the Fort Wayne, Indiana facility.  Throughout her/his employment, CW 16 reported to Curt Banger ("Banger"), the Cost Control Manager, who reported to the Accounting Manager, Lesser.  CW 16 has knowledge concerning Terex's improper recognition of inventory sales through its premature delivery of Certificates of Origin and the movement of inventory off-site at quarter or year-end during the Class Period.

40.     Confidential Witness 17 ("CW 17") was a Consultant with the Company in the role of Manager of Consolidation in Terex's Corporate Accounting department in Westport, Connecticut from December 2008 through October 2009, originally reporting to Director of Corporate Accounting Janet Evans ("Evans"), who reported to Controller Jon Carter ("Carter"), and later to Controller Mark Clair ("Clair").  Carter, and later Clair, reported directly to Defendant Widman. CW 17, who previously was in charge of internal audits at Texaco, Inc., where she/he worked for more than 25 years (including as the Deputy Controller), has direct knowledge of major problems with the Company's goodwill accounting, inaccurate accounting records, major internal control problems, and serious revenue recognition problems.  Specifically, CW 17 knew of problems on Terex's inter-company accounts in which revenue was recognized improperly in the form of sales. In other words, Terex used intercompany transfers to "generate" and book improper sales, thus

artificially inflating revenue. CW 17 also performed an extremely detailed analysis of the improper inter-company sales, which was sent directly to Defendant Riordan and Clair. CW 17 believes her/his contract with Terex was terminated because she/he refused to help Terex executives, including Clair and Defendant Riordan, find a way to conceal the improper revenue recognition problem or to correct it without disclosing it.

41.     Confidential Witness 18 ("CW 18") was the Manager of Global Aftermarket Revenue for Terex from July 2008 through April 2009, reporting to Director of Terex Construction Ken Gurney ("Gurney"), who reported to Construction Vice President of Americas Robert Desel ("Desel"). Desel, in turn, reported to President of Construction Isaman. CW 18, who focused on aftermarket or replacement parts for worn, damaged, or broken equipment, has direct knowledge through her/his review of sales reports that Terex improperly recorded intercompany transfers as sales, thereby artificially inflating revenue.

42.     Confidential Witness 19 ("CW 19") worked for Terex from January 1998 through November 2008, first as a Business Development Manager for Terex Construction, and then later as General Manager for Terex's European Roadbuilding division. In CW 19's Roadbuilding position, she/he reported to former President of Terex Roadbuilding Ragot, who was replaced by Jones, who was later replaced by Ellis. Jones and Ellis reported to Defendant Riordan. CW 19 has knowledge of sales demand in Europe for the Company's Construction division products and intercompany sales from the Company's European facilities to the Company's U.S. facilities during the Class Period.

43.     Confidential Witness 20 ("CW 20") worked for Terex from June 2006 through January 2008 as a Production Supervisor at Terex Building 6 in Terex's Redmond, Washington AWP facility, reporting to Materials Engineer Rick Dunaway. CW 20's duties included supervising

shipping of scissor lifts and aluminum lifts to customers worldwide, and she/he has direct knowledge of the "rows and rows" of excess inventory the Company had at its Redmond, Washington facility throughout the time that CW 20 was employed by Terex.

44.     Confidential Witness 21 ("CW 21") worked for Terex from 2007 though April 2009 as the Executive Assistant for President of Materials Processing Rick Nichols ("Nichols").  CW 21 also reported to the President of Cranes Steve Filipov ("Filipov").  CW 21 has knowledge concerning problems in Terex's Construction division, as well as monthly meetings that were attended by the each of the Terex division Presidents, Defendant DeFeo and Defendant Riordan during the Class Period.

45.     Confidential Witness 22 ("CW 22") worked as a Sales Engineer for Concrete Products from 2001, when the Company acquired CMI, through June 2008, reporting to Sales Director Jim Johnson ("Johnson") and Vice President of Sales Gary Hirsch ("Hirsch").  Johnson and Hirsch reported to head of the Terex Roadbuilding division Jones, and then later to his replacement, Ellis.  CW 22 has knowledge regarding the Company moving products offsite and shipping products to customers early in order to prematurely recognize revenue during the Class Period.

46.     Confidential Witness 23 ("CW 23") worked for Terex – and before that CMI – from 2000 through 2003, when she/he was laid off.  CW 23 was hired back by Terex in 2006 and remained through April 2010.  CW 23 was a Supervisor, overseeing the construction of Terex Asphalt Plants, reporting to Director of Operation David Dobson ("Dobson"), and then reported to Mark Saffell, who replaced Dobson.  CW 23's duties included overseeing time-reporting by employees and supervising 52 employees to make sure plants were produced on schedule.  CW 23 has knowledge regarding the movement of Terex products off-site in order to book sales and prematurely recognize revenue during the Class Period.

47.     Confidential Witness 24 ("CW 24") was a former long-time employee of Irving Materials, Inc., ("Irving") a customer of Terex that had purchased product from the Company for years, including during the Class Period.[3] CW 24 has information concerning how Irving repeatedly received defective products at the end of the month or quarter from Terex, as well as being repeatedly asked by Terex employees to sign invoices indicating Irving had paid for and received trucks before the trucks had actually been delivered.

48.     Confidential Witness 25 ("CW 25") worked in the Terex Advance Mixer facility for 25 years until April 2008, including many years before Terex acquired Advance Mixer. CW 25 was Plant Operations Manager and reported to the head of Roadbuilding, including Jones and later Ellis. CW 25 also reported up to the General Manager for Fort Wayne, including Jim LoPresti ("LoPresti") followed by Jim Yankel. CW 25 was responsible for purchasing, manufacturing and operations at the Terex Advance Mixer facility. CW 25 has knowledge concerning the faltering performance of Advance Mixer and the problems in the Roadbuilding division.

49.     Confidential Witness 26 ("CW 26") worked for Terex from January 1, 2007 through August 30, 2008. For the first year of her/his employment, CW 26 was the North America National Sales Account Manager for the Trashmaster product line. At the start of 2008, CW 26 was promoted to also be the Western Regional Manager for Trashmaster. CW 26 was also responsible for supporting the Terex Trashmaster dealer network, including Waste Management and Allied Republic. CW 26 reported to Director of Landfill Compaction Denny, who reported to former Vice President of Sales Gary Hirsch. Hirsch reported to former Vice President of Roadbuilding Jones and

---

[3] Irving is a privately held building materials supplier headquartered in Greenfield, Indiana.

later Vice President of Roadbuilding Ellis.   CW 26 has knowledge concerning how Terex manipulated its financials in violation of revenue recognition rules.

50.     Confidential Witness 27 ("CW 27") worked for Terex from April 1999 through April 2009 as the Engineering Manager for Mobile Equipment in Oklahoma City in the Roadbuilding division.  CW 27's duties included directing day-to-day engineering activities, assigning projects, resources and assisting with electrical engineering.  CW 27 worked on all Terex Roadbuilding equipment made in Oklahoma City except for Asphalt and Concrete Plants.  CW 27 reported to Director of Engineering John Roberts ("Roberts") and later Vice President of Engineering David Emerson ("Emerson").  Roberts and Emerson reported to Vice President of Roadbuilding Jones and later George Ellis.  CW 27 has knowledge concerning the Company's improper booking of sales and shipping of items with known flaws in order to recognize revenues.

51.     Confidential Witness 28 ("CW 28") worked for CMI from 1993 through the acquisition of CMI by Terex, and then continued working at Terex until October 2009.  CW 28 was the Senior Project Engineer for Reclaimers and Stabilizers, which were part of the Trashmaster line of products within the Terex Roadbuilding division.   CW 28 reported to Vice President of Engineering Roberts and then Vice President of Engineering Emerson.   The Vice Presidents of Engineering reported to Vice President in charge of the Roadbuilding Division Jones, and later Ellis. CW 28's job duties included overseeing new product development and working on Terex lean manufacturing initiatives as well as assisting with sales calls.  CW 28 has knowledge concerning Terex's practice of parking inventory offsite so that it could recognize revenue at the end of fiscal quarters during the Class Period.

52.     Confidential Witness 29 ("CW 29") worked for CMI from 1972 through the acquisition of CMI by Terex, and then continued working at Terex until October 2010.  CW 29 was

the Traffic Supervisor in Oklahoma City for the Roadbuilding division.  CW 29 reported to Jones, then to Saffell, and later to Daniel Vitello.  CW 29's job duties included arranging for the transport of finished equipment from Oklahoma City.  CW 29 has knowledge concerning Terex's practice of hiring trucking companies to remove Terex inventory offsite so that Terex could claim the products as sales.

53.     Confidential Witness 30 ("CW 30) was an Operations Manager at Terex's Cedar Rapids, Iowa plant from August 2005 through late 2009.  The Company's Cedar Rapids facility made rock crushing and screening equipment, and fell under the purview of Terex's Materials Processing & Mining division.  CW 30 oversaw the Cedar Rapids machine shop, fabrication, and welding.  A Master Scheduler, Production Planner, and approximately 50 union employees reported to CW 30.  Among other things, CW 30 has knowledge and information concerning how it was common practice to count unfinished Terex equipment as completed, and often moved unfinished equipment to an off-site location so that equipment could be counted as a sale.

54.     Confidential Witness 31 ("CW 31") worked for Terex until September 2009 at the Company's Redmond, Washington facility, which was part of Terex's AWP division.  CW 31 joined Genie in late 1991 and continued working for the Company following its merger with Terex.  In the five years prior to CW 31's departure, she/he worked as a Group Lead for Shipping, where she/he oversaw a staff of shipping clerks and was responsible for, among other things, performing and overseeing inspections of finished equipment before it was sent to Terex customers.  CW 31 has information concerning the slowdown in Terex's AWP business and the glut of inventory of finished goods that was piling up at Terex's Redmond, Washington facility.

## VI.     SUBSTANTIVE ALLEGATIONS

### A.     The Company and Its Business

55.     Defendant Terex is a global manufacturer of construction products with four principal business divisions, AWP, Construction, Cranes, and Mining.  During the Class Period, the Company operated its roadbuilding and utilities businesses under the Roadbuilding division.  This division was dissolved on January 1, 2009, when the roadbuilding business was moved into the Construction division and the utilities business was moved into the AWP division because the businesses were no longer self-sustaining.

56.     The Company's AWP division designs, manufactures, refurbishes and markets aerial work platform equipment, telehandlers, power products and construction trailers.  Products include material lifts, portable aerial work platforms, trailer-mounted articulating booms, self-propelled articulating and telescopic booms, scissor lifts, telehandlers, construction trailers, trailer-mounted light towers, power buggies, portable generators, related components and replacement parts, and other products.  The products are used by customers to construct and maintain industrial, commercial and residential buildings and facilities, as well as in a wide range of infrastructure projects.

57.     Terex's Construction division designs, manufactures and markets two primary categories of construction equipment and their related components and replacement parts:  heavy construction equipment, including off-highway trucks, scrapers, hydraulic excavators, large wheel loaders and material handlers; and compact construction equipment, including loader backhoes, truck-mounted articulated hydraulic cranes, compaction equipment, mini and midi excavators, site dumpers, compact track loaders, skid steer loaders and wheel loaders.  Construction, forestry, rental, mining, industrial and government customers use these products in construction and infrastructure projects and in coal, minerals, sand and gravel operations.

58.     The Company's Cranes division designs, manufactures and markets mobile telescopic cranes, tower cranes, lattice boom crawler cranes, truck-mounted cranes (boom trucks) and telescopic container stackers, as well as their related replacement parts and components.  These products are used primarily for construction, repair and maintenance of commercial buildings, manufacturing facilities and infrastructure.

59.     Terex's Mining division designs, manufactures and markets materials processing equipment (including crushers, impactors, washing systems, screens and feeders), hydraulic mining excavators, highwall mining equipment, high capacity surface mining trucks, drilling equipment, related components and replacement parts, and other products.  Construction, mining, quarrying and government customers use these products in construction and infrastructure projects and commodity mining.

60.     The Company's Roadbuilding division, when operating as a separate business division of Terex during the Class Period, designed, manufactured and marketed asphalt and concrete equipment (including pavers, transfer devices, plants, mixers, reclaimers/stabilizers, placers and cold planers), landfill compactors, bridge inspection and utility equipment (including digger derricks, aerial devices and cable placers), as well as related components and replacement parts. Government, utility, infrastructure and construction customers use these products to build roads and bridges, construct and maintain utility lines, trim trees and for other commercial operations.

**B.     Unbeknownst to Investors, Terex Experiences Dramatically Declining Demand for Its Products**

61.     Prior to the Class Period, market demand for many of the Company's products dropped precipitously.  As detailed further herein, Defendants were able to disguise and conceal this trend by making numerous positive statements about the strength of Terex's business and by causing

19

the Company to engage in improper accounting practices, which enabled Defendants to disguise the true state of affairs at the Company.

62.     In the Roadbuilding division, demand for the Company's advanced concrete mixers – which generated 40% of the entire Roadbuilding division revenue in 2007 – began a significant decline in 2007 that continued throughout 2008.  Indeed, prior to 2007, Terex typically sold 200 to 300 cement mixer vehicles per month.  By October 2008, that number had dropped to two cement mixer vehicles per month, and by the end of 2008, Terex had only built one new cement-mixer vehicle in four months.  By April 2008, orders for Terex cement mixers were so slow that Terex employees could build a cement mixer in a week when it normally took them approximately six weeks to build one.  Likewise, by mid- to late-2008, sales of Terex's Reclaimer/Soil Stabilizers were off 50% and orders for asphalt plants were down 50% or more.  The Company's "Trashmaster" compactor, which sold in price ranges of $650,000 to $700,000 for larger ones and $350,000 to $400,000 for smaller ones, experienced such stagnant sales that the Company eliminated the entire product line.

63.     Put simply, it was clear prior to and throughout the Class Period, that the Company's Roadbuilding division was experiencing a severe downward trend and that the entire division was at risk of collapsing.  The Company shut down many assembly lines at Terex plants and conducted several mass layoffs of employees, but Defendants could not stop the bleeding.  Problems were so severe that Company employees in Oklahoma City had no work to do and there were nowhere near enough orders for the capacity the Company had available.

64.     Other Terex divisions began to experience weakening demand.  By mid-2008, sales of the Company's AWP products had tanked.  The decline in the Company's AWP business had been occurring *at least* throughout 2008 and was very noticeable throughout the Company.  The

Company's cranes business suffered a similar, dramatic decline in demand. By the Summer of 2008, for example, the amount of materials Terex ordered to build cranes had fallen by approximately 33%. At this time, a material amount of Terex crane units were being returned to the Company because customers would not accept delivery.

65.     Likewise, Terex's Construction division was performing poorly during the Class Period. Confidential witnesses described Terex as a bottom feeder in the construction industry that had no market share in construction in North America. Yet, Terex's Construction division was DeFeo's "little pet project," and so Terex never eliminated the division despite the fact that it was consistently in the red. Sales of the Company's construction products overseas were also very poor.

66.     Defendants were well aware of the severity of the declining demand facing the Company. Both DeFeo and Ragot, the former President of Roadbuilding, knew that Roadbuilding was not doing well. Also, Riordan made multiple trips to Terex's Oklahoma City facility and was familiar with the Roadbuilding division's financials. Additionally, DeFeo and Riordan watched market trends, market volumes, and they also followed market shares very closely. Further, CW 19, the former Business Development Manager for Terex Construction, made reports every week and every Monday had a conference call with Jones or Ellis to discuss their forecasts for the coming week and month. Indeed, CW 26, the former National Sales Account Manager for Terex, was told by Ellis in the Fall of 2008 that "[r]oadbuilding has been bleeding red ink for more than a year and we have to stop the bleeding." CW 19 stated that "[t]here was no way people in charge could claim they didn't know what was happening."

67.     Similarly, all of the executives at the Company knew that the Construction division was not doing well. Terex hosted monthly meetings in the board room at the Company's headquarters that were attended by Riordan and DeFeo and the division presidents. Prior to each

21

month-end meeting, CW 21, the former Executive Assistant for President of Materials Processing at Terex, collected data from each division president then organized the information into a report that was then discussed at that month's meeting.  Indeed, the poor performance of the Construction division led to conflicts between Isaman, the President of the Construction division, and Riordan and DeFeo.

68.     The information detailed herein concerning the plummeting demand for the Company's products prior to and at the beginning of the Class Period was provided by numerous Confidential Witnesses, including CW 2, CW 3, CW 4, CW 5, CW 6, CW 7, CW 9, CW 12, CW 14, CW 19, and CW 21.  For example, CW 14 recalled that in 2005, she/he sold $75 million worth of cement mixers in her/his region and the entire cement mixer sales for the Company were $150 million.  In 2006, CW 14 sold $82 million in her/his region.  By 2007, sales began to decline dramatically and CW 14 only sold $55 million in her/his region.  In the entire year of 2008, CW 14 sold $24 million and the whole Company sold only $40 million, less than this person sold in 2007. In 2009, CW 14 sold $10 million through September when she/he left the Company.

69.     Things were even worse for CW 9 who was responsible for selling Terex's "Trashmaster" compactor product line.  Terex assigned CW 9 a sales quota of twenty to fifty Trashmasters, annually.  Over the approximate two years that CW 9 held her/his sales position, she/he sold a *total* of four to five Trashmasters.  Approximately six to nine months after CW 9 left the Company, Ellis eliminated the Trashmaster product line at Terex.  Describing Defendants' knowledge of the extent of problems facing the Company, CW 9 stated that if "[DeFeo] says he didn't know Roadbuilding was losing money, he's full of shit."

70.     Things were so severe that CW 11 recalled how Terex employees in Oklahoma City were idle because there was nothing to do.  CW 11 described how employees "were standing around

doing nothing.  People were sweeping floors," because there were nowhere near enough orders for the capacity available.

C.    **In Order to Mask Declining Demand and the True Condition of Its Business, Terex Engages in Improper Accounting Practices**

71.    During the Class Period, Terex engaged in improper accounting practices which were designed to mask the true condition of the Company's business.  These practices violated Generally Accepted Accounting Principles ("GAAP") as detailed herein at ¶¶200-249.

72.    **Premature Revenue Recognition**: Defendants caused Terex to prematurely recognize revenue in connection with product sales by moving Terex products to off-site locations – such as nearby interstate truck stops – and then reporting those products as sold, even though they were not then being sent to customers.  This "Truck-Stop-Two-Step" tactic was employed repeatedly during the Class Period in order to prematurely recognize revenue from sales and enable Terex to meet market expectations during the Class Period.

73.    To be recognized as a sale within a certain fiscal time period, Terex products had to be shipped from Terex's facilities to a buyer prior to the end of the period, *i.e.*, before the quarter-end or year-end.  Terex's policy was that if the product physically remained on Terex land it could not be counted as a sale, but if it actually left Terex property – even if it was not being shipped to a customer – it was booked as a sale.  Indeed, Jones, the Vice President and General Manager of Roadbuilding, told Terex Roadbuilding employees during the Class Period, including several Confidential Witnesses, to make sure these moved – but not delivered or actually sold – products were recognized as *bona fide* sales.  The process was simple: Jones would give the direction to

23

temporarily move products off site, and then it would happen.[4]  Throughout the Class Period, Terex thus moved products off-site for storage at local truck stops specifically to recognize revenue prematurely.  It was crystal clear to Terex employees that this tactic's sole purpose was to hit quarterly sales targets.

74.    The "Truck-Stop-Two-Step" practice was pervasive.  Every type of product that the Roadbuilding division manufactured got shipped up the street to the truck stops.  After booking the products as sold and recognizing revenue, Terex kept the products at the truck stops for anywhere from one day to several days while Terex waited for shipping permits needed to transport the products to its customers.

75.    The practice also infected the Company's Mining division plant in Cedar Rapids, Iowa, where unfinished product was moved from Terex's facility to a distributor's yard across the street so that it could be counted as a sale.  This happened at month-end, and the J.W. Bell Company – a Terex Mining division distributor – provided the structure to move the equipment and the space in its yard.  Likewise, unfinished product on Terex's assembly lines in Cedar Rapids was frequently counted as sold so that quarterly and month-end sales targets could be met.  Terex also shipped unfinished Mining division equipment to customers to book sales in an attempt to meet sales goals.

76.    At Terex, the premature recognition of revenue was standard practice at the end of every quarter as instructions were given to "ship and invoice anything not bolted down."  This message was communicated regularly, and on the last day of each quarter and fiscal year, employees involved in logistics and shipping had to come in early and stay until everything was sent out the door, which usually did not occur until late at night.  The "Truck-Stop-Two-Step" fraud was so

---

[4] The truck-stop-two-step did not end when Jones left Terex.  Once Ellis took over, he also directed Company employees to engage in the exact same misconduct.

severe that Terex frequently had to use more than one truck stop at a time because there were so many trucks loaded with products.

77.     The amount and type of equipment moved off-site varied and depended on how much Terex needed in additional sales to meet its quarterly goals.  Moreover, Terex employed this scheme for both domestic and international orders.  For example, at quarter-end Terex would book sales a week before international orders were even picked up – and the items would be left sitting on the Terex loading dock in a special section reserved for international orders.[5]

78.     The "Truck-Stop-Two-Step" was ordered from the top down: it was not the brainchild of rogue employees.  Indeed, Riordan was involved in applying pressure to get the products shipped to the truck stops.  Riordan told CW 1 that "we need these numbers to hit, we have to get these sales."  Jones would call CW 1 in Jones' office when Jones was talking on the speakerphone with Riordan about how tight the Roadbuilding division was running.  Riordan would tell Jones and CW 1, "[a]nything we have to do we'll make it happen."  Jones would then look at CW 1 and say "make it happen."  This was confirmed by CW 23, who stated that the orders to move Terex product offsite came from Jones and above.

79.     These facts demonstrate that the Company and Defendants regularly employed fraudulent tactics as well as violated GAAP in order to boost sales, meet market expectations and maintain Defendants' unrealistic financial projections.  The effect of Defendants' scheme enabled

---

[5] On top of prematurely recognizing sales, the off-site parking of Terex products had another consequence.  Terex had such a large percentage of their trucks packed with product and effectively out of commission because they were sitting at remote locations, that the Company could not ship orders to other customers who were ready to receive product because they did not have trucks available.  Eventually, some of the products were unloaded from the "in transit" trucks and placed on the ground so that the trucks could be used by Terex to fill other orders.

the Company to boost its reported financial performance and to not only create, but maintain, artificial inflation in the price of Terex common stock throughout the Class Period.

80.     The information provided herein concerning Defendant's use of the "Truck-Stop Two-Step" to improperly recognize revenue prior to and during the Class Period was provided by numerous Confidential Witnesses, including CW 1, CW 11, CW 15, CW 16, CW 22, CW 23, CW 26, CW 27, CW 29, and CW 30.  For example, CW 1 was specifically directed by both Jones and Ellis to move Terex products off-site at the end of fiscal quarters so that the Company could book the products as sold.  Although Ellis was less direct than Jones, it was always clear to CW 1 what Ellis was directing her/him to do.  Jones would tell CW 1"[w]e need sales this month.  Get it up there [to the truck stops] and make it happen."[6]

81.     According to CW 14, Terex parked finished trucks at Triple S Tires, TFS Paint Shop and Cummins Diesel, among other stores, in Fort Wayne, Indiana, near the Company's facilities.  As an example, if Terex completed a cement mixer truck at 5:00 P.M. on the last Friday before quarter-end, and the truck was ready for delivery, Terex employees would drive the truck to the parking lot of a local business so that the Company could claim the sale for the quarter that just ended.  Although the actual sale would not be consummated until the upcoming quarter, the Company would, in essence, backdate the sale in order to report positive financial performance and meet market expectations.

---

[6] In addition to fraudulently adding sales to the Company's books when they should not have been recognized through the truck-stop-two-step, Terex improperly kept returned and damaged product off its books.  For example, Jones would instruct CW 1 to have damaged product brought back to Terex's Oklahoma City facility for repair, but Terex would not put the damaged product back on its books.  CW 1 later found out from Terex's accounting department that this product treatment was not appropriate because any products that came back to Terex damaged were supposed to be placed back on Terex's books until they were repaired and returned to the customer.

82.     According to CW 14, the number of trucks parked off-site to make it appear they were sold and delivered to a customer "depended on how the month fell."  If Terex needed to claim additional sales to make its quarterly targets, then Terex would park the trucks off-site.  On one occasion, the General Manager of the Fort Wayne facility at the time, LoPresti, gave the order to Howard, who told CW 14 to drive one of the three trucks that were to be parked off-site so that Terex could meet its quarterly sales goal.  This former employee did as she/he was ordered, even though she/he was a salesman and not a truck driver.

83.     Likewise, CW 11 confirmed that Terex employees loaded up component inventory and unsold inventory onto trucks that were sent to four local truck stops, including Flying J, Love's, and TravelLodge, among others.  CW 11 understood from Traffic Department employees and from the timing of the inventory being moved off-site that it was done "to hide the inventory from the Company's auditors."  Inventory was moved out at the end of quarters or end of fiscal years just before auditors came to visit.[7]  According to CW 11, every corner of the nearby I-40 highway had truck stops, two on the north and two on the south.  According to CW 11, they were "huge" truck yards capable of holding "300 to 500 rigs on each."

84.     CW 15 also observed the "Truck-Stop Two-Step" and recalled that the main way Terex recognized revenue prematurely – in order to meet sales targets at quarter or year-end – was to have machines taken down to nearby truck stops, such as Love's or Flying J.  For example, CW 15 recalled an instance when a customer was not ready to receive equipment, but Terex wanted to book the revenue immediately.  Thus, Terex sent the equipment to the truck stops to sit there until the

---

[7] CW 11 recalled the timing of the auditors because CW 11 and her/his co-workers had to meet with the auditors and sign documents attesting to the fact that they were not "ghost employees."  CW 11 had to tell the auditors who she/he was and give them her/his clock card.

customer was ready.  CW 15 recalled that the majority of the time, Terex products were moved off-site so that the Company could book sales and revenue while it awaited the proper shipping permits. While these fraudulent practices sometimes happened at month-end, they were more frequent and involved more equipment at quarter-end.

85.     CW 15 further described how she/he was "horrified" that an unlicensed driver was instructed to execute the "Truck-Stop Two-Step", as it could have led to employees being arrested. Specifically, at the end of the third quarter 2007, the trucks needed to move trailers off-site were not there.  CW 15 stated the unlicensed driver – Johnny Howard – was told to hook the Company's "yard truck" up to a trailer and to park the trailer at a nearby 76 gas station so that Terex could claim sales.  The yard truck, however, was only meant for maneuvering trailers around Terex's facility, and was not built, designed, or licensed for travel on the road.  Despite this, the Company sent out an employee in a non-street legal truck, without a commercial driver's license, insurance, or permits so that it could improperly book sales.  This was confirmed by CW 29, who was actually involved in the yard truck incident.

86.     In another instance in approximately early 2008, CW 29 was directed to send 24 to 30 trailers that together made up one asphalt plant to the truck yard of a local trucking company, Daly Express, where the trailers would sit for several weeks before the plant could be shipped to the customer.  Even though Terex showed the asphalt plant on its books as shipped, the asphalt plant was not actually shipped to the customer until approximately two to three weeks later.

87.     Echoing the experiences of the other confidential witnesses, CW 16 stated that at quarter-end, Terex parked cement-mixer trucks off-site at various locations so the Company could claim the trucks were sold by the quarter-end deadline, even though it was known that the trucks were not yet *en route* to customers or delivered to customers, as required by Terex policy.  CW 16

confirmed that the trucks were parked at the TFS Paint Shop, Triple S Tires, and Cummins Diesel locations in Fort Wayne, Indiana.  She/he stated that Terex did this "every month" and "especially at the end of the quarter."

88.      In another instance, in late summer 2007, the Roadbuilding division was sending an asphalt plant and other products on schedule, but the customer did not have a site ready to receive it. Rather than bring the product back to Oklahoma City, Jones made arrangements for CW 1 to send products to other non-customer owned sites rented by Terex so the products could be called "in transit" and placed on the books as a sale.  According to CW 1, the trucks loaded with the products ended up just sitting at non-customer sites.

89.      In yet another instance, in late 2007, CW 1 returned from a trip to find that an asphalt plant and other equipment had been sent to the truck stops to await delivery.[8]  According to CW 1, an asphalt plant took up to thirty tractor trailers to transport, and other products also took multiple trucks.  As such, any one truck stop often would not have enough free parking space capacity for all the trucks loaded with product that Terex needed to park.  This was confirmed by CW 23, who stated that Terex put a full plant at a truck stop West of Morgan Avenue and across the I-40 just to have it off the yard and book the revenue as a sale.

90.      In another instance, Terex parked a full asphalt plant broken into many, many truckloads at an Oklahoma City truck yard for an extended period to be able to book the revenue for the plant, even though the customer was not ready to receive it.  That plant cost between $3.5 million and $4 million and was part of the Gateway Equipment project in New York.  While the trucks were parked in the truck yard, someone broke in and stole all the copper wiring off one of the truckloads.

_____

[8] CW 1 stated that Terex asphalt plants cost from $1.5 million to $4 million at the time.

91.     According to CW 26, on another occasion in 2007, she/he sold two Trashmasters to a customer in Canada for delivery in 2008.  Notwithstanding the fact that the customer did not want the product until 2008, Denny told CW 26 to book the sales in 2007 rather than 2008 because Terex needed to make its sales targets in 2007.  According to the CW 26, Terex left the Trashmasters in the Terex yard until 2008 but booked the sales in 2007.  CW 26 remembers this occurrence clearly because in 2007, she/he was compensated solely by salary, but in 2008 her/his compensation changed to include sales commissions.  CW 26 had expected to earn $20,000 in commissions on the sale of the Trashmasters to the Canadian customer, but because Terex booked the sale in 2007, CW 26 got nothing.

92.     Describing the mentality behind the "Truck-Stop-Two-Step", CW 15 stated it was "a huge deal that we had to hit those [quarterly] numbers" and the Company's approach was to get it done by "get[ting equipment] off the property" no matter what.  CW 29 was also told by her/his superiors that equipment "had to leave the yard to collect revenue."  As a result, CW 29 directed trucking companies to come and take the equipment away by the end of the quarter, even though she/he knew they lacked permits and would be "bootlegging" the goods as a result.  CW 29 and her/his superiors, including Vice President of Sales Hirsch, knew that having the trucking companies pick up the equipment was essentially just a formality because without permits, the equipment could not travel for delivery to the customer.

93.     Like other former employees, CW 30 stated that Terex engaged in premature revenue recognition schemes by moving uncompleted products off-site, by counting unfinished product on the assembly line as sold, and by shipping unfinished products to Terex customers.  CW 30 stated that the purpose of these tactics was to make sure the Company's Cedar Rapids, Iowa plant was meeting its sales and financial performance targets.  Moreover, these practices were not a secret

within the Company.   CW 30 recalled that counting unfinished equipment as completed was discussed at scheduling meetings, depending on how critical it was to meet that specific month's numbers.

94.     On top of the "Truck-Stop-Two-Step," Defendants employed other means to get sales at quarter-end or year-end.   As an example, Terex would deliver cement mixer trucks to customers, but not deliver the Certificate of Origin until the customer had paid for the truck.   The Company's policy, however, was that Terex would deliver the truck to the customer, and then the customer would take one to three days to inspect the truck.   Only after completing the inspection would the customer pay for it.   According to policy, Terex would not issue the Certificate of Origin until the inspection was complete and the customer had paid.   Holding on to the Certificate of Origin until payment was received provided Terex with some security.   Even though the customer had physical possession of the truck, the customer could not register or operate the truck until the customer also had the Certificate of Origin.

95.     Therefore, Terex was not allowed to recognize revenue until it delivered the Certificate of Origin to the customer.   For example, Terex would deliver a truck on Friday and the customer may not pay until Monday, and in that event Terex would not be able to recognize the sale until Monday.   Yet, during the Class Period, Defendants ignored these policies in an attempt to make Terex's quarterly sales numbers.

96.     Specifically, every quarter-end and some month-ends, particularly after 2007, Terex shipped trucks and Certificates of Origin at the same time, even though Terex had not yet been paid for the trucks.   More than half of trucks sold in the last week of quarters were sent with Certificates of Origin even though the customers had not yet paid Terex.   CW 14 quantified this as six to ten trucks at the end of each quarter that were delivered to customers with a Certificate of Origin even

though the customers had not yet paid Terex.  She/he noted that this left Terex with no collateral in case the customer declined to pay or took longer than the agreement called for to pay.

97.     According to CW 14, the practice of shipping trucks and Certificates of Origin at the same time was "**_driven from corporate, top-down.  It was do or die._**"

98.     Terex would also boost sales by pressuring customers to take delivery of products before the customers wanted them.  In order to get a customer to agree to accept an order before it really wanted it, Terex would offer the customer 90 days with no payments so that there was no cost to the customer of doing so.[9]  Road Machinery Services ("RMS"), a Terex customer based out of North Carolina, was a frequent target of pressure from the Roadbuilding division to take on inventory payment free before RMS actually wanted it.  RMS was the single largest buyer of Terex Trashmaster compactor equipment.  The former Terex employee who worked in sales for the Roadbuilding division noted that shipping products to customers early in order to recognize revenue occurred often, especially at the end of 2007.

99.     This was confirmed by CW 26, who stated that in 2007 and 2008, in order to meet sales at quarter's end, her/his supervisor Denny would tell her/him that RMS had agreed to buy the needed number of units, but would not pay for them until RMS had sold them on to its own customers.  According to CW 26, it was essentially a consignment arrangement, but Terex reported it just like a regular sale.  RMS was given "deferred billing until as long as it took to get it sold and never paid for them until they were sold."  According to CW 26, this happened repeatedly throughout 2007 and into 2008.

_____

[9] According to CW 1, the two employees most closely involved in actually convincing customers to accept merchandise sooner than they wanted it were Vice President of Sales Hirsch and Director of Sales Mike Rodriguez ("Rodriguez").

100.    According to CW 14, Terex also asked some customers to backdate receipts to indicate that the customers received trucks before the end of the month even though the customers did not.  As an example, CW 14 noted that a truck might leave the Terex facility on the last day of a month and not arrive to the customer until two days into the next month.  Terex sales people would then ask the customer to backdate the invoice so that it appeared that the sale occurred on the last day of the previous month.  CW 14 said that many customers regularly accepted this proposition.  This information was confirmed by CW 24, the former employee of Irving, who stated that, on multiple occasions, she/he was asked to sign invoices before trucks were completed.  Two people at Terex who asked CW 24 to sign invoices before the trucks were completed were Terex Plant Manager Ted Deckard and Meyers.

101.    According to CW 14, Terex also had a regular practice of delivering cement mixer trucks in the last ten days before quarter or year-end, even if the trucks were not finished or up to quality standards.  Every quarter, Terex delivered trucks with known problems (in order to get them out the door and improperly book sales) only to have to go retrieve the trucks the next week or send somebody out to repair them.  According to CW 14, two days after delivery Terex would lose money as it had to "repair or finish a truck," but in the meantime Terex had booked sales on the trucks in the prior quarter or year because the Company had purportedly "delivered" them.

102.    From 2007 through 2009 the practice got even worse - the practice was to "shove them out the door whether it was done or not."  CW 14 stated that almost half of the trucks delivered during that time had legitimate initial delivery complaints because Terex rushed them out the door to make numbers.  Put simply, the trucks were knowingly sent out wrong.

103.    This practice was so severe that Irving, the biggest Terex Advance Mixer customer, eventually told Terex that it would not accept deliveries in the last week of a month any longer

because the trucks that Terex sent during that period were consistently incomplete and had problems. This was confirmed by CW 24, who stated that Irving "got no trucks on the first of the month" but instead "got a ton at the end of the month." When CW 24 asked Terex employees why they always delivered trucks to Irving at the end of the month, CW 24 was told by the Terex employees that Terex was pushing trucks out at the end of the month to make its sales targets.

104.    **Failure To Timely Writedown Goodwill**: As set forth above, Defendants were able to mask known declining demand for the Company's products – and maintain their unattainable financial projections – through a variety of improper and premature revenue recognition tactics. Defendants furthered their fraud by reporting hundreds of millions of dollars of goodwill to the market during the Class Period, despite the fact that the goodwill was severely impaired and Defendants knew it.

105.    As early as the Summer of 2006, Terex began investigating a number of different avenues to raise capital and divest the Company of poorly performing businesses. When Riordan joined Terex in 2007, he brought in a strategy expert who analyzed all five divisions of Terex - Cranes, Roadbuilding, AWP, Mining and Construction. The strategy expert then gave his report to Riordan. CW 1 was very familiar with the strategy expert's Roadbuilding analysis because CW 1 helped provide data to the strategy expert. The strategy expert asked for all sites to give him a tour and for each site's data about headcounts, facility square footage, revenue dollars per square footage, and other details. The strategy expert's analysis had the same format for each Terex division. The report was created in Excel and CW 1 reviewed a copy of it.

106.    After the strategy expert completed his analysis, Riordan, Jones and other Roadbuilding executives discussed possible solutions, and eventually, Riordan decided to put the

Roadbuilding division up for sale.  The sale discussions began within six months of Riordan's January 2007 arrival.

107.    The efforts to sell the Roadbuilding division were kept secret and known within Terex as "Project Cowboy."  Jones received all reports regarding Project Cowboy.  After Ellis replaced Jones, in approximately March 2008, Ellis took control and began receiving all reports.  As Terex was discussing the possible sale, Terex executives sent letters to a few select Roadbuilding employees who would be called upon to assist with the sale and transition.  CW 1 received one of those letters and a proposed Retention and Separation Agreement dated September 7, 2007, promising a bonus calculated as a percentage of her/his salary, plus a lump sum payment if CW 1 remained with Terex's Roadbuilding division through the sale and assisted with the transition.

108.    There were at least two entities that expressed interest in the proposed sale of the Roadbuilding division.  One of those prospective purchasers was "Atlas."  The offer from Atlas was between $180 million and $190 million – an amount deemed insufficient by Terex to cover everything Terex had spent acquiring the various Roadbuilding businesses included in the proposed sale.  CW 1 received and reviewed documents from Jones describing the Atlas offer.  The documents provided by Jones describing the offer listed Riordan as one of the recipients.  The Atlas offer was not an offer that Terex was even willing to entertain.  Thereafter, DeFeo sent a letter saying the Roadbuilding division was not going to be sold at this time, and Riordan personally went to Oklahoma City to deliver that message to Terex employees.

109.    Following Terex's failed efforts to sell the Company's Roadbuilding division, Ellis stated, several times during monthly meetings held in Ellis' office during early to mid-2008, that the Roadbuilding division was not an attractive business because of all the goodwill Terex had on its books and that the Company wanted to include in the selling price.  According to what Ellis told CW

35

1 and others, the interested purchasers did not think the Roadbuilding division was worth near the value Terex placed on it when Terex's goodwill was included in the price. These discussions with Ellis were in approximately late 2007 to mid-2008.

110.    By the first quarter of 2008, executives in the Roadbuilding division were holding weekly meetings to try to figure out how to utilize capacity because orders and consequently production were down so much. CW 1 saw unused capacity and underutilization from first quarter 2008 on through. According to CW 1, Terex management was definitely aware of what was going on throughout the Roadbuilding division. There were a lot of questions about what was going to be done with the Roadbuilding division by Terex top executives. CW 1 stated Riordan knew all the sales and capacity numbers, that Riordan and Ellis "worked on it quite a bit," and that "Tom [Riordan] was very hands on with the numbers." CW 1 knew this because she/he met with Riordan during 90% of Riordan's visits – at least every three to five months, but much more frequently in 2008 as capacity got to be an increasingly apparent issue.

111.    On one occasion in approximately March or April 2008, CW 1 went up to Fort Wayne, Indiana to meet with Riordan for the quarterly review of the business with Riordan and Ellis. She/he attended this quarterly review with Riordan, Ellis, Nadeem (the new head of the Fort Wayne facility), representatives from the Cedar Rapids Paving group, as well as representatives from Terex Bidwell, based in Canton, South Dakota. CW 1 recalled that the meeting was just after Nadeem joined the Company because Nadeem was still struggling with the numbers due to his recent arrival.

112.    **Improperly Reporting Intercompany Transfers As Sales**: In addition to the foregoing, Terex overstated its reported financial results by improperly reporting intercompany transfers as sales. According to Plaintiffs' investigation, Defendants booked at least $350 million in sales from improper intercompany transfers. These allegations were confirmed or corroborated by

36

many of Plaintiffs' Confidential Witnesses, including CW 17, the former Consultant, and CW 18, the former Manager of Global Aftermarket Revenue.  As a result, Terex's sales, margin, and revenue were materially overstated at all times during the Class Period.

113.   For example, CW 17 who worked as the Manager of Consolidation in Terex's Corporate Accounting department stated that she/he discovered major accounting problems with Terex shortly after arriving at the Company.  Moreover, she/he told the Company's Controller, Clair, about transactions that were booked as sales **with** profit margins, but which should have been booked simply as intercompany transfers.

114.   CW 17 stated the improper intercompany transfer problem was "serious" and resulted in revenue being recognized incorrectly.  ***She/he recalled that there were "big discussions" among Terex executives about how to treat the problem***.  CW 17 specifically recalled that Terex Construction, Cranes, and AWP were booking intercompany transfers improperly as sales, and that the practice had been going on for at least three years, or more.  CW 17 stated one of the biggest violators in terms of dollars was the Company's Construction division, which accounted for significant amounts of improperly recognized revenue.

115.   Describing the intercompany transfer scheme in more detail, CW 17 stated that in Europe, the Company was moving and selling inventory and booking ***profit*** on the sale, even though the transactions involved nothing more than interaction between Terex subsidiaries.  CW 17 gave the following example:  Two related Terex entities, one of which sells a tractor to the other, for $4 million, and books it as a sale, including profit.  The other entity puts the tractor in its inventory to cover it up, and then sells it to a customer, also booking that transaction as a sale.  As CW 17, who has substantial experience in auditing issues, stated, "[i]f that is intentional, that is absolutely fraud." At Terex, CW 17 stated the practice had been going on for "at least a couple of years."

116.    CW 17's analysis of the Company's improper revenue recognition scheme was not simply general or anecdotal.  She/he has first hand, direct knowledge, and her/his study of the problem was "down to the penny."  Moreover, she/he reported the information to Clair and Riordan. In response, Riordan sent an email to CW 17 and expressed concern that if Terex came forward and announced that its books were overvalued because of the intercompany transfer problem, Terex would lose credibility in the market.  CW 17 stated Terex and Riordan did not want to go public with information showing the reported numbers at Terex were unreliable.

117.    Undeterred, CW 17 told Riordan there was "no magic you can do" and that the Company had to book the entries correctly and face the consequences.  When Riordan continued to complain, CW 17 told Riordan there was nothing else to do.  CW 17 had been hired to confirm every transaction and to identify mistakes that needed to be corrected.  Although she/he did exactly that, Terex executives did not want to reveal the truth.  Rather than do so, the Company terminated CW 17's contract just prior to the finalization of Terex's third quarter financial reports for 2009.  CW 17 said the timing of the dismissal from Terex was very unusual, and she/he believes she/he was let go because she/he refused to help Terex executives, including Riordan and Clair, find a way to conceal the revenue recognition problem or to secretly correct it.  Moreover, CW 17 believed Evans, the former Director of Corporate Accounting, was asked to leave the Company in early 2009 because she also objected to the improper accounting practices.  Therefore, it was clearly known within Terex and by the Individual Defendants that the Company's reported financials were bloated by bogus intercompany "sales."   Rather than come clean and face the consequences, Defendants terminated employees who objected and tried to sound the alarm.

118.    Likewise, CW 18 unequivocally stated that Terex "improperly recorded intercompany transfers as sales."  For example, she/he stated Terex Fuchs in Germany sold items to Terex in the

United Kingdom, and that the parts or equipment sold were recorded as sales with a profit margin for Terex Fuchs.  Then, when Terex United Kingdom sold the parts or equipment to a customer, the Company would also book it as a sale.

119.    CW 18 learned about the improper intercompany transfer practice almost as soon as she/he arrived at Terex.  CW 18 was tasked with reviewing "sales reports" for the various Terex factories that made and sold Terex parts.  When she/he calculated the numbers underlying the sales reports, she/he quickly realized the sales were being double counted because intercompany transfers were wrongly booked as sales.  For example, CW 18 knew a Terex factory in Motherwell, Scotland sold parts to the Terex Construction distribution facility in Southhaven, Mississippi.  Those parts were booked as actual sales and even included a profit margin for the Company's Motherwell facility.

120.    CW 19 also had knowledge of the illicit intercompany transfers.  According to CW 19, intercompany sales from Belgium were priced at cost plus 10 percent to the Company's Oklahoma City operations.  Yet, Terex Roadbuilding facilities at CMI and Cedar Rapids, Iowa, charged Belgium different prices when buying equipment from U.S. Terex facilities to sell in Europe.

121.    Shortly after arriving at Terex in July 2008, CW 18 and Gurney, the Director of Terex Construction, began working on the 2009 budgets.  That process revealed a large number of intercompany transfers improperly booked as sales.  Through the budget process, CW 18 learned that Terex claimed $750 million in sales reports, but really it was only $400 million because $350 million was from improper intercompany transfers.

122.    Because of the huge amount of improper sales, Gurney and CW 18 notified the Company's Finance department in Westport, Connecticut about the problem.  The response from the

Company's Finance department was that the Company understood its net sales were not as large as they appeared, but that the problem would be "taken care of or netted out" at year-end. Specifically, in late 2008 the Company's Finance department acknowledged to CW 18 that the problem existed with intercompany transfers being improperly recorded as sales. The Finance Department also told CW 18 that Terex would simply "take the adjustment at year-end" to fix the problem. There was no way to explain, however, how the year-end "adjustment" would work because, among many other things, Terex reported its sales to the market on a quarterly basis.

123. The intercompany transfer scheme had another consequence. CW 18 stated that Terex had at least a two-tier pricing system. When equipment was purchased for immediate delivery, it was known as "emergency" and came with a 5 percent discount off of list prices. When products were purchased as "stock" with a 14 or 21 day lead time, they came with a 15 percent discount off list price. As a result of the discounts offered to customers, it frequently was the case that a Terex subsidiary "purchased" the equipment from another subsidiary at a higher price than it was able to get from the end user/customer. ***Put simply, the intercompany transfers were at higher prices than sales to bona fide customers***. Even with discounting to customers, Terex prices to customers were not competitive because there was so much markup internally between subsidiaries as a result of the intercompany transfer scheme: offering a discount off the high intercompany transfer price was not enough to provide Terex with competitive pricing to its customers, so Terex lost sales as a result.

124. In addition to the foregoing, CW 17 identified several very large transactions on the books at Terex that were suspicious and lacked adequate support, detail, or documentation. When CW 17 pressed for more details, she/he started having problems with Company executives, including Clair, who told her/him "don't worry about it." But, CW 17's job duties included verifying the

accuracy of the Company's accounting.  Therefore, when CW 17 discovered these large revenue

recognition discrepancies – which were in the tens of millions of dollars – she/he had a meeting with

Clair and Greg Moskoff, who reported to Clair.  Their response was negative, to which CW 17 stated

that the problem was the Company was reporting the wrong numbers for five years.  Despite the

negative response, Clair told CW 17 that he had relayed the Consultant's concerns to Widman.

125.    Following up on the various, suspicious entries that lacked supporting details, CW 17

asked for documentation, and the Company simply did not have it.  For example, there was a $10

million entry that showed a credit in one account and a debit in another account, but there were no

details for what the transaction was for or any other details supporting it.  Interestingly, the entry was

for *exactly* $10,000,000.00 – which CW 17 stated was very, very unusual because most legitimate

transactions are not round numbers.  She/he brought the matter to Clair's attention but, although

Terex assigned someone to look at the matter, the Company never found any supporting details.  A

week later, the research into the matter was cancelled.  CW 17 stated it was clear Terex was not

serious about finding or exposing these substantial accounting and internal control problems.  This

former employee specifically shared her/his concerns with Clair, the Company's Controller, and

Moskoff.

126.    Terex's financial record problems were so severe that it was CW 17's opinion that no

one at Terex "knows the true accounts of the Company."  She/he stated that all of the Company's

executives, including Riordan, DeFeo, and Widman, knew about the significant problems and

absolute uncertainty in the Company's books.  Indeed, Clair told CW 17 that information on the

Company's faulty accounts was relayed to Terex's Executive Committee, which included each of the

Individual Defendants.

127.    On August 12, 2009, the SEC charged Terex with accounting fraud and filed a complaint against Terex in the U.S. District Court for the District of Connecticut (the "SEC Action") for, among other things, "recording improper entries that misstated [Terex's] earnings and concealed intercompany imbalances in its accounts."[10]  The SEC Action further supports the accounts of CW 17, CW 18, and CW 19, *supra*, and demonstrates Defendants' knowledge of both the improper intercompany transfer accounting and Terex's overstatement of its reported financial results.

128.    Indeed, the SEC Action, which Terex agreed to settle for $8 million on the day it was filed, alleges that from 2000 through June 2004, Terex's accounting staff failed to resolve imbalances arising from certain intercompany transactions.  Instead of investigating and correcting the imbalances, Terex improperly accounted for imbalances arising from intercompany transactions, and offset the imbalances with unsupported and improper entries to Terex's currency transaction account or its other deferred liability account.  The SEC Action alleges that "[t]he use of unsupported entries over a number of years created the potential for additional errors."  As a result, costs were not recorded as expenses, and, on a consolidated basis, Terex appeared to be more profitable than it really was.

129.    For example, the SEC action describes how Terex used intercompany accounts to make cashless settlements, and that these accounts were maintained between Terex's corporate office and its various subsidiary businesses and for transactions between business units.  The intercompany accounts should have balanced and if they did not, they should have been reconciled to determine the reason for the imbalance and then corrected.  But, Terex "did not properly resolve

---

[10] The SEC Action is styled *Securities and Exchange Commission v. Terex Corporation*, No. 3:09civ1281(AWT) (D. Conn. Aug. 12, 2009).  On top of alleging that Terex misled its own investors, Terex was charged with aiding and abetting a fraudulent accounting scheme at United Rentals, Inc., another Connecticut-based public company that did business with Terex.

the growing imbalances in these intercompany 'current' accounts between the Terex parent company and its subsidiaries.  Instead of investigating and correcting the problems giving rise to these imbalances, [Terex's Accounting Manager] offset the intercompany accounts that had debit imbalances against the intercompany accounts that had credit imbalances.  To the extent that the accounts remained out of balance, she typically made an entry into [the currency transaction account] that was the exact amount needed to make the balance sheet account balance."  The SEC Action describes how Terex's Assistant Controller engaged in similar misconduct.

130.    The SEC Action alleges "Terex knew, or should have known, of the entry the Accounting Manager made into the [currency transaction account] and of the manner in which that entry was calculated.  It was a recurring entry that was made every quarter and was not subject to review.  Terex's personnel knew, or should have known, that the balancing entry was improper under Generally Accepted Accounting Principles ("GAAP") because that entry was not properly supported or calculated."

131.    The SEC Action concluded that "Terex had many deficiencies in its internal controls and recording [sic] keeping over the course of several years that facilitated its wrongful accounting for those transactions.  Among other things, Terex failed to properly identify, record, and reconcile its intercompany imbalances, made incorrect entries into its [currency transaction and other deferred liability] accounts that concealed the unreconciled amounts, and failed to implement proper internal controls to ensure that transactions were properly recorded."

132.    The allegations of the SEC action corroborate and lend additional weight to the accounts of CW 17 and CW 19, each of whom detailed severe intercompany accounting failures at Terex.  Moreover, the fact that Terex rapidly settled on the SEC Action on the day it was filed indicates that Terex and the Individual Defendants had prior knowledge and discussions (most likely

43

during the Class Period) with the SEC concerning its investigation into Terex's fraudulent accounting practices and the SEC's intent to file the SEC Action. These facts provide clear evidence of Defendants' scienter concerning Terex's serial intercompany transfer and accounting deficiencies, which rendered Terex's Class Period financial statements materially false and misleading.

## VII. MATERIALLY FALSE AND MISLEADING ISSUED STATEMENTS DURING THE CLASS PERIOD

133. On February 20, 2008, Terex issued a press release announcing its financial results for the fourth quarter and year-ended December 31, 2007. The press release, which included Defendant DeFeo's comments on Terex's results, stated, in pertinent part as follows:

> *"For Terex, 2007 was a very strong year in terms of financial performance, with our best sales quarter of the year coming in the fourth quarter. This was a transformational year for our Company, as it demonstrated that the changes made as part of the journey we embarked on a few years back are taking hold and working,"* commented Ron DeFeo, Terex Chairman and Chief Executive Officer. "We achieved a full year operating margin of 10.5%, net sales grew 19.5% and income from continuing operations was up 55% when compared with 2006. These achievements place us well ahead of the pace we communicated a year earlier in conjunction with our medium term financial goals, and yet the operating margin improvement is still below the potential that we think exists in the Company. We achieved these goals while continuing to have certain product lines of the Company face challenging market conditions in their particular niche. We have benefited from strong global markets, as well as a relatively small exposure to the U.S. housing market; in fact non-U.S. net sales represented 70% of our total net sales for the full year 2007.

> Included in this release is our initial outlook for the 2008 fiscal year, said Mr. DeFeo. *Reflecting on where we are today with respect to our objective of $12 billion in sales and a 12% operating margin by 2010, we feel we are ahead of our original timeline.*

>                     *        *        *

> *Net Sales: Net sales reached $2,586.3 million in the fourth quarter of 2007, an increase of $556.8 million, or 27.4%, from $2,029.5 million in the fourth quarter of 2006.* Global infrastructure spending continues to drive *increased demand in most of our product categories, particularly cranes*, mining, and materials processing equipment*, as well as the continued strength of the aerial work platforms product category in North America. Sharp increases in demand are also being experienced in Europe for construction equipment and aerial work platforms.*

\*　　\*　　\*

**"We are poised to have another record financial performance in 2008,"** said Mr. DeFeo. **"We expect generally strong global markets to continue to drive demand for our equipment. Add to that our expectation that we will have the ability to produce at greater volumes and with improved productivity, and 2008 looks to be a significant step forward towards our corporate 2010 objective. It is our expectation that Terex's total revenue for 2008 will be between $10.0 and $10.5 billion, and earnings per share in the range of $6.65 to $7.15 per share,"** continued Mr. DeFeo. **"Expectations are for earnings in the first and second half of 2008 to be approximately equal. Additionally, we expect our first quarter results to be approximately 35% - 40% of our first half guidance."**

Fourth Quarter Segment Performance Review

Terex Aerial Work Platforms: **Net sales for the Terex Aerial Work Platforms (AWP) segment for the fourth quarter of 2007 increased $71.9 million, or 14.0%, to $585.9 million versus the fourth quarter of 2006.**

\*　　\*　　\*

Terex Construction: **Net sales for the Terex Construction segment for the fourth quarter of 2007 increased $113.8 million, or 26.3%, to $546.1 million versus the fourth quarter of 2006.**

\*　　\*　　\*

Terex Cranes: **Net sales for the Terex Cranes segment for the fourth quarter of 2007 increased $161.2 million, or 32.1%, to $663.0 million versus the fourth quarter of 2006. Excluding the translation effect of foreign currency exchange rate changes, net sales increased approximately 22%.**

\*　　\*　　\*

Terex Roadbuilding, Utility Products and Other: **Net sales for the Terex Roadbuilding, Utility Products and Other (RBUO) segment for the fourth quarter of 2007 decreased $14.4 million, or 7.4%, to $179.3 million versus the fourth quarter of 2006.**

134.    The next morning, on February 21, 2008, erex hosted a conference call to discuss its fourth quarter and year-end 2007 financial results and operations.  Defendants DeFeo, Riordan and Widman participated in the call on behalf of the Company.  Commenting on the Company's financial performance, DeFeo stated, in pertinent part as follows:

45

Overall we are pleased with Terex operating and financial performance in 2007. This was a pretty important year for us. We faced a number of challenges and we feel we handled them reasonably well with an ability to continue to build capability for the future. Meaningful shifts took place in our business. These shifts support the overall growth and margin improvement strategies that are being deployed. For the full year non-U.S. business represented 70% of our total net sales. The sales downdraft from U.S. housing began in mid 2006 so we had a full year effect in 2007. ***We were able to offset the rather small exposure that we do have to the U.S. housing market* to *begin and continue to grow our business in markets where area work platforms and cranes*** and mining equipment ***are still relatively quite strong.***

135.    As the call continued, Widman spoke positively about Terex's business stating in pertinent part as follows:

> ***We also had strong volume performance in the aerial work platform and construction segments.***
>
> \*         \*         \*
>
> ***Let's move on to a quick review of the full-year performance. Our growth trajectory on net sales continues to put us on track to achieve our 12 by 12 in 2010 objective.***

136.    DeFeo also stated, with regard to Terex's 2008 opportunities, that:

> ***What we know gives us confidence that we will have another great year at Terex. We think the fundamentals are strong and the negative market trends in the U.S. and perhaps in some markets in Europe will not overwhelm the positive momentum in our business. We specifically expect to substantially grow revenue and believe we will end the year with net sales in the 10 to $10.5 billion range.*** We do think we will get, -- we do not think, rather, we will get the lift from currency that we did in 2007. So this growth is mostly internally generated.
>
> ***Earnings per share are expect to be in the $6.65 to $7.15 range. This is a pretty nice growth over 2007.***

137.    During the question and answer portion of the conference call, an analyst asked a question concerning the trend of AWP orders for the year.   In response, Defendant Ford, the President of Terex's AWP division stated, in pertinent part:

> In the fourth quarter, as Tom said, our sales were down high single digits. I think what we saw was customers were reluctant to commit in the environment we saw in the fourth quarter, but as we got late into the quarter and ***into the early part of '08, the order pattern has actually been quite encouraging. Orders were reasonably***

46

***strong in the fourth quarter and into the early part of the first quarter*** with some of the larger customers placing some orders early.

138.    Nichols, the President of Terex Cranes concurred by stating, in relevant part:

I would agree with that. I think being in the business a very short period of time I definitely see real opportunity to grow capacity and capability of the cranes business both locally and on a much larger geographic basis. ***And the demand is there,*** if we can grow that capacity and capability both from a footprint standpoint and from a supply-chain standpoint.

139.    On February 27, 2008, Terex filed with the SEC its Annual Report on Form 10-K for the year ending December 31, 2007 (the "2007 10-K"), which confirmed the previously announced financial results and was signed by DeFeo, Widman, and Carter.  The 2007 10-K further stated, in relevant part:

***2007 was another year of solid performance for Terex***, as we continued to benefit from global economic growth driving strong end market demand.  We focused on numerous internal initiatives to grow sales and profitability as we transform from a holding company to an integrated operating company.  We have also benefited from global growth driven by strong economies in North America and Western Europe and improving standards of living around the world.  Although we expect slower economic growth in 2008 in North America, and to a lesser extent in Western Europe, ***our strategy of product and geographic diversity is expected to drive sales growth that will allow us to remain on pace to achieve our goal of $12 billion in sales with a 12% operating margin by 2010.  Demand for infrastructure and energy has resulted in extraordinary demand for our cranes.***

140.    The statements referenced in ¶¶133-39 were each materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Demand was not strong or increasing. In fact, since before the Class Period, demand was on the decline.  In order to mask the dramatic decline and slowdown in the Company's business and dwindling demand for its products, Defendants manipulated the Company's accounting, violated GAAP and ran roughshod over Terex's own internal controls and revenue recognition policies in order to prematurely recognize revenue and sales that should have been recognized in later financial reporting periods, thus boosting the Company's apparent financial performance.

- Defendants' untoward practices, including the Truck-Stop-Two-Step and delivery of unfinished products (or those with known defects), were purposefully timed at the end of each quarter so that Terex could report results that met market and analyst expectations, creating the appearance that the Company's financial performance was much better than it actually was.

- Based on the material decline in demand for its products and the build up of excess finished inventory, Defendants lacked a reasonable basis for their positive statements that Terex would able to meet its objective of $12 billion in sales and a 12% operating margin by 2010.

- As result of the abysmal failure of the secret "Project Cowboy" as well as other reasons, it was well known, by no later than December 31, 2007, that the Company's reported goodwill – which amounted to hundreds of millions of dollars – was materially and permanently impaired. While they were reporting "no indicators of goodwill impairment," Defendants were fully aware Terex was grossly overstating its income and assets by failing to timely record an impairment in the value of its reported goodwill. Nonetheless, Defendants knowingly or recklessly caused Terex to delay the recognition of its goodwill impairment until almost the very end of the Class Period, when the Company announced its approximate $460 million goodwill write-off, including 100% of the goodwill attributed to Terex's Roadbuilding division.

- The Company failed to maintain any semblance of adequate controls over its financial reporting, which regularly included premature revenue recognition that manipulated market expectations, inflated the price of Terex stock, and misled the market. For example, rather than evidencing the "best sales quarter of the year," the Company's fourth quarter 2007 represented the fruits of Defendants' fraudulent scheme and accounting.

- As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, revenue projections and financials, as well as its future business prospects.

141. In response to Defendants' false and misleading statements, on February 21, 2008, the price of Terex common stock rose $4.52 per share, or 7%, from a closing price of $62.21 on February 20, 2008 to close at $70.27 per share on February 27, 2008.

142. On March 4, 2008, Terex hosted a conference call at the Citigroup 21st Annual Global Industrial Manufacturing Conference to discuss its fourth quarter and year-end 2007 financial results. DeFeo participated in the call on behalf of the Company. DeFeo spoke positively about Terex's business stating in pertinent part as follows:

As a reminder, we set goals for 2010. Our stretch goals. We talked about $12 billion of revenue, 12% operating margins in 2010. You see where we ended up in 2006. We actually set these metrics a year ago. ***We're on the growth curve, probably a little ahead of the sales trajectory.***

\*       \*       \*

***Just to reiterate a little bit of our performance here and guidance, sales guidance, 10 to $10.5 billion.*** Again, expected some coming from our acquisitions but not significant this year. ***EPS in the $6.65 to $7.15 per share. So significantly up from this year.*** And we're pretty optimistic in terms of hitting these levels. I think everything doesn't have to go right. There's going to be a balance of things that go wrong. But if everything goes right, we're probably towards the high end. If a few things go wrong, that are pretty darn significant, we might be towards the low end but we try to balance our objectives here, being as real as we can and given the significant demand outside of North America, ***we're pretty confident in terms of the growth ambitions we have.*** And you can see the historical pattern there.

143.    The statements referenced in ¶142 were each materially false and misleading when made for the reasons set forth in ¶140 and the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶142 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Contrary to DeFeo's statement that the Company was on a "growth curve," Terex was experiencing a dramatic decline in demand for its products and a concomitant, substantial build-up of excess inventory.  The only way Defendants could maintain the "growth curve" façade was to engage in a bevy of fraudulent revenue recognition practices, which were described in great detail by many former Terex employees with firsthand knowledge thereof.  DeFeo, like the other Defendants, had knowledge of these pervasive premature revenue recognition practices, but never disclosed them to the market during the Class Period.

- DeFeo's rosy, professed confidence in the Company's "growth ambitions" was a ruse designed to mislead the market.  Contrary to his statements, DeFeo, like the other Defendants, knew the Company was dining on a feast of misleading and deceptive accounting practices, internal control violations, premature revenue recognition games, and overstuffed goodwill.

- DeFeo and each of the Defendants knew the Company's touted financial projections sat on a cornerstone of GAAP and internal control violations, rendering false

Defendants' statements regarding the Company's expected financial performance and future business prospects.

144.    On April 23, 2008, Terex issued a press release announcing its financial results for the first quarter ended March 31, 2008.  In the press release, the Company raised its earnings per share guidance and sales projections, stating ***"we now anticipate earnings per share for 2008 to be towards the middle to high end of our previously announced range, or $6.85 to $7.15 per share, on net sales of $10.5 to $10.9 billion."***  The guidance was raised from $6.65 to $7.15 per share on net sales of $10 to $10.5 billion.  For the quarter, the Company reported net income of $163.3 million, or $1.59 per share, and net sales of $2,362.7 million.  Defendant DeFeo commented on the results, stating, in pertinent part, as follows:

> We are pleased with the first quarters results, with both net sales and net income growth posting solid double digit percentage increases versus the prior year. The strength of international end markets and the continued strength of the domestic U.S. `in-the-air' products yielded excellent results in our Aerial Work Platforms and Cranes business segments. Continued demand for commodities drove favorable results for our Materials Processing & Mining business segment. The performance of the balance of our businesses, namely the Construction, Roadbuilding and Utility operations, were somewhat disappointing for the quarter. We believe, however, that the near term outlook is positive for the Construction segment, and that its operating margin will improve in the mid-year period and lead to good margin expansion on a year-over-year basis in 2008. In general, we think that all of our operations continue to have solid prospects heading into the remainder of the year.

> *           *           *

> In February, we provided earnings guidance for our 2008 performance, indicating that we anticipated earnings per share to be between $6.65 and $7.15 and net sales to be between $10.0 and $10.5 billion. ***Given our strong performance this quarter, balanced against the uncertainties surrounding some of our end markets and increased input costs, we now anticipate earnings per share for 2008 to be towards the middle to high end of our previously announced range, or $6.85 to $7.15 per share, on net sales of $10.5 to $10.9 billion.***

145.    With regard to the Company's AWP, Construction and Roadbuilding and Cranes divisions, the press release stated, in pertinent part, as follows:

Aerial Work Platforms: ***Net sales for the Aerial Work Platforms (AWP) segment for the first quarter of 2008 increased $38.9 million, or 7.1 %, to $586.6 million versus the first quarter of 2007.*** Excluding the translation effect of foreign currency exchange rate changes, ***net sales increased approximately 5.8%.   Strong U.S. demand coupled with international demand, primarily in the Middle East, Russia and Eastern Europe, continued to drive higher sales volume.***

\*        \*        \*

Construction: ***Net sales for the Construction segment for the first quarter of 2008 increased $40.5 million, or 9.9%, to $448.3 million versus the first quarter of 2007.*** Excluding the translation effect of foreign currency exchange rate changes of $29.8 million and ASV sales since its acquisition of $21.3 million, ***net sales decreased approximately 2.6%.***

\*        \*        \*

Roadbuilding, Utility Products and Other: ***Net sales for the Roadbuilding, Utility Products and Other (RBUO) segment for the first quarter of 2008 decreased $9.6 million, or 5.4%, to $169.2 million versus the first quarter of 2007.***

\*        \*        \*

Cranes: ***Net sales for the Cranes segment for the first quarter of 2008 increased $131.4 million, or 26.2%, to $632.2 million versus the first quarter of 2007.*** Excluding the translation effect of foreign currency exchange rate changes, ***net sales increased approximately 15.4%.*** Very strong global demand, particularly for large crawler cranes and mobile telescopic cranes, continued to drive robust sales and order activity. Growth in rough terrain cranes sales in the quarter reflected North American and Middle East market strength, particularly from the energy sector, while sales of cranes in North America remained under pressure.

146.    Following issuance of the press release, Defendants held a conference call with analysts and investors to discuss the Company's first quarter earnings and operations.  Defendants DeFeo, Widman, Riordan, and Ford, as well as Isaman, and Nichols participated in the call.  During the conference call, Defendants reiterated the increase in Terex's full-year 2008 guidance to a net sales level of $10.5 to $10.9 billion and earnings of $6.85 to $7.15 per share.  During the conference call, DeFeo spoke positively about the Company's business and operations stating in pertinent part as follows:

*The first quarter performance we feel is another positive step in what we expect to be a milestone year for Terex on our way to the 12 by 12 in 10 goal.*

\*     \*     \*

*Lastly, we have some really strong businesses that we expect will stay this way and in fact, balance out our business portfolio. Look at the strength in cranes with a growth of 26% year over year in the quarter.* Materials processing and mining with a growth of over 42%. I know some had thought the area work platform business was teetering on the brink but the first quarter actually illustrated growth in both North America and International. For our construction business, there's definite softening of certain countries in Western Europe and the housing market in the U.S. remains quite weak. *However, we continue to view the current market place more as an opportunity than as a near-term risk.*

\*     \*     \*

*All in all, Terex remains strong and is getting stronger.*

147.    As the call continued, Riordan stated, in pertinent part:

*The markets continue to be reasonably strong on average as most regions continue to improve their infrastructure which drives demand for our products.* There are clear differences in the relative strength of various geographies. *We believe we're reasonably well-positioned for the current economic environment.*

148.    Discussing the AWP division, Ford stated, in relevant part:

*Our North American market has remained more buoyant than we thought it would in the fourth quarter. . . .The customer base in the U.S. is -- continues to perform well. We've had some market share gains that have been favorable for us. And frankly, all of our customers haven't put orders in for the year. So, we think that we're in a pretty good position for the remainder of the year in North America. We think North America will be a decent story for us this year.*

149.    The statements referenced in ¶¶144-48 were each materially false and misleading when made for the reasons set forth in ¶140 and the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶144-48 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

52

- Given the reality of decreasing demand for its products as well as increasing inventory levels, together with the impairment of its goodwill, the Company's raised guidance lacked a reasonable basis, and served to both maintain and increase the artificial inflation in the price of Terex stock. Defendants were fully aware the Company's reported financial results depended upon a concoction of premature revenue recognition and an ongoing refusal to recognize the impaired value of Terex's reported goodwill.

- Terex's reported net sales, income, and margins were inflated through a variety of revenue recognition schemes, which served to mask declining demand.

- Defendants' statements regarding "near term outlook" and net sales were buoyed by the fraudulent financial reporting and improper tactics, such as the truck-stop-two-step, detailed herein.

- Rather than being "another positive step" towards the Company's "12 by 12 in 10" goal, Terex's reported first quarter performance was a grossly misleading indicator of the Company's true financial condition and future business prospects. Defendants' touting of the "12 by 12 in 10" goal thus lacked a reasonable basis when made.

150. On May 6, 2008, Terex filed its interim quarterly financial report on Form 10-Q for the quarter ending March 31, 2008, which confirmed the previously announced financial results and was signed by Widman and Carter (the "First Quarter 10-Q"). In the First Quarter 10-Q, Defendants for the first time revealed that Terex had updated its forecast to address the impact of changes in business conditions in the Company's Roadbuilding division. The First Quarter 10-Q stated in pertinent part as follows:

As of March 31, 2008, the roadbuilding reporting unit within the Roadbuilding, Utility Products and Other segment did not meet the forecasted business performance used in the annual goodwill impairment test as of October 1, 2007. The downturn in the U.S. residential housing market and limited funding for infrastructure projects, has negatively impacted the businesses in which this reporting unit operates.

The Company updated its forecast to address the impact of changes in business conditions and performed a goodwill impairment test as of March 31, 2008 for the roadbuilding reporting unit. The roadbuilding reporting unit passed the test and no impairment charge was recorded. The Company will continue to monitor the estimated fair value of the roadbuilding business for purposes of determining whether impairment is evidenced. The amount of goodwill recorded for the roadbuilding reporting unit as of March 31, 2008 was $34.4.

151.    In response to this partial disclosure, which caused a portion of the artificial inflation in the price of Terex stock to come out, the Company's common stock fell more than 4.9% from a closing price of $74.80 on May 6, 2008, to close at $71.91 on May 7, 2008.

152.    Notwithstanding the partial revelation of Terex's true financial condition and future business prospects that were found in the First Quarter 10-Q, Defendants were able to continue maintaining artificial inflation in the Company's stock price in the days and months thereafter by continuing to make materially false and misleading statements.  For instance, two days later, on May 8, 2008, the Company hosted a conference call at the Banc of America Securities BASics/Industrials Conference.  During the call, DeFeo again spoke positively about Terex's business stating in pertinent part as follows:

> Moving to the specifics of our company, *we have a very strong and diversified revenue base.* Our income from operations in '07 increased 36%, 19% higher sales. *Income in the first quarter was up 28% on a 17% increase in sales.* And our geographic business diversity is an important part of the company. 70% of our overall revenue comes from markets outside the United States. You see the 12-year compounded annual growth rate of 27%. I think it is a pretty remarkable compounded annual growth rate, 27%. *So in many respects, Terex has taken the machinery industry and found a way to both grow organically, in part help from the market,* and grow through acquisitions by buying good companies or companies that could be significantly improved at the right time. Europe, Africa, Middle East represents 48% of our business, the US 30%, and you can see the distribution on the pie chart on your left.
>
> *        *        *
>
> Aerial Work Platforms, what drives this business, increasing labor rates, tightening worker safety regulations and driving demand and developing markets. This is a mature market but *demand is still fairly strong*, but the opportunities for future growth, not tomorrow, not next quarter, but over the next several years will clearly be there in many developing market as safety regulations get put in place.
>
> *Our Construction segment, probably one of the biggest opportunities we have in our portfolio of businesses,* being managed by a leader that we recruited from United Technologies about a year-ago, a real lean expert, a fellow that ran the Otis Elevator business in China for five years, a fellow that's really taking this business and building it into a more cohesive group of companies. It is European focused today. There are large markets that we have small shares in, and the weak dollar has hurt

this business because most of our factories are located in Europe, so importing back to U.S. has not been very pleasant. But as we look forward, *we're building sales* and service capabilities. We are emphasizing sourcing and production now in low-cost countries. We acquired ASV to give us access to a more focused small equipment manufacturing or -- distribution base and we think there is opportunities to combine with our other product lines.

*Turning to the Crane business, one of the strongest businesses in our industry*, it is typically considered a late cycle business. We think the reason this business is going to continue to be strong is because there is a lot of fundamentals that need cranes and the market has consolidated over many years. *Strong demand at least through 2010*. We are clearly the market leaders above 300-ton capacity. We think pricing and volume leverage are going to drive our margin improvements. You've seen our first quarter numbers. We had a 13% operating margin. It's about 300 basis points ahead of last year.

                    *        *        *

Sales and backlog, we've got a tremendous backlog as a company. *Sales at AWP were up 9%*, backlog up 4%, I view that as a relatively flat backlog. *Our Crane business, sales up 26%*, backlog up 70%. This is both a blessing and a curse simultaneously. Backlogs that are as high as we have in the Crane business, which are close to $2.5 billion, that's too high. We're taking orders for 2009, 2010, and some of those orders are not showing up in this backlog because our backlog as defined is only orders that we plan to ship in the next 12 months.

*Our Construction business, revenue up 18%*, backlog up 48%. Materials Processing and Mining backlog increased, that's nice as well. Roadbuilding and Utility backlog was down and sales were down. *So overall, some really strong segments and a couple that are laggards.*

153.    In response to Defendants' false statements on May 8, 2008, the price of Terex common stock remained inflated, rising slightly by $0.27 per share to close at $72.18 per share. But for Defendants' continuous false and misleading statements, which were designed to and did maintain the artificial inflation in Terex's stock, the price of Terex stock would have declined.

154.    On May 30, 2008, Terex hosted a conference call at the Sanford C. Bernstein & Co. Strategic Decisions Conference.  Defendant DeFeo and Kirk Goddard participated on the call on behalf of the Company.  During the call, DeFeo made several false and misleading statements

designed to minimize the impact of the economic downturn in the economy on the Company. DeFeo

spoke positively about the Company stating in pertinent part as follows:

> We have a fairly strong and diversified revenue base. Income from operations in 2007 was up 36% on 19% higher revenue. **Income from operations in the first quarter was up 28% on 17% higher sales. We had a 46% increase in earnings per share.**
>
> \*      \*      \*
>
> So that is our area work platform business. **It's a highly profitable segment as some of you know.**
>
> \*      \*      \*
>
> Let me turn to our crane business. **The crane segment is operating at a fairly high level, incredibly strong demand which we see at least through 2010 and frankly I think probably beyond that.** We are the market leader above the 300 ton capacity. That means big cranes, big lattice boom cranes, not the tower cranes although we do make tower cranes but we're not the market leader there. We think there are pricing and volume leverage opportunities that will drive margins.
>
> Now more specifically nonresidential construction in our crane business our crane business is a demonstration of that. **It is incredibly strong and I expect it to continue to be strong**.
>
> \*      \*      \*
>
> **The US credit crunch is more an issue for people who are going to make acquisitions and it's more an issue for people who have collateral and investments in mortgages and US housing. But when we sell equipment, our equipment is an asset.** That asset is definable, it's good business for lending institutions because they can determine what the residual value is typically going to be on that equipment and they can also determine what the cash flow is going to be from the use of that equipment. **So I don't see the credit crunch affecting our customers as much as people might think.**

155. The statements referenced in ¶¶152 and 154 were each materially false and

misleading when made for the reasons set forth in ¶140 and the factual detail contained throughout

this Complaint. In addition, the statements referenced in ¶¶152 and 154 were materially false and

misleading when made because they represented and/or omitted adverse facts which then existed and

disclosure of which was necessary to make the statements not false and/or misleading.  The true

facts, which were known to or recklessly disregarded by each of the Defendants, were:

- The Company's reported revenue base was a misleading indicator of Terex's true financial condition.  Although DeFeo described increases in sales and income, he knew that Terex boosted its sales numbers in the AWP, Construction, Cranes and Roadbuilding divisions through a multitude of GAAP violations, including but not limited to, (a) moving inventory off-site through the truck-stop-two-step process, (b) fraudulently recording improper intercompany transfers as sales, (c) persuading customers to accept early delivery of Terex's products in exchange for vastly expanded payment terms, and (d) delivering incomplete and non-functional products to customers.  DeFeo, like the other Defendants, knew that all of the aforementioned fraudulent practices were timed to occur at quarter-end and/or year-end so that Terex could prematurely recognize revenue.

- Rather than experiencing strong demand, the Company had been and was experiencing the exact opposite.  Indeed, from prior to the Class Period, and clearly by May 8, 2008, it was apparent that demand for Terex's AWP products had declined significantly.  Demand was so soft that Terex was saddled with massive amounts of inventory and finished product that was piling up so high at Terex facilities that it was left to rust and deteriorate outside.  Put simply, Defendants had no rational basis to point to increased demand when, in reality, the opposite was so severely true that it was dragging down the Company's entire financial performance.

156.    On June 25, 2008, Oshkosh Corporation ("Oshkosh"), a competitor of certain of

Terex's divisions, warned investors that it expected to report a loss in the third quarter, citing a

slowing economy and weakness in the nonresidential construction market in North America and

Europe.  As a key weak point, Oshkosh pointed to its JLG access-equipment unit (a competitor of

Terex's AWP division), which makes lifts for workers who need to reach high objects like billboards

or street lights.  Oshkosh's announcement was a partial disclosure to the market of the fact that

Defendants' prior Class Period statements concerning Terex's AWP division were false and

misleading.  Indeed, following the downward revisions announced by Oshkosh, Bank of America

issued an analyst note stating that Oshkosh's announcement could have negative implications for

Terex.

157.     On this news, the price of Terex stock dropped more than 9% from a closing price of $59.17 on June 25, 2008 to close at $53.64 on June 26, 2008.

158.     Later on the same day that OshKosh gave its negative commentary, Terex hosted a conference call at the Wachovia Nantucket Equity Conference.   Ignoring the OshKosh announcement, DeFeo continued to paint an extremely rosy (and false) picture of Terex for the market stating in pertinent part as follows:

> And as a company, I think we've made real progress here. If you look at our revenue and financial performance, we've got a strong and diversified revenue base. ***Income from operations in the first part of this year is up 36%; versus last year, 19% higher. This is to 2007, 19% higher revenue. First quarter was up 28% income from operations on 17% higher sales.***
>
> *              *              *
>
> ***I set a goal a couple of years ago to go from about a $7 billion business to be 12 by 12 in '10, meaning $12 billion of revenue with a 12% operating margin in 2010. We're on course to do that. In fact, one might say we're ahead of course that we set out from a revenue point of view. It's going to require about 9.5% growth over the next couple of years compounded annually.***
>
> *              *              *
>
> The Crane segment--probably our strongest segment. It's pretty close with our Mining segment to see which is strongest. ***Great demand, we think, clearly through 2010.*** We've taken orders through 2010 on some of our product lines.  Frankly, we're very positive about the prospects. This is a big business, getting bigger, and the margins are expanding in the Crane area.

159.     DeFeo also downplayed any slow-down in the market for lift products, notwithstanding Oshkosh's earlier announcement concerning the rapid speed at which its business was deteriorating:

> In the interest of time, I'm going to just kind of go over. We see our business in late cycle, early cycle, middle cycle kind of segments with an underpinning at the bottom of what we see as a protracted mining and commodities-based business. So you might say, "Well, we see your most profitable segment, Aerial Work Platforms, we see that business rolling over and turning negative." ***And I say it may slow down. It may not be as strong this year as it was last year or next year as it is this year, but***

*frankly, that's going to be more than offset, in our view at this stage, by a very strong performance from our Crane and Mining business.*

160.    During a question and answer session on the conference call, DeFeo continued to misrepresent the Company's financial outlook by definitively stating "*I'm still going to make my 12 by 12 in '10 goal.*"  DeFeo's false statements halted the bleeding, *i.e.*, the artificial inflation that was coming out of Terex's common stock due to the OshKosh announcement, and maintained much of the artificial inflation that was present in the Company's common stock due to Defendants' fraud.

161.    The statements referenced in ¶¶158-160 were each materially false and misleading when made for the reasons set forth in ¶140 and the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶158-160 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- By highlighting the Company's "revenue and financial performance," DeFeo grossly misled the market as to the true reasons behind the Company's seemingly positive financial performance.  Despite discussing the purported reasons for the Company's reported financial success, DeFeo omitted any mention of the top-down premature revenue recognition practices, decreasing demand and the expansive inventory build-up.

- Rather than being "ahead of course to achieve "12 by 12 in '10," Terex was crumbling under the excessive weight of maintaining Defendants' charade.  Indeed, the Company was being crushed by the weight of materially decreased demand, which was masked by Defendants' fraudulent scheme detailed herein.

162.    On July 23, 2008, Terex issued a press release announcing its financial results for the second quarter 2008, ended June 30, 2008.  In the press release, Terex revealed that business in the Company's AWP division was slowing down and that the Company's construction business was becoming even weaker.  The press release stated, in pertinent part as follows:

The infrastructure and commodity boom is driving strong demand for our cranes and mining equipment. Based on our increasing backlog for these products, we expect

these positive trends to continue. Also, as expected, this was partially offset by slower growth trends in the Aerial Work Platforms (AWP) segment and further softening in the Construction segment. Though both AWP and Construction experienced growth this past quarter, slower growth in Western Europe impacted their performance.

163.     Then, the next day, during a conference call with analysts and investors to discuss the

Company's second quarter earnings and operations, Defendants disclosed more detail about the

softening of European demand for Terex products and its impact on  the Company's Construction

and AWP divisions.  Indeed, Riordan disclosed that the "AWP market in Europe ha[d] noticeably

slower order rates during Q2, and we expect that situation to continue for the balance of the year."

Defendants also, for the first time, revealed that Terex was having inventory issues.  Discussing the

status of inventory in the Construction division, Riordan stated, in pertinent part:

> In the construction business, we have too much inventory in our view, ourselves. Less about the channel and more the inventory that we have. And we are going to reduce production and it is affecting our near term outlook. And I don't think our customers, like other industry participants, have a lot of floor planned inventory. We just don't have the dealer network that a Caterpillar does, where the forward view of Caterpillar or Volvo or other companies that do a lot of floor planning, have. So the inventory issue we have is our own issue. And in the aerial work platform business, we're cutting production in order to get our inventories in line.

164.     In response to the conference call and accompanying press release, on July 24, 2008,

the price of Terex common stock dropped $3.40 per share, or 6.78%, to close at $46.72.

165.     Notwithstanding these partial revelations of Defendants' fraud, Defendants were able

to maintain artificial inflation in the Company's common stock price over the next several days by

continuing to make false and misleading statements designed to mute the impact of the partial

revelations.  For example, during a conference call on July 24, 2008, DeFeo stated, in pertinent part:

> ***We continue to see strength in several of our businesses, and believe that the strength in cranes*** *plus materials, processing and mining,* ***will offset the obvious slow downs in construction and aerial work platforms. The Terex portfolio is sufficiently diverse to balance a wide variety of change in any individual segment with offsetting effects in other segments.***

*We do expect the back half of this year, the earnings to be about in line with last year.* As Phil will explain, this is a more traditional income split between half years. *The full year EPS outlook represents about a 17 to 22% income growth compared with 2007. We are on track or ahead of the rate required to achieve our 2010 targets.*

166.    As the call continued, Widman stated, in pertinent part,

Our second quarter performance surpassed historic levels in several areas. *Net sales was a record for the period of $2.9 billion, up 25% overall and 14% excluding the translation impact of foreign currency exchange rate fluctuation and acquisitions.* While our income from operations of $371 million increased 30%. *Earnings per share increased to a record level of $2.32 from $1.66 in the prior year period.*

\*       \*       \*

Considering our strong year-to-date performance, the challenges and opportunities in some of our end markets, the anticipated input cost pressures and our response to these factors, *we are maintaining our full year 2008 guidance with an up sales level of $10.5 billion to $10.9 billion, and earnings per share of $6.85 to $7.15.*

167.    Discussing various parts of Terex's business, Riordan added:

*Our aerial work platform business had a very solid Q2 performance in spite of challenges of choppy markets and inflationary steel pricing.* As we discussed earlier this year, we expected to see this business grow moderately in 2008, which it's doing, up 5% from last year Q2. We're happy with the 18.6% operating margin in Q2, against a very tough comparison from Q2 last year.

*Revenue in the US and Europe were both up compared to a year-ago. In fact, we had a record revenue quarter in the US.* The AWP market in Europe has noticeably slower order rates during Q2, and we expect that situation to continue for the balance of the year.

US markets have remained fairly stable and our belief is the order rates will be reduced for the balance of this year. With a slower order rate expected in the second half, we're taking appropriate judicious actions to reduce build rates and overhead spending *while keeping inventory in line*. Overall we expect revenue for AWP to be flat to slightly up for the full year 2008 versus 2007 results.

\*       \*       \*

*Our construction business has done a very nice job in growing its top line.* Eastern Europe, Middle East, Africa, Russia and other areas continue to be strong as compared to softness that we see in Western Europe and the US. Even when you take out acquisitions and foreign exchange, we are up single digit revenue growth year to date versus last year.

\*      \*      \*

***Our cranes business had a truly remarkable quarter with revenue up over 48% and operating income more than doubling to $126 million.*** The crane segment is now our largest business.

\*      \*      \*

***Our road building utility segment had a solid quarter with revenues and operating margin up nicely.*** The road building business remains challenged with tough end markets in the US and solid markets in South America. We expect the US market to remain soft and we are continuing to stay focused on cost reductions and pricing to offset cost inflation. Utilities had a very nice quarter and we're expecting the underlying trends of gradual revenue and margin improvement to continue.

168.    Commenting further, Defendant DeFeo added, in pertinent part:

***Incremental margins from cranes*** and material processing and mining ***are expected to make up for the short falls with construction and AWP. Though the match-off won't be perfect, we believe that over time our strategy and goals will prove out.***

***The 2010 goals we set for ourselves look like they are within our reach,*** remembering of course that we set them when our revenue was around $7 billion about 24 months ago. Stretch goals were set and we continue to stretch. This is not going to stop at Terex, no matter what the economic environment. ***We are holding our full year outlook and remain confident about the future.***

We are not forecasting 2009 at this point, but ***believe that cranes*** and MP&M ***will remain strong, and that we will see AWP have a steady year. Construction will stay on course to improve in a challenging Western European environment, plus road building and utility improvements will continue. We feel still that the best is yet to come.***

***So as we look out to 2009, our view is that*** mining materials processing ***and cranes continues to be quite strong. Aerial work platforms will be steady as I indicated. I do believe we feel positive about the total Company's prospects, and in order for us to achieve our 12 by 12 in '10, we're going to have to continue growing the Company, growing our earnings and progressing toward that goal.  And while I don't know what the quarterly splits will be in 2009, or what the absolute number will be at this stage, we remain reasonably positive.***

169.    Defendants also made numerous false and misleading statements in the July 23, 2008 press release accompanying the company's 2008 earnings release.  The press release falsely stated, in pertinent part:

Results this quarter demonstrate the continued strength of our global franchise. *The infrastructure and commodity boom is driving strong demand for our cranes* and mining equipment. *Based on our increasing backlog for these products, we expect these positive trends to continue*

\*       \*       \*

The power of our strategy of product and geographic diversity is illustrated in our results," continued Mr. DeFeo. *"We have been able to continue to grow net sales and income through an evolving sales mix.*

\*       \*       \*

Mr. DeFeo said, *"We expect our performance for 2008 to be within our previously announced range for earnings per share of $6.85 to $7.15 and net sales of $10.5 to $10.9 billion.* We expect strong infrastructure and commodity demand trends for our Cranes and MPM segments to continue, which will drive a higher portion of our net sales and income for the balance of 2008."

Our global and product diversification has allowed the Company to perform well despite the difficult economic conditions in the U.S., softening of the markets in Western Europe and increasing input costs. *Demand remains strong for many of our products,* and we are continuing to invest in our business for today and tomorrow, particularly in developing markets such as China and India. We expect world demand for infrastructure, energy and mining products to continue, while at the same time we are positioning our businesses for the eventual recovery in the U.S. market. *We remain confident in our ability to achieve our previously stated goal of `12 by 12 in 10', which is $12 billion in revenues with a 12% operating margin by 2010.* By quickly adapting to changing market conditions in all of our segments and geographies, we are showing that we can provide products that meet our customers' needs worldwide*, and at the same time improve our financial performance* and invest in growth for the Company."

Net Sales: *Net sales reached $2,935.9 million in the second quarter of 2008, an increase of 25.3% from $2,342.2 million in the second quarter of 2007.*

\*       \*       \*

Second Quarter Segment Performance Review

Aerial Work Platforms: *Net sales for the AWP segment for the second quarter of 2008 increased 5.1%, to $672.7 million, versus the second quarter of 2007.* Excluding the translation effect of foreign currency exchange rate changes*, net sales increased approximately 1%. . . . AWP production is being adjusted to reflect anticipated demand in the second half of 2008 in the U.S. and Western Europe.*

\*       \*       \*

Construction: ***Net sales for the Construction segment for the second quarter of 2008 increased 23.6% to $620.9 million versus the second quarter of 2007.***

\* \* \*

Cranes: ***Net sales for the Cranes segment for the second quarter of 2008 increased 48.7% versus the second quarter of 2007, to $809.8 million.***

\* \* \*

Roadbuilding, Utility Products and Other: ***Net sales for the RBUO segment for the second quarter of 2008 increased 13.3%, to $191.3 million, versus the second quarter of 2007.***

170.    On August 1, 2008, the Company filed its interim quarterly financial report on Form 10-Q for the quarter ending June 30, 2008, which confirmed the previously announced financial results and was signed by Defendants Widman and Carter (the "Second Quarter 10-Q").  The Second Quarter 10-Q represented that the Company was performing strongly stating in pertinent part as follows:

> ***Financial performance during the second quarter of 2008 was strong and the outlook for our Cranes*** and Material Processing & Mining ***segments remains favorable. Demand for cranes,*** material processing and mining equipment ***is being driven by global infrastructure development and maintenance, rising energy demand and global commodity demand.***
>
> \* \* \*
>
> We remain confident that our strategy of product and geographic diversity is the right one for the industries in which we operate. Our relatively balanced mix of product types helps to moderate cyclical sales movements for Terex as a whole, as demand for one product may weaken, but be offset by demand for products in a different cycle. ***A balanced geographic sales mix also helps moderate demand swings for our products, as demand in one region may strengthen or weaken over different times as compared to demand in other geographies. For example, as the demand for Aerial Work Platforms products is expected to weaken during the second half of 2008 due to slowing demand and rising input costs, continued strength is forecasted from the Cranes*** and Materials Processing & Mining segments***, which are expected to contribute to stability in earnings. The results of the second quarter of 2008 support this strategic thesis, as strong financial performance by the Cranes*** and Materials Processing & Mining ***segments was a more significant driver of the financial results for the second quarter of 2008.***

64

*Based on discussions with our customers, industry experience and knowledge of our internal improvement initiatives, we remain confident in our ability to reach our 2010 targets of $12 billion in revenue with a 12% operating margin.*

\*       \*       \*

*Net sales for the three months ended June 30, 2008 increased $593.7 million when compared to the same period in 2007.*

171.    The statements referenced in ¶¶165-170 were each materially false and misleading when made for the reasons set forth in ¶140 and the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶165-170 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Defendants lacked a reasonable basis to state that weakening demand in certain of the Company's divisions would be offset by the positive performance of Terex's other divisions.  This was because any reported decrease in demand remained obfuscated by Defendants' premature revenue recognition practices.  In other words, demand was far less than Defendants represented throughout the Class Period.  The end result of the foregoing was that the market was materially misled at all relevant times, and Defendants lacked a reasonable basis for touting the Company's financial guidance.

- AWP was not set for a steady year and the Construction division was not on course to improve.  On the contrary, the Company was experiencing a dramatic decline in demand for its products in its AWP and Construction divisions.  According to CW 2, who was the former Global Director of Marketing for AWP, by the summer of 2008, business in the AWP division was rapidly declining and the Construction division was losing money.

- Demand for most of the Company's products was far from strong.  According to several Confidential Witnesses, including CW 1, the former Director of Operations for Roadbuilding, CW 6, the former Marketing Director for Roadbuilding, CW 14, the former Regional Sales Manager, CW 5, the former Cost Accountant, and CW 7, the former Senior Buyer, there was a dramatic slowdown in sales from 2007 through 2008.

- Inventory in the AWP division was not being kept "inline."  Instead, as set forth by CW 8, the former Material Cost Analyst, the AWP division, in the face of declining demand, nevertheless "kept making stuff but not selling it" leading to a significant

65

buildup of finished goods inventory. This substantial inventory buildup began as early as 2007. The excess finished goods inventory in the AWP division was so material that employee parking lots and even other people's property were used to store Terex's unsold AWP products.

- As a result of information learned as a result of "Project Cowboy" as well as other factors, the Defendants were well-aware that the Company's goodwill was materially impaired. Despite this, Defendants caused Terex to continue reporting hundreds of millions of dollars in worthless goodwill, and the Company failed to properly and timely account for the impaired assets until February 3, 2009. The result of the foregoing was that Defendants' statements regarding the Roadbuilding division's "solid quarter" and "revenues and operating margins up nicely" – as well as statements regarding the Company's financial performance and financial expectations – lacked a reasonable basis when made.

- Based on the dramatic decline in demand for Terex products and the build-up of excess finished inventory, Defendants lacked a reasonable basis for their positive statements that Terex was "on track or ahead of the rate required to achieve [its] 2010 targets."

172. Despite having reaffirmed its raised earnings and sales guidance in late July 2008, on September 4, 2008, Terex issued a press release titled, "Terex Updates 2008 Earnings Guidance and Confirms Terex Investment Analyst Meeting." In the press release, Terex *lowered* its 2008 full-year guidance and quarterly guidance, with new full-year 2008 earnings per share expected to be between $6.35 and $6.65, and net sales in the range of $10.2 to $10.6 billion. The previously announced range for 2008 earnings per share was $6.85 to $7.15 with net sales of $10.5 to $10.9 billion. Later that day, appearing on a conference call during the Terex Investment Analyst Meeting, DeFeo stated, in relevant part:

> Our estimates -- we took guidance down from $6.85 a share to -- $6.85 to $7.15 to $6.35 to $6.65, basically a $0.50 reduction in our earnings per share estimate for the balance of the year, principally because of our continued additional soft -- view of softness in our Aerial Work Platform business and in our Construction business, aerial work platforms mostly from both North America and Europe and construction mainly from Europe.

173.     Defendants also disclosed for the first time that the purported strong performance in the Company's Cranes and Mining divisions was no longer expected to offset market softening in the AWP and Construction divisions.

174.     In response to these new partial disclosures of Defendants' fraud, on September 4, 2008, the common stock dropped more than 19.6%, from $47.32 per share on September 3, 2008 to close at $38.02 per share on September 4, 2008.

175.     Following the Company's partial revelation of its finances and future business prospects, the Company hosted a conference call during which Defendants downplayed the earnings revision in an attempt to negate or at least minimize the impact of the partial revelation of the truth. For example, DeFeo stated, in relevant part:

> I think you'll get a sense of what's driving those businesses today. ***From a positive standpoint, we continue to be bullish and are actually taking up our internal estimates in our Crane business*** and in our Mining business. ***So, we have a Company that continues to benefit from its diverse product portfolio.*** We thought it to be very appropriate to give you our best estimate on where our business is performing right now, but in an overall context, we feel very positive about our future. . . .

*     *     *

> ***Yes, we took down our estimates for 2008, but we haven't taken up -- we haven't changed our goals for 2010. I'm still focused on the 12 x 12 in '10, and we'll get there.*** We have a run rate of $10.1 billion of revenue looking backward. It needs about a 7% compounded annual growth to achieve that. And that doesn't -- that is something that we think we can clearly achieve. The 12% operating margin may be a little bit harder because right now, we have some pressures from costs and pressures from a market that's shrinking in a few places. But, I still believe we can achieve the 12% operating margin. And a 15% working capital ratio, compared with a 22% run rate is probably the hardest number on that page.

176.     Later in the call, Defendant Widman falsely stated:

> Let me talk about the near-term and medium-term outlook. Earlier today we did issue a press release on updated guidance. ***We changed our EPS estimates mainly because of softening in Europe and the U.S. in AWP, as well as more significant softening in compact equipment in the Construction business in Europe.***

*       *       *

*We reduced our overall sales guidance approximately $300 million in total. What's interesting though, is that our significant benefit we receive in Cranes* and the Mining business. We talk about this mix in our portfolio*. Cranes demand is booming. It continues to boom.* Significant profitability coming from that. Mining activity, significant opportunity, continuing to grow. You'll see the segment discussions today related to those, and why *they should continue to grow*.

That creates a level of balance. In this short-term period we're not perfectly in sync, but there is dramatic changes in terms of the positive, as well as some of the softening areas. *Our EPS guidance is there and we felt it important, given where we're at in the year, actually to issue quarterly guidance, which is something we haven't done previously. But, we felt it was important to try to be as clear as we can in terms of our expectations at this time.*

**S**o before I get into some of these enabling initiatives, I think the course for *our outlook is clear.* You'll see today the *opportunities in the different segments, in the portfolio we have to continue to support that profitability and growth of our business.*

177.    Commenting further on the crane business, DeFeo falsely stated:

Without a doubt, some of our smaller crane product lines are being affected. If you really examine our business on a micro basis, you'll see the smaller boom trucks that we have the business is down, even some of the smaller truck cranes in North America are down. But it's a relatively small part of our Crane business today, that's the good news I guess.  Some of the small tower cranes are down in Europe. But the *facts are is that the rest of the world's requirements for cranes is just so strong, particularly the bigger cranes, the big lattice boom cranes, the very, very large all terrain cranes. The market for that on basic big infrastructure projects is still soaring*.

178.    Filipov also played up the Company's Crane business:

*And guess what? This is a great time to be in the Crane business, if you haven't figured that out yet. It's an excellent time.* It is something that TEREX has owned for many, many years and that we've worked on for many, many years.  So again, I'll take you through the Cranes business. $2.6 billion provider of cranes. If you go back to the early '90s, we had a little small business that was in Waverly, Iowa, which I'll also talk about, which is about $40 million. We had no less than 15 acquisitions over the past few years. But we've grown the business organically, as Ron and Phil alluded to, after Demag in 2002, most of the growth within the Crane business has actually been organic business.  *We're benefiting, definitely, from a strong demand* and we have to thank our customers for buying our equipment. *That demand looks good.* I also think that over the years, if we did not do the acquisitions that we did, we probably would have missed the boat on a lot of these acquisitions. A lot of this

68

development is in the higher capacity cranes, which means our Demag franchise in Zweibrücken (sic), Germany was a critical piece of the puzzle of us creating a cranes franchise.  It's generating great returns. Its taken some time to get there, but we've been able to build the foundations and I'm sure that this business, again, going forward is going to continue to deliver. ***We're well positioned in a continuing strong market.*** I'll talk about, again, the markets that we're in and the products that we have today. And I think you'll -- I'll talk to you a little bit about the strategy that we're looking at going forward.

*       *       *

***The outlook, again, remains solid.*** I'd say, out into the midterm, end-market is definitely going to be strong. Global non-residential construction outlook, some of the charts that you've seen is kind of flattening out, but again is going to continue to grow. ***And again, it's going to be an excellent time to be in this business for the next few years.***

So in summary, again, a lot of work has gone into building this franchise from the team. I still think that there's a lot of opportunity, and that's kind of tough probably to get up and here say that. But, there is a lot of opportunity left in this business, to grow it, to strengthen the base, to strengthen the foundation and to continue to look at those opportunities to diversify the business. ***So again, this is a great time to be in the crane business and, again, I thank you for your time. So, thank you very much.***

179.    Later in the call, Widman stated:

No, and not everything's going to hit at the same time in terms of our business situation and our initiatives, but I think it's -- the point is, ***we do have triggers to pull internally that we control. And I think that is going to provide a level of buffer to any significant downturn impact.***

180.    As set forth above, although the price of Terex stock dropped in response to the partial disclosures on September 4, 2008, Defendants' false and misleading statements made during the September 4, 2008 conference call served to maintain at least some of the artificial inflation.  But for Defendants' ongoing fraud and false statements to the market, the price of Terex stock would have declined further.

181.    On September 11, 2008, the Company participated in a conference call at Morgan Stanley Global Industrials CEO's Unplugged Conference.  DeFeo, who spoke during the call on behalf of the Company, took the opportunity to make additional false and misleading statements

69

concerning Terex's financial prospects and future business.  For example, DeFeo stated, in pertinent

part as follows:

> Sure. Well, Glad to just give a very brief commentary about Terex**. *If you look at*
> *how our common stock has been trading, you would not expect the weather to be*
> *quite as nice as it is out here. But I think for me, that is a real opportunity because*
> *Terex is a young company, a company which has tremendous prospects for it. We*
> *have a goal for 2010 to be $12 billion in revenue with a 12% operating margin.*
> *And we call it our 12 by 12 in '10 goal. And despite the fact that there have been*
> *pullbacks in a couple of our businesses, we remain pretty focused on achievement*
> *of that goal.*  As you may or may not know, I have set lofty goals for the Company
> historically. And I've been running Terex since really the early '90s. And some of
> the goals I said in the beginning were stay alive, then it was stay alive and make
> money. Then to go from a couple hundred billion to doubling in size every several
> years**. *And we've made all of those goals and I don't expect not to make this goal.*
>
> *There is some offsets in our business as we look forward, but the bottom line is we*
> *will do in the range of $10.5 billion of revenue in 2008, where guidance is $6.35 a*
> *share to $6.65 a share.*

182.    The statements referenced in ¶¶175-79 and ¶181 were each materially false and

misleading when made for the reasons set forth in ¶140 and the factual detail contained throughout

this Complaint.  In addition, the statements referenced in ¶¶175-79 and ¶181 were materially false

and misleading when made because they represented and/or omitted adverse facts which then existed

and disclosure of which was necessary to make the statements not false and/or misleading.  The true

facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Rather than benefitting solely from its diverse product portfolio, Defendants were
  using that, along with improper, premature revenue recognition practices that
  violated GAAP as well as the Company's internal policies and controls, to paint a
  distorted picture of Terex's financial performance and future business prospects to
  the market.

- Defendants lacked any reasonable basis for taking up their estimates in the Cranes
  division or touting that "it's a great time to be in the Crane business."  According to
  CW 4, the Kanban Coordinator, since as early as the Summer of 2008 there was a
  33% decrease in Terex's orders for parts used to build Cranes and, correspondingly,
  a significant decrease in production of cranes.  CW 4 also noted that a lot of cranes
  were being returned because customers would not accept delivery.

- Defendants were well aware that in addition to not being able to make the Company's estimates for 2008 financial performance, Terex would simply be unable to reach the "12 by 12 in '10" level of financial performance. Put simply, Defendants' scheme of premature revenue recognition to mask the true extent of the Company's problems, including plummeting demand and swelling inventory, was already starting to fail, and it was only a matter of time before Defendants would be forced to reveal the Company's true financial condition to the market.

- The Company's guidance and reported financial results remained materially inflated – and thus misleading – by the Defendants' ongoing misrepresentation of the Company's reported goodwill.

183. On October 22, 2008, Terex issued a press release announcing its third quarter 2008 results, as well as certain cost reduction activities. The Company *again* revised its estimated fourth quarter 2008 earnings per share guidance downward, resulting in full year 2008 earnings per share guidance between $5.69 and $5.79 and full-year 2008 net sales between $10.0 and $10.3 billion. This was a dramatic downward revision from the earnings guidance that Defendants had insisted they would hit just over one month earlier. The press release noted that beginning in the fourth quarter of 2008, the Company now expected net sales for the next twelve months in the AWP division to be down 30%-40%, for Materials Processing to be down 15%-20% and for Construction to be down 25%-35% versus the prior twelve month period.

184. The Company also announced a series of actions to attempt to reduce costs and inventories in certain of the Company's divisions, including layoffs and adjusting production lines. The Company further announced that effective in January 2009, the Roadbuilding business would be realigned under the Construction division, while the Utility Products business would be moved under the AWP division. The Company further announced that it took a small impairment charge in the quarter, and that there would be a larger charge in the fourth quarter for the AWP division and the Construction division.

185. In response to these additional partial disclosures of Defendants' true financial condition and future business prospects, on October 23, 2008, the price of Terex common stock

dropped $2.32 per share, or 13.88%, on October 23, 2008, to close at $14.40 per share.  Thereafter, on October 24, 2008, the price of the common stock dropped another $1.71 per share, or 11.88% and on October 27, 2008 the price of the common stock dropped another $0.52 per share, or 4.10% to close at $12.17.

186.    While making additional negative disclosures, Defendants again sought to negate and offset them with positive news.  For instance, on October 23, 2008, during a conference call to discuss Terex's third quarter 2008 financial results for the quarter ended September 30, 2008, DeFeo stated, in pertinent part:

> ***The depression scenario for Terex would have all these segments roll over all at once and we do not see this, nor do our customers and competitors. The only group that seems to believe this is the traders of our common stock. Someone is wrong here and we do not think it is us,*** although we readily admit uncertainty remains in this environment. But we have seen these market cycles before and managed to steadfastly build the Company effectively.

187.    As the call continued, Widman stated, in relevant part:

> Our third quarter was certainly a challenge given the volatility of external factors that Ron mentioned. We also had our own internal challenges to quickly respond to this volatility. ***Net sales were $2.5 billion for the third quarter, up 15% overall, and 6% including the translation impact of foreign currency exchange rates and acquisitions. Our net sales demonstrated the continued strength of the*** Material Processing & Mining and ***Cranes segments, where net sales increased by 18% and 26%, respectively, excluding currency and acquisition effects.***
>
> *            *            *
>
> ***Earnings per share decreased to a level of $0.96***, which included charges totaling $0.12 related to the crane repair program and headcount reductions, compared to $1.45 in the prior-year quarter. Cash provided by operating activities was $21 million in the quarter, and a use year to date of $35 million, which is fairly typical given the seasonality of our businesses.

188.    Later in the call, Riordan stated, in pertinent part:

> ***On a more upbeat note, our Cranes business had another terrific quarter with revenue up 36%.*** Excluding the charges for the crane repair program mentioned in the press release, the operating margin in the quarter was 14.4%. ***Demand in order rates continue strong and product pricing and material cost increases continue to***

*approximately balance each other.* The press release has a detailed backlog presentation showing adjusted backlog up 50%, as Phil had mentioned.

\* \* \*

*The Roadbuilding and Utilities business has continued to gradually improve, with some exceptions.*

189.   On November 3, 2008, Terex filed with the SEC its third quarter financial results on Form 10-Q for the quarter ending September 30, 2008.   The financial results reported in the November 3, 2008 10-Q were substantially similar to this reported in the Company's October 23, 2008 press release.   The Form 10-Q was signed by Defendants DeFeo and Widman and contained required Sarbanes-Oxley certifications signed by Defendants DeFeo and Widman stating that the Form 10-Q did not include any material misrepresentations or omissions.   The 10-Q continued to cover-up Defendants' fraud by misleading the market about Terex's business prospects:

We have seen a credit crisis that appeared limited to the U.S. intensify into a worldwide financial crisis in September and October. The causes of this financial turbulence differ from past downturns, thus there is no historical precedent with which to compare. *We remain confident, however, that our strategy of product and geographic diversity is the right one to deliver positive shareholder returns through this period. Our relatively balanced mix of product types helps to moderate cyclical sales movements for Terex as a whole, as demand for one product may weaken, but be offset by demand for products in a different cycle.* A balanced geographic sales mix also helps moderate demand swings for our products, as demand in one region may strengthen or weaken over different times as compared to demand in other geographies.

*We continue to see strong demand for cranes* and mining equipment, *which remain in sustained up-cycles. Year-over-year demand for our cranes and mining businesses continues to grow.* This growth has been driven by global infrastructure development and maintenance, as well as commodity and energy prices that remain at levels which support continued investment in capital equipment. Commodities and energy pricing may be weakening, but this has not affected our business materially at this point in time.

\* \* \*

*The RBUO segment showed improvements in sales, as well as profitability, when compared to the prior year period. Stronger demand for utility products, coupled*

73

*with cost reduction efforts in the roadbuilding business, have resulted in improved profits.*

\*     \*     \*

*Net sales for the three months ended September 30, 2008 increased $318.1 million when compared to the same period in 2007.*

\*     \*     \*

*Net sales for the Aerial Work Platforms segment for the three months ended September 30, 2008 decreased $50.4 million when compared to the same period in 2007.*

\*     \*     \*

*Net sales in the Construction segment increased by $22.1 million for the three months ended September 30, 2008* when compared to the same period in 2007, as developing market demand was partially offset by softer demand in North America and Western Europe.

\*     \*     \*

*Net sales for the Cranes segment for the three months ended September 30, 2008 increased by $190.8 million* when compared to the same period in 2007, as global infrastructure and energy demand continued to drive strong sales of cranes.

\*     \*     \*

*Net sales for the Roadbuilding, Utility Products and Other segment for the three months ended September 30, 2008 increased $26.4 million* when compared to the same period in 2007.

190.    The additional false and misleading statements found in the November 3, 2008 10-Q had their intended effect.  After closing at $15.69 on November 3, 2008, the price of Terex stock jumped nearly 12%, or $1.88 per share, on November 4, 2008 to close at $17.57.

191.    The statements referenced in ¶¶186-89 were each materially false and misleading when made for the reasons set forth in ¶140 and the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶186-89 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure

of which was necessary to make the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Demand in order rates in the Cranes division was not strong. On the contrary, demand was significantly decreasing and had been on a downward spiral for several months. By the Summer of 2008 demand in the Cranes division was declining, Terex had decreased its orders for crane parts, and cranes were being returned by customers who would not accept delivery.

- Defendants knew neither the mix of product type offered by Terex or its geographic diversity would moderate or offset the meager demand for Terex products. The Company's sales were weak across all divisions, and any cyclical sales movement would be insufficient to balance Terex overall sales and "provide positive shareholder returns" through the time period.

- The Company's sales numbers were deceiving because Defendants knew the sales were based upon a fraudulent scheme of premature revenue recognition which included a multitude of GAAP violations as well as violations of its own internal policies. This scheme allowed Defendants to artificially boost sales and continue its charade upon the market.

- Far from showing "improvement in sales," the Roadbuilding division was consistently losing money. According to CW 1, in the Fall of 2008, Ellis, the head of the Roadbuilding division, stated "Roadbuilding was bleeding red ink for more than a year and we have to stop it." Further, during this very quarter, Terex performed its annual impairment test and determined that the goodwill in Roadbuilding was 100% impaired. Nevertheless, this impairment was not disclosed until February 3, 2009 and the amount of the impairment was not revealed until February 11, 2009.

- Although the Company again revised its guidance downward, its guidance and reported financial results remained materially inflated – and thus misleading – by the Defendants' ongoing misrepresentations concerning the basis for its sales results and the Company's reported goodwill.

192. On February 3, 2009, Terex issued a press release *once again* revising its fourth quarter 2008 and year-end guidance. Specifically, the press release revealed that the Company:

[E]xpects earnings for 2008 to be approximately 5% below the low end of its previous full year guidance of between $5.69 and $5.79 per fully diluted share. This revised guidance excludes charges associated with the reduction of our production levels, asset impairments and certain other items. Comparable earnings for the full year 2007 were $5.85 per fully diluted share.

Although not yet finalized, the Company expects to record a non-cash impairment charge of certain of the Company's goodwill, identifiable intangibles and other non

75

current assets principally related to its Construction, Roadbuilding and Utilities businesses. This impairment charge is estimated to be approximately $600 million, only a portion of which will be tax affected. We are currently in compliance with all of the financial covenants under our bank credit facilities and indentures and this impairment charge will not affect our compliance.

\*          \*          \*

Mr. DeFeo continued, "In response to the present economic environment, we are taking and will continue to take aggressive actions to reduce costs and inventories in all of our businesses. We feel we have responded appropriately with significant actions already in progress, many of which we began late last summer and fall. Our actions include reductions in force, significantly curtailed production schedules in affected businesses, including temporary and permanent factory shutdowns, facility consolidations, the rescheduling of incoming raw materials and reducing executive compensation costs."

193.    Despite the downward revision in guidance, analysts, still unaware of the true financial condition of the Company due to Defendants' fraud, highlighted the attractive value of Terex stock relative to its peers. For example, a JP Morgan analyst report titled, "Reducing Estimates in Global Recession," dated February 3, 2009, stated that Terex's "valuation looks compelling." Another analyst report issued by Gabelli & Company, Inc. titled "Earnings Updated" stated, in pertinent part, "[n]onetheless, we are maintaining a buy rating on Terex stock. . . . The stock remains inexpensive, trading at 2.2x 2008E and 3.4x 2009P earnings. In addition TEX is trading at a 65% discount to its 2009P PMV of $35."

194.    In response to the Company's press release and reactive analyst reports, on February 3, 2009, the price of Terex common stock rose slightly $0.23 per share, or 1.95% to close at $12.01. The stock price continued to rise gradually through February 9, 2009, when it closed at $14.63 per share.

195.    Defendants' massive, ongoing fraud was fully revealed on February 11, 2009, when the Company issued a press release announcing a significant net loss for the fourth quarter 2008. Specifically, Terex posted a net loss in the amount of $421.5 million, or $4.46 per share. Defendants

also included charges of $459.9 million, or $4.84 per share, for the impairment of goodwill to the Company's Construction, Roadbuilding divisions.  The Company also incurred pre-tax charges of $21.8 million, or $0.24 per share, largely due to a reduction in production levels in the fourth quarter of 2008.

> Net sales for the fourth quarter of 2008 dropped by approximately 20% to $2.08 billion versus $2.59 billion in the fourth quarter of 2007, as declining demand in the Company's Aerial Work Platforms, Construction and Materials Processing businesses continued.

> *     *     *

> For the full year 2008, the Company reported net income of $71.9 million, or $0.72 per share, compared to net income of $613.9 million, or $5.85 per share, for the full year 2007. The goodwill impairment charges mentioned above reduced net income by $4.60 per share for the full year, and other pre-tax charges totaling $25.8 million, primarily related to adjustment of the Company's production levels, decreased full year 2008 net income by $0.18 per share.

> *     *     *

> Net sales were $9.89 billion in 2008, an increase of 8.2% from $9.14 billion in 2007. ….The strong full year performance of the Cranes and Mining businesses were offset by the dramatic decline in demand for many of the Company's other products during the second half of 2008, largely due to the impact of the rapidly deteriorating global economy.

> Ron DeFeo, Terex Chairman and Chief Executive Officer, stated, "This past year has been like no other – the first half of the year exhibited robust growth and expansion, while the second half of the year was severely impacted by the global credit crisis and economic deterioration, which drove significant declines in customer demand in our businesses. For the full year, net sales increased significantly in our Cranes and Mining businesses, but were offset by the results in our Aerial Work Platforms, Construction, and Materials Processing businesses, which experienced considerable weakness in the second half of the year.

> *     *     *

> Highlights for the Fourth Quarter of 2008

> *     *     *

> These results include the impact of $459.9 million of charges in the fourth quarter of 2008 for goodwill impairments in the Construction, Roadbuilding and Utility

Products businesses, where the recorded value of those assets exceeded their fair value due to lower projected results for these businesses resulting from adverse market conditions.

*    *    *

In response to the global credit crisis, the Company began taking actions during the third quarter of 2008, and as the global economy continued to weaken, the Company accelerated its responses. Actions have been taken to slow, and in some cases stop, the production of our products and to reduce the Company's workforce for those realities. Our strategic supply partners have cooperated well with the rescheduling of incoming material.

196.     The next day, February 12, 2009, the Company hosted a conference call to discuss its fourth quarter and year-end 2008 financial results.  Defendants DeFeo, Widman, Riordan, and Ford, as well as, Nichols, Nielsen and Kiernan participated in the call on behalf of the Company.  On the call Defendants acknowledged the true facts surrounding Terex's financial condition and the weakness in its business overall.  For example, DeFeo stated:

2008 was a watershed year for Terex in many respects. During the year, we faced many challenges and enjoyed some significant successes. In a sense, we were able to realize some of the potential in our business, with an incredible first half. However, like many industrial businesses, we experienced a rapid slide during the second half of the year that accelerated as the year ended. **It is now clear that the "12 X 12 in 10" goals ($12 billion in revenue, with 12% margins by 2010) will not be achieved without an unlikely miracle turnaround. We confirmed, as we reflect back on the year, that our stronger businesses of Aerial Work Platforms, Cranes and Material Processing & Mining could and would produce excellent returns**.  We also realized that our weaker businesses of Construction and Roadbuilding were not yet strong enough and need much more work, both strategically and operationally.

Let me switch to a non cash item. As indicated in our third quarter Form 10-Q, we disclosed the potential risk of goodwill impairment related to our Construction and Roadbuilding businesses. Given the continued decline in customer demand and continuation of slow market conditions, our annual impairment test in the fourth quarter of this year indicated the need to fully impair the goodwill in the Construction, Roadbuilding and Utilities businesses. The pre-tax charge was approximately $460 million, or $4.84 per share, in the fourth quarter. The share count and effective tax rate weighting implies a full year impact of $4.60 per share. After finalizing our review, we determined that no identifiable asset impairments other than goodwill were required.

As we looked to our outlook for 2009, we were tempered by the order rate in the fourth quarter and also with the reality that our Cranes and Mining businesses were not immune to the effects of the economic crisis. Order rates continued to soften in the AWP, Construction and Materials Processing businesses, and the Cranes business, in particular in the tower and rough terrain crane product lines, experienced significant reductions. A substantial percentage of the unpriced crane backlog for 2009 failed to materialize into confirmed orders.

197.    Later in the call, Riordan stated, in pertinent part:

It all starts with one simple approach: we are managing our business for cash. Most of our businesses are experiencing continued reductions in incoming orders, with orders in the backlog being cancelled or deferred.

*        *        *

The Roadbuilding and Utilities division had a solid quarter for this environment, with revenue about flat and profit neutral. As we said in Q3, our U.S. business remains challenged, while our South American business is doing very well. We are not anticipating a noticeable recovery in this division from the stimulus package recently passed in Congress. As previously announced, these two businesses will be consolidated with other divisions in 2009, with the Utilities business joining the AWP division, and the Roadbuilding business joining our Construction division.

Our business in emerging markets has also slowed in most areas, although Latin America is reasonably solid. Russia and India have experienced dramatic slowdowns, and even China has moderated. While there are some key projects still in the early stages of ramp-up, such as the Panama Canal expansion project, private development and some public projects have stalled in many geographies.

198.    The revelations concerning the true financial condition of the Company significantly impacted the price of Terex common stock and caused the remaining artificial inflation to come out of the price of the common stock.  The price of Terex common stock dropped $4.17 per share to close at $9.45 per share on February 12, 2009, representing a tremendous decline of more than 30%.

199.    As indicated above, as numerous partial revelations of Terex's true financial condition and future business prospects were revealed to the market, a picture of the extent of Defendants' fraud and false and misleading financial reporting emerged.  Thus, when the price of the Company's common stock dropped upon revelation of Terex's true financial condition concealed by the fraud, Plaintiff and the Class suffered losses proximately caused by Defendants' fraud.

## VIII.   TEREX'S FALSE AND MISLEADING FINANCIAL REPORTING

200.    When the Class Period began on February 20, 2008, Terex reported better than expected financial results.  On the February 21, 2008 conference call with investors, Defendant Widman noted that "***net sales reached a record for a quarterly period***" and "***income from operations of $240 million was a second largest quarterly amount in our history.***"

201.    Analysts following Terex were happy to trumpet Defendants' positive statements. For example, KeyBanc noted:

> In our view, the earnings beat was due to solid revenue performance in all operating segments (excluding RBUO) and overall continued strength in most end markets and geographies.  In addition to TEX's solid performance, management introduced 2008 revenue and EPS guidance of $10.0 billion-$10.5 billion and $6.65-$7.15, respectively (more detail below) and noted that it believes it is ahead of schedule with respect to achieving its 2010 goals ($12 billion in sales and 12% operating margin by 2010; implies ~$9.00 EPS on an unlevered basis).  In our view, TEX's strong end market commentary and this guidance should largely alleviate investor concerns regarding a near-term weakening of fundamentals in TEX's end markets. [Emphasis added.]

202.    Similarly, JP Morgan commented:

> Terex reported revenues of $2.6 billion, above our estimate of $2.2 billion.  Adjusted EBITDA was $263 million, beating our estimate of $239 million.  Sales growth was 27.4% in the quarter (19.1% net of foreign exchange) and operating margins increased 100bp year-over-year on account of better price realization and leverage from revenue growth, which offset soft performance in the concrete mixer truck and telehandler businesses.  Global infrastructure spending continues to drive demand, particularly demand for cranes, mining, materials processing equipment and aerial work platform products.  [Emphasis added.]

203.    In response to Defendants' statements on February 21, 2008, the price of Terex common stock soared $4.52 per share, or 7%, to close at $66.73 per share.

204.    Approximately two months later, Terex announced more positive financial results for its first quarter ended March 31, 2008 in the face of a challenging economic environment, with Defendant DeFeo noting:

*. . . our net sales were up 9% on an organic basis.  This organic growth rate alone will get us to about the $12 billion level in 2010* but of course, we would expect to be making some acquisitions during this period plus  I'm hopeful that we can do better than this 9% organic growth rate.  All is not doom and gloom in our markets and I hope you get that sense from our press release.

205.    In response, Credit Suisse commented:

**Graduating At The Top Of Its Class**

**Strong 1Q08**. TEX reported 1Q08 EPS of $1.59 vs. the street est. of $1.41 and TEX's guidance of ~$1.29.  Ex. a lower tax rate, higher other income, and lower share count, TEX still beat by $0.09. Sales were up 17% (9% organically) w/particular strength in Mining (up 43%) and Cranes (up 26%).

206.    Similarly, KeyBanc noted:

After the close Wednesday, TEX reported impressive 1Q08 results of $1.59 vs. consensus of $1.41 and our estimate of $1.37.  The Company reported solid revenue, margin and backlog numbers (see below), and increased its revenue guidance to $10.5 billion-$10.9 billion from $10.0 billion-$10.5 billion. Additionally, TEX raised the low end of its earnings guidance by $0.20 to $6.85, while maintaining the high end at $7.15.  In our view, investors should consider these results as a positive affirmation that TEX's geographic positioning (>70% of revenue from outside the United States), in conjunction with its mix of early, mid and late cycle businesses, should deliver solid results despite ongoing concerns about North American end markets.  [Emphasis added.]

207.    In response to statements made with regard to Terex's first quarter 2008 earnings, the price of Terex common stock initially dropped $1.13 per share, or 1.60%, to close at $69.53 per share, but then rose 4.3% over the next two trading days to close at $72.54 on April 28, 2008.

208.    Defendants' positive statements about the Company's then current and future financial performance in the face of a rapidly deteriorating macro environment for Terex's products evidence the aggressive financial results driven culture that Defendants foisted on Company employees.  Indeed, Terex's employees understood that the Defendants' unrealistic revenue and other financial targets were to be achieved by any means necessary.

209.    Not coincidentally, during the first half of 2008, Company insiders took advantage of these positive statements, which buoyed Terex's stock price during a time frame when the market

was concerned about the effects of the economic conditions on Terex's operations, with more than 90% of their Class Period Terex stock sales occurring during the February 22, 2008 – May 19, 2008 timeframe.



210.   What Defendants knew, but the market did not, was that Terex's positive financial results during the early part of the Class Period, were made on the back of accounting machinations that fraudulently allowed Terex to materially overstate its reported operating results.

211.   During the Class Period, Defendants represented repeatedly that the Company's financial statements were prepared in conformity with GAAP.   These representations were materially false and misleading when made because Defendants, in violation of GAAP, knowingly

or recklessly employed improper accounting practices which materially inflated the Company's income and assets during the Class Period.

212.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provides accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

213.    Indeed, compliance with GAAP is a basic fundamental obligation of publicly traded companies.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).

A.    **Defendants' Intentional Scheme to Manipulate Reported Revenues**

214.    Pursuant to GAAP, revenue from the sale of goods should not be recognized until it is both earned and realized or realizable.  Revenue from product sales is generally earned when the products are delivered to the customer and is usually considered realized or realizable once the customer has paid, or has committed to pay for the products, and the customer's ability to pay is not in doubt.  *See* FASB Concepts Statement No. 5, ¶83.

215.    The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is

fixed or determinable, collectability of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue. Generally, revenue should not be recognized until an exchange has occurred and the earnings process is complete. A transfer of risk has to occur in order to effect an "exchange" for the purposes of revenue recognition. *See* SEC Staff Accounting Bulletin ("SAB") No. 104 ; FASB Concept Statement Nos. 2 and 5; FASB Statement of Financial Accounting Standards ("SFAS") No. 48; Accounting Research Bulletin ("ARB") No. 43; Accounting Principles Board ("APB") Opinion No. 10; and American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 97-2.

216.    In addition, GAAP provides that intercompany sales are to be eliminated from consolidated financial statements. *See* ARB 51.

217.    During the Class Period, Defendants falsely represented that Terex complied with these accounting rules and its publicly disclosed policy of revenue recognition.

218.    In its 2007 Form 10-K, Terex's financial statements for the year-ended December 31, 2007 (the "2007 financial statements") disclosed:

> ***Revenue Recognition****.*          Revenue and related costs are generally recorded when products are shipped and invoiced to either independently owned and operated dealers or to customers. Shipping and handling charges are recorded in Cost of goods sold.
>
> Revenue generated in the United States is recognized when title and risk of loss pass from the Company to its customers which occurs upon shipment when terms are FOB shipping point (which is customary for the Company) and upon delivery when terms are FOB destination. The Company also has a policy which requires it to meet certain criteria in order to recognize revenue, including satisfaction of the following requirements:
>
> > (a)     Persuasive evidence that an arrangement exists;
> >
> > (b)     The price to the buyer is fixed or determinable;
> >
> > (c)     Collectability is reasonably assured; and

(d)      The Company has no significant obligations for future performance.

In the United States, the Company has the ability to enter into a security agreement and receive a security interest in the product by filing an appropriate Uniform Commercial Code ("UCC") financing statement.  However, a significant portion of the Company's revenue is generated outside of the United States.  In many countries outside of the United States, as a matter of statutory law, a seller retains title to a product until payment is made.  The laws do not provide for a seller's retention of a security interest in goods in the same manner as established in the UCC.  In these countries, the Company retains title to goods delivered to a customer until the customer makes payment so that the Company can recover the goods in the event of customer default on payment.  In these circumstances, where the Company only retains title to secure its recovery in the event of customer default, the Company also has a policy requiring it to meet certain criteria in order to recognize revenue, including satisfaction of the following requirements:

(a)      Persuasive evidence that an arrangement exists;

(b)      Delivery has occurred or services have been rendered;

(c)      The price to the buyer is fixed or determinable;

(d)      Collectability is reasonably assured;

(e)      The Company has no significant obligations for future performance; and

(f)      The Company is not entitled to direct the disposition of the goods, cannot rescind the transaction, cannot prohibit the customer from moving, selling, or otherwise using the goods in the ordinary course of business and has no other rights of holding title that rest with a titleholder of property that is subject to a lien under the UCC.

In circumstances where the sales transaction requires acceptance by the customer for items such as testing on site, installation, trial period or performance criteria, revenue is not recognized unless the following criteria have been met:

(a)      Persuasive evidence that an arrangement exists;

(b)      Delivery has occurred or services have been rendered;

(c)      The price to the buyer is fixed or determinable;

(d)      Collectability is reasonably assured; and

(e)      The customer has signed off on the acceptance, the time period has elapsed or the Company has otherwise objectively demonstrated that the criteria specified in the acceptance provisions have been satisfied.

In addition to performance commitments, the Company analyzes factors such as the reason for the purchase to determine if revenue should be recognized. This analysis is done before the product is shipped and includes the evaluation of factors that may affect the conclusion related to the revenue recognition criteria as follows:

      (a)      Persuasive evidence that an arrangement exists;

      (b)      Delivery has occurred or services have been rendered;

      (c)      The price to the buyer is fixed or determinable; and

      (d)      Collectability is reasonably assured.

In limited circumstances, certain new units may be invoiced prior to the time customers take physical possession. Revenue is recognized in such cases only when the customer has a fixed commitment to purchase the units, the units have been completed, tested and made available to the customer for pickup or delivery, and the customer has requested that the Company hold the units for pickup or delivery at a time specified by the customer. In such cases, the units are invoiced under the Company's customary billing terms, title to the units and risks of ownership pass to the customer upon invoicing, the units are segregated from the Company's inventory and identified as belonging to the customer and the Company has no further obligations under the order.

Revenue from sales-type leases is recognized at the inception of the lease. Income from operating leases is recognized ratably over the term of the lease. The Company routinely sells equipment subject to operating leases and the related lease payments. If the Company does not retain a substantial risk of ownership in the equipment, the transaction is recorded as a sale. If the Company does retain a substantial risk of ownership, the transaction is recorded as a borrowing, the operating lease payments are recognized as revenue over the term of the lease and the debt is amortized over a similar period.

The Company, from time to time, issues buyback guarantees in conjunction with certain sales agreements. These primarily relate to trade value agreements ("TVAs") in which a customer may trade-in equipment in the future at a stated price/credit, if certain conditions are met by the customer. The trade in price/credit is determined at the time of the original sale of equipment. In conjunction with the trade-in, these conditions include a requirement to purchase new equipment at fair market value at the time of trade-in, which fair value is required to be of equal or greater value than the original equipment cost. Other conditions also include the general functionality and state of repair of the machine. The Company has concluded that any credit provided to customers under a TVA/buyback guarantee, which is expected to be equal to or less than the fair value of the equipment returned on the trade-in date, is a guarantee to be accounted for in accordance with FASB Interpretation ("FIN") No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, including Indirect Guarantees of Indebtedness of Others" ("FIN No. 45").

The original sale of equipment, accompanied by a buyback guarantee, is a multiple element transaction wherein the Company offers its customer the right, after some period of time, for a limited period of time, to exchange purchased equipment for a fixed price trade-in credit toward another of our products. The fixed price trade-in credit is accounted for under the guidance provided by FIN No. 45. Pursuant to this right, the Company has agreed to make a payment (in the form of a trade-in credit) to the customer contingent upon the customer exercising its right to trade-in the original purchased equipment. Under the guidance of FIN No. 45, the Company records the fixed price trade-in credit at its fair value. Accordingly, as noted above, the Company has accounted for the trade in credit as a separate deliverable in a multiple element arrangement.

*     *     *

Our consolidated results include the elimination of intercompany sales activity among segments.

219.    As set forth above, during the Class Period, Defendants falsely represented that Terex complied with GAAP and its publicly disclosed policy of revenue recognition because Defendants engaged in a deliberate scheme whereby Terex recognized revenue prior to product shipment/delivery to Terex's customers.

220.    During the Class Period, Defendants caused Terex to falsely recognize hundreds of millions of dollars in revenue before such revenues were earned, the buyer's price was fixed and determinable, and the collectability of such revenues were reasonably likely. These allegations were confirmed or corroborated by many of Plaintiffs' Confidential Witnesses, including CW 1, the former Director of Operations for Roadbuilding, CW 15, the former Logistics Coordinator, and CW 16, the former Inventory Analyst, and are set forth more fully above.

221.    In addition to violating GAAP, former Company employees stated that Terex regularly violated its own internal policies to get sales recorded at quarter or year-end by, among other things, prematurely issuing Certificates of Origin (when delivering the products and without being paid) and delivering unfinished product and product with known quality defect so that revenue could be improperly accelerated. These allegations were confirmed or corroborated by many of

Plaintiffs' Confidential Witnesses, including CW 14, the former Regional Sales Manager, and CW 16, the former Inventory Analyst, and are set forth more fully above.

222.    As a result of the foregoing, Terex's financial statements issued during the Class Period violated GAAP and the Company's publicly disclosed policy of revenue recognition because Defendants engaged in a deliberate scheme whereby the Company fraudulently recognized hundreds of millions of dollars in revenue before such revenues were earned, the buyers' price was fixed and determinable, and the collectability of such revenues were reasonably assured.  In addition, Defendants caused Terex to improperly recognize and report revenues on intercompany transfers.

### B.    Defendants' Overstatement of Goodwill

223.    When a company reports its goodwill is impaired, it acknowledges its current expected future cash flows from a particular line of business are less than what it expected such business to generate when it was acquired.  In furtherance of Defendants' attempt to convince the marketplace that Terex was relatively immune to the deteriorating macro economic environment for the Company's products, Defendants knowingly or recklessly overstated the amount of Terex's goodwill, which, in turn, materially inflated the amount of the Company's income and assets.

224.    Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  During the Class Period, GAAP required that companies accounted for their business combinations using the purchase method of accounting as set forth in SFAS No. 141, *Business Combinations*.  Under the purchase method of accounting, the assets acquired and liabilities assumed are initially recorded at their respective fair market values.  The excess of the purchase price over the fair value of the net assets acquired is recognized and reported as an asset called goodwill.

225.    An asset is an item which provides economic value to an entity.  *See* Concepts Statement No. 2, ¶25.  Goodwill is considered to be an asset because future economic benefits are

expected from it in combination with the future benefits of the other assets acquired in the acquisition. Goodwill is intended to reflect the going concern value of the business acquired and its expected contribution to future earnings growth. SFAS No. 141, ¶¶B101-114.

226. During the Class Period, GAAP required that companies account for their goodwill in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*. SFAS No. 142 requires that a company review its goodwill to determine if the asset is impaired. A goodwill impairment occurs when the carrying amount of goodwill exceeds its fair value. ***Goodwill must be tested at least annually for impairment, and more often when events or circumstances arise that indicate the goodwill could be impaired***. *See* SFAS No. 142, ¶¶18-29.

227. Pursuant to SFAS No. 142:

Goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Examples of such events or circumstances include:

a. ***A significant adverse change in legal factors or in the business climate***

b. An adverse action or assessment by a regulator

c. Unanticipated competition

d. A loss of key personnel

e. ***A more-likely-than-not exception that a reporting unit or a significant portion of a reporting unit will be sold or otherwise disposed of***

f. The testing for recoverability under Statement 144 of a significant asset group within a reporting unit

g. Recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

SFAS No. 142, ¶28. [Emphasis added.]

228. Testing for goodwill impairment is a two-step process. The first step in the process is used to identify potential goodwill impairment while the second step is used to measure the amount

of the impairment.  A company performs goodwill testing at a reporting unit level.  In the first step, a company will compare the fair value of a reporting unit to its carrying value.  If the fair value of the unit exceeds its carrying amount, then goodwill is deemed to not be impaired and no further testing is required.  However, if the carrying value of the unit exceeds its fair value, then a second step is performed to measure the amount of the impairment.  *See* SFAS No. 142, ¶¶17-22.

229.    Under SFAS No. 142, a goodwill impairment test must be performed at the operating segment level or one level below – the reporting units.  The following diagram shows the level of disaggregation at which an impairment test must be performed.



230.    Pursuant to SFAS No. 142, the present value of cash flow estimates is generally the best technique to measure an impairment loss when quoted market prices for the relevant assets are unavailable.  The Company confirmed this fact when it applied this technique in calculating its goodwill impairment in its 2007 financial statements (*see* below).  In addition, SFAS No. 142 mandates that cash flow estimates in measuring any impairment loss be based on reasonable and supportable assumptions.[11]

---

[11] The relevant paragraph of SFAS No. 142 was superseded with SFAS No. 157, *Fair Value Measurements.*  However, as disclosed in its public filings, Terex adopted these superseding provisions for its non-financial assets in 2009.

231.    In its 2007 Form 10-K, Terex's financial statements for the year-ended December 31, 2007 (the "2007 financial statements') disclosed:

> ***Goodwill***.  Goodwill, representing the difference between the total purchase price and the fair value of assets (tangible and intangible) and liabilities at the date of acquisition, is reviewed for impairment annually, and more frequently as circumstances warrant, and written down only in the period in which the recorded value of such assets exceed their fair value.
>
> The Company does not amortize goodwill, in accordance with Financial Accounting Standards Board (the "FASB") Statement of Financial Accounting Standards ("SFAS") No. 142 "Goodwill and Other Intangible Assets."  The Company selected October 1 as the date for the required annual impairment test.  ***There were no indicators of goodwill impairment in either of the tests performed as of October 1, 2007 and 2006.***  The impairment test performed as of October 1, 2005 identified indicators of goodwill impairment in the Roadbuilding, Utility Products and Other segment that resulted in a pre-tax impairment charge of $3.3. See Note L – "Goodwill."
>
> The initial recognition of goodwill, as well as the annual review of the carrying value of goodwill, requires that the Company develop estimates of future business performance.  These estimates are used to derive expected cash flow and include assumptions regarding future sales levels, the impact of cost reduction programs, and the level of working capital needed to support a given business.  The Company relies on data developed by business segment management as well as macroeconomic data in making these calculations.  The estimate also includes a determination of the Company's weighted average cost of capital.  The cost of capital is based on assumptions about interest rates as well as a risk-adjusted rate of return required by the Company's equity investors.  Changes in these estimates can impact the present value of the expected cash flow that is used in determining the fair value of acquired intangible assets as well as the overall expected value of a given business.

232.    As noted above, Terex's 2007 financial statements falsely touted that "***[t]here were no indicators of goodwill impairment in either of the tests performed as of October 1, 2007 and 2006.***"  This statement, as well as other similar statements made by Defendants, were false and misleading because during the Class Period, Terex overstated its income and assets by at least tens of millions of dollars by failing to timely record an impairment in the value of its reported goodwill.

233.    As noted in detail herein, by no later than 2007, Terex's business was in a rapid state of decline.  Indeed, CW 1, the former division former Director of Operations for the Roadbuilding

division explained that the Advance Mixer concrete business, which generated 40% of the entire Roadbuilding division revenue by 2007, "fell quick and fell hard" and was down significantly by late 2007.

234.    These conditions, as noted in SFAS No. 142, ¶28 (*see* above), were circumstances indicating that Terex's goodwill was impaired.  Yet, despite the rapidly accelerating decline in the Company's Roadbuilding division through the second half of 2007, and despite Defendants' intimate knowledge of the financials (as set forth above), Defendants knowingly or recklessly stated that "[t]here were no indicators of goodwill impairment . . .[as] of October 1, 2007. . . ."

235.    Further, Defendants **knew** that Terex's goodwill was impaired and materially overstated by no later than December 31, 2007, because Defendants attempted to sell Terex's Roadbuilding division and potential buyers were unwilling to pay the Company anything close to the asset carrying values associated with such business that Terex reported in its financial statements to investors.  SFAS No. 142, ¶28 also notes that a "more-likely-than-not exception that a reporting unit or a significant portion of a reporting unit will be sold or otherwise disposed of" is an event indicting goodwill may be impaired.

236.    Indeed, Terex's 2007 financial statements reported that at December 31, 2007, the carrying value of the identifiable assets and goodwill for the Roadbuilding division totaled $436.4 million and $78.1 million, respectively, or $514.5 million combined.  However, CW 1, the former Director of Operations for Roadbuilding, who received offer-related documents from "Atlas," one of the Roadbuilding division's prospective purchasers, said that Atlas was only willing to pay between $180 million and $190 million for the Roadbuilding division.

237.    The amount offered for the Roadbuilding division by potential buyers was a clear indicator that the fair value of the Roadbuilding division was significantly less than the carrying

value of that division's assets and, accordingly, that the value of Terex's goodwill was materially impaired during the Class Period. Nonetheless, as Defendants knew or recklessly ignored, Terex improperly delayed the recognition of its goodwill impairment until almost the end of the Class Period when it announced its approximate $460 million goodwill write off, including the entire $78.1 million of the goodwill attributed to its Roadbuilding division.

### C.     Defendants' Financial Manipulations Were Material

238.    The foregoing violations of GAAP caused Terex's financial results to be overstated by hundreds of millions of dollars during the Class Period. Nonetheless, Defendants have continued their deceptive financial reporting by failing to restate Terex's improper Class Period financial statements.[12]

239.    Similarly, the Company's Class Period SEC filings were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

240.    With respect to material financial statement misstatements, GAAP, as noted in the SEC's SAB No. 99, provides:

> For the reasons noted above, ***the staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial.*** While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. ***The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings. In that***

---

[12]    GAAP, in SFAS No. 154, provides that previously issued financial statements that are erroneous due to an error or a misapplication of accounting principles are to be retroactively restated.

*instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements. The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings. Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.* [Footnotes deleted, emphasis added.]

241.    SAB No. 99 also provides that:

... the staff believes that there are numerous circumstances in which misstatements below 5% could well be material. *Qualitative factors may cause misstatements of quantitatively small amounts to be material*; as stated in the auditing literature:

> As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements.

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are:

1)    whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate

2)    **whether the misstatement masks a change in earnings or other trends**

3)    **whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise**

4)    whether the misstatement changes a loss into income or vice versa

5)    whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability

6)    whether the misstatement affects the registrant's compliance with regulatory requirements

7)    whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements

8)    whether the misstatement has the effect of increasing management's compensation, for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation

94

9)      whether the misstatement involves concealment of an unlawful transaction.

This is not an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement. (Footnotes deleted, emphasis added).

**D.      Terex's Failure to Maintain Adequate Controls Over Its Financial Reporting and Disclosures Violated Applicable Accounting Principles and SEC Regulations**

242.    The SEC defines "disclosure controls and procedures" as follows, in relevant part:

controls and procedures . . . of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a *et seq*.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. 17 C.F.R. §240.13a-15(e).

243.    "Internal control over financial reporting" is defined by the SEC as:

[A] process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

(1)     Pertain to the maintenance of records that, in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(2)     Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements. 17 C.F.R. §240.13a-15(f).

244.    The Securities Exchange Act of 1934 ("1934 Act") Rule 13a-15 requires the

Company's principal executive officer and principal financial officer to annually certify the

effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure

controls and procedures, and provide management's assessment of the effectiveness (or deficiencies

95

in the effectiveness, as applicable) of the Company's internal controls over financial reporting, as of the end of each fiscal year.  *See* 17 C.F.R. §240.13a-15(b)(1) and (c).

245.    During the Class period, Defendants misled investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting, insofar as they knowingly or recklessly misrepresented that the Company's disclosure controls and procedures and internal controls over financial reporting were effective when they were not.

246.    CW 17, the former Consultant, stated that within her/his first month at Terex, she/he learned of major problems with the Company's goodwill accounting and that "big entries did not have required supporting details or records."  CW 17 stated that $10 million accounting journal entries were recorded without the most basic documentation to substantiate where even the transaction actually occurred.

247.    Moreover, CW 5, the former Cost Accountant, explained that the Company was unable to accurately account for product labor and material costs.  As an example, CW 5 said Terex used erroneous bills of materials in determining the cost to manufacture products and that the number of hours it took to build products was misstated.  According to CW 5, the bill of material cement mixers only had three tires and three rims when obviously the truck actually had four tires and four rims before it could leave the factory.

248.    Terex's 2007 Form 10-K disclosed:

In our Annual Report on Form 10-K for the year ended December 31, 2006, management identified a material weakness in our internal control over financial reporting with respect to accounting for income taxes. A material weakness is defined to be a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

In response to this material weakness, we took a number of substantial actions during the year and quarter ended December 31, 2007, as outlined below.

*     *     *

We have determined as of December 31, 2007, that the remediated controls discussed above were effectively designed and demonstrated effective operation for a sufficient period of time to enable us to conclude that the material weakness regarding accounting for income taxes has been remediated.

The effectiveness of any system of controls and procedures is subject to certain limitations, and, as a result, there can be no assurance that our controls and procedures will detect all errors or fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system will be attained.

We will continue to develop new policies and procedures as well as educate and train our employees on our existing policies and procedures in a continual effort to improve our internal control over financial reporting, and we will be taking further actions as appropriate. We view this as an ongoing effort to which we will be devoting significant resources and which will need to be maintained and updated over time.

249.    Thereafter, Terex's Forms 10-Q during the Class Period falsely and misleadingly represented that the Company's internal controls were operating effectively when they were not, as alleged herein.  These false and misleading representations were wrongfully certified by Defendants DeFeo and Widman:

I, [DeFeo and Widman], certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Terex Corporation;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

97

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

250.    At all relevant times, the market for Terex common stock was an efficient market for the following reasons, among other things:

(a)      Terex common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market; and

(b)     Terex regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

251.    As a result, the market for Terex common stock promptly digested current information regarding Terex from all publicly-available sources and reflected such information in Terex's common stock prices.  Under these circumstances, all purchasers of Terex common stock during the Class Period suffered similar injury through their purchase of Terex's common stock at artificially inflated prices and a presumption of reliance applies.

## X.     LOSS CAUSATION

252.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the value of Terex common stock and operated as a fraud or deceit on Class Period purchasers of Terex common stock by misrepresenting the Company's business success and future business prospects, including but not limited to, misrepresentations regarding the strength and source of the Company's sales, a multitude of accounting violations, the value of Terex's goodwill, the ability of the Company to meet its financial projections, and its financial reporting.

253.    As a result of Defendants' fraudulent conduct as alleged herein, the prices at which Terex common stock traded were artificially inflated, at varying levels, throughout the Class Period. When Plaintiffs and other members of the Class purchased their Terex common stock, the true value of such common stock was substantially lower than the prices actually paid by Plaintiffs and the other members of the Class.

254.    During the Class Period, Defendants improperly concealed Terex's true financial condition and future business prospects.  Consequently, the price of its common stock was

artificially inflated throughout the Class Period.  Defendants also misrepresented the reasons behind Terex's reported results and made numerous false and misleading statements regarding many aspects of its business, including, but not limited to, the strength and source of the Company's sales and the ability of its stronger Cranes and Mining divisions to offset any slowdown in the AWP, Construction, and Roadbuilding divisions, thus minimizing the impact that declining markets would have on its business prospects.  Indeed, the Company's reported financial performance during the Class Period depended upon premature revenue recognition and vastly overvalued goodwill.  Later, however, when the truth regarding Terex's true financial circumstances was revealed, and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Terex common stock fell as the prior artificial inflation was removed.  As a result of their purchases of Terex common stock during the Class Period at artificially inflated prices, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws, when such artificial inflation dissipated.

255.    By misrepresenting the success of the Company's business and concealing its improprieties, Defendants presented a misleading picture of Terex's financials and future business prospects.  For example, Defendants' consistent statements that the Company would achieve "12 by 12 in '10" and that demand for its products and sales were strong, such that any softening in the AWP and Construction divisions would be off-set by the strength of its Cranes divisions, caused and maintained the artificial inflation in the price of Terex common stock throughout the Class Period, even as negative news reached the market, until the truth was finally revealed at the close of the Class Period.

256.    As a result of Defendants' materially false and misleading statements and documents, as well as the adverse, undisclosed information known to the Defendants, Plaintiffs and other

members of the Class relied, to their detriment on such statements and documents, and/or the integrity of the market, in purchasing their Terex common stock at artificially inflated prices during the Class Period.  Had Plaintiffs and the other members of the Class known the truth, they would not have taken such actions.

257.    As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by Plaintiffs and other members of the Class, and maintained the artificial inflation in the prices of Terex's common stock throughout the Class Period until the truth leaked out and was partially revealed to the market, at which time the prior inflation came out of the stock.  Defendants' false and misleading statements had the intended effect and directly and proximately caused, or were a substantial contributing cause, of Terex's stock trading at artificially inflated levels throughout the Class Period.

258.    Through a series of partial disclosure events regarding the Company's financial outlook and future business prospects, which culminated in the Company taking a substantial goodwill impairment charge and withdrawing its "12 by 12 in '10" guidance, as well as revealing, material problems relating to the demise of its Roadbuilding division and the substantial decline in demand and sales in its AWP and Construction divisions - in contradiction of Defendants' Class Period statements regarding the Company's financials and future business prospects - the artificial inflation came out of the price of Terex common stock.

259.    These events and disclosures, set forth more specifically above, included several disclosure events by the Company, as well as market analyst criticisms of the veracity and integrity of Defendants' Class Period Statements.  For example they included:

(a)        a partial disclosure in the Company's interim quarterly financial report filed on Form 10-Q on May 6, 2008, reflecting a change in business conditions in the Company's Roadbuilding division, resulting in a stock price decline totaling 4.9%;

(b)        a partial revelation during a conference call on June 25, 2008, regarding a slowdown in the AWP division, which caused a stock price decline totaling 9%;

(c)        a partial revelation in a press release on July 23, 2008, regarding a slowdown in the Company's AWP division and weakness in the Company's Construction division, resulting in a stock price decline totaling 6.7%;

(d)        a partial revelation in a September 4, 2008 press release regarding lowered quarterly and full year guidance, as well as a disclosure that the Company's Cranes and Mining divisions were no longer expected to offset market softening in the AWP and Construction divisions, which resulted in a stock price decline of 19.6%; and

(e)        a partial revelation in a press release on October 22, 2008, wherein the Company again revised its full year guidance downward and advised that the Company expected net sales for the next 12 months in the AWP division to be down 30-40%, net sales for the Materials Processing division to be down 15%-20%, and Construction to be down 25%-30% versus the prior twelve month period, resulting in a stock price decline totaling 4.02%.

260.    Defendants, however, mitigated or at least minimized the impact of these partial revelations of the truth in a further attempt to mislead the market's expectations for the Company by, among other things, declaring that the strength of the Company's Cranes and Mining divisions would offset any slowdown in its Construction and AWP divisions, by manufacturing sales through a series of accounting practices in violation of GAAP and Terex's own internal accounting policies, and by consistently pointing to the Company's "12 by 12 in '10" financial guidance.  For a time,

Defendants were successful.  Defendants' false and misleading statements limited the declines and maintained the artificial inflation in Terex's common stock.

261.    Nevertheless, the market's expectations were ultimately corrected on February 11, 2009, when Defendants abruptly withdrew their touted "12 by 12 in '10" guidance and recorded hundreds of millions of dollars in goodwill impairments, demonstrating the full extent of the decline in the Company's financials as a result of weak demand and loss of sales, even in its stronger Cranes division.  This final disclosure had a devastating effect on the price of Terex stock, as it fell by as much as 30% to close at $9.45 on February 12, 2009, a decline of as much as 87% off its Class Period high.

262.    The timing and magnitude of the decline in Terex common stock negates any inference that the loss suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Terex common stock and its subsequent decline in value as Defendants' prior misrepresentations and other ongoing fraudulent conduct were revealed, market expectations were corrected, and the artificial inflation came out of the price of Terex common stock.

263.    In addition, the decline in price of Terex common stock was a natural and probable consequence of Defendants' fraud and should have been foreseen by Defendants in light of the attending circumstances.  The market reactions to the disclosure of Terex's true financial condition and future business prospects were foreseeable to Defendants and well within the "zone of risk" concealed by Defendants' fraudulent conduct.

## XI.   NO SAFE HARBOR

264.   The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Terex who knew that those statements were false when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XII.   COUNT I:  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

265.   Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

266.   During the Class Period, Terex and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Terex common stock; and (iii) cause Plaintiffs and other

members of the Class to purchase Terex common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Terex and the Individual Defendants took the actions set forth herein.

267.    These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Terex's common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of Terex, as alleged below.

268.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participating in the making of affirmative statements and reports, to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, future business prospects, and operational performance, so that the market prices of Company common stock would be based on truthful, complete and accurate information.

269.    Terex and each of the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the

business, business practices, performance, operations and future business prospects of Terex as specified herein.

270.    These Defendants each employed devices, schemes and artifices to defraud while in possession of material adverse non-public information.  These Defendants also engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of Terex's value, performance, and financial and operational growth.  These acts included the making of, or the participation in the making of, untrue statements of material facts and omitting to state necessary facts in order to make the statements made about Terex and its business operations and future business prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Terex common stock during the Class Period.

271.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of her/his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and (iii) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which each knew or disregarded with recklessness was materially false and misleading.

272.    Each of these Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with

recklessness and for the purpose and effect of concealing Terex's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' misstatements of the Company's financial condition and performance throughout the Class Period, each of the Individual Defendants, if he or she did not have actual knowledge of the misrepresentations and omissions alleged, was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

273.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Terex common stock were artificially inflated, at varying levels, throughout the Class Period.  In ignorance of the fact that market prices of Terex common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or disregarded with recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Terex common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among other things, the common stock price declines identified herein that released the artificial inflation from the price of Terex common stock.

274.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, future business prospects and intrinsic value of Terex, which were not disclosed by Defendants, Plaintiffs and other members

of the Class would not have purchased or otherwise acquired their Terex common stock during the Class Period, or they would not have done so at artificially inflated prices which they paid.

275.    By virtue of the foregoing, Terex and the Individual Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

276.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period, as evidenced by, among other things, the common stock price decline on or about February 11, 2009, that released the artificial inflation from Terex's common stock.

## XIII.   COUNT II:  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

277.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

278.    Each of the Individual Defendants acted as a controlling person of Terex within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's fraudulent financial reporting and actual performance, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

279.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

280.     As set forth above, Terex and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, each of the Individual Defendants is liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period when the artificial inflation was released from Terex common stock, as detailed herein.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action and designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  November 18, 2010

DISERIO MARTIN O'CONNOR &
  CASTIGLIONI LLP


_/s/ Jonathan P. Whitcomb_
JONATHAN P. WHITCOMB

JONATHAN P. WHITCOMB (ct15014)
One Atlantic Street
Stamford, CT 06901
Telephone:  203/358-0800
203/348-2321 (fax)
jwhitcomb@dmoc.com


ROBBINS GELLER RUDMAN
  & DOWD LLP


_/s/ Samuel H. Rudman_
SAMUEL H. RUDMAN

SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID J. GEORGE
ROBERT J. ROBBINS
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

SUGARMAN & SUSSKIND
HOWARD S. SUSSKIND
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

CAVANAGH & O'HARA
PATRICK J. O'HARA
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 18, 2010, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system.  The electronic case filing system sent a "Notice of

Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as

service of this document by electronic means.

*/s/ Samuel H. Rudman*
Samuel H. Rudman