## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHEET METAL WORKERS LOCAL 32 PENSION
FUND and IRONWORKERS ST. LOUIS COUNCIL
PENSION FUND, Individually and on Behalf of All
Others Similarly Situated,

Plaintiffs,

- against -

TEREX CORPORATION, RONALD M. DEFEO,
PHILLIP WIDMAN, THOMAS J. RIORDAN, TIM
FORD, and JONATHAN D. CARTER,

Defendants.

NO. 3:09-CV-02083-RNC

CLASS ACTION

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
## CONSOLIDATED CLASS ACTION COMPLAINT

WILLIAM G. MCGUINNESS
DAVID B. HENNES
FRIED, FRANK, HARRIS, SHRIVER
 & JACOBSON LLP
ONE NEW YORK PLAZA
NEW YORK, NEW YORK 10004-1980
TEL: (212) 859-8000
FAX: (212) 859-4000

BRIAN E. MORAN
ROBINSON & COLE LLP
1055 WASHINGTON BOULEVARD
STAMFORD, CT 06901-2249
TEL: (203) 462-7500
FAX: (203) 462-7599

*Attorneys For Defendants*
*Terex Corporation, Ronald M. Defeo, Phillip C. Widman,*
*Thomas J. Riordan, Timothy A. Ford, and Jonathan D. Carter*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 7

    The Parties ...................................................................................................... 7

    Overview of Financial Crisis ......................................................................... 8

    Terex's 2007 Year-End Results ..................................................................... 9

    The First Half of 2008 .................................................................................. 10

    The Second Half of 2008 .............................................................................. 12

ARGUMENT ...................................................................................................... 18

I.      PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ................................... 18

    A.    Plaintiffs Must Plead Facts Demonstrating That  The Alleged Fraud Caused The Investor Losses .................................................................. 18

    B.    The Complaint Fails To Plead That The Alleged  Fraud Proximately Caused Any Investor Loss ...................................................................... 20

        1.    The Goodwill Impairment Charge  Did Not Cause Investor Losses ......... 20

        2.    The Alleged Accounting Fraud  Did Not Cause Investor Losses ............. 23

    C.    Market Conditions Caused Terex's Stock Price To Drop ...................... 26

II.    PLAINTIFFS HAVE FAILED TO PLEAD A STRONG INFERENCE OF FRAUDULENT INTENT ................................................................................ 28

    A.    The Individual Defendants' Trading Activity  Negates Any Inference Of Scienter ................................................................................................ 29

    B.    Plaintiffs Fail To Plead Particularized Facts That Give Rise To  A Strong Inference Of Conscious Misbehavior Or Recklessness ......................... 33

III.   TEREX'S FORWARD-LOOKING STATEMENTS ARE PROTECTED BY THE PSLRA SAFE HARBORS .................................................................. 44

**PAGE**

     A.      The Reform Act's Safe Harbors Are Absolute Bars To Liability ..........................44

     B.      The Forward-Looking Statements ........................................................................45

     C.      All of Terex's Forward-Looking Statements Were  Accompanied By
               Meaningful Cautionary Language ........................................................................46

     D.      Plaintiffs Fail To Plead Facts Establishing "Actual Knowledge" Of Falsity ........49

IV.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL
      TO IDENTIFY ANY FALSE STATEMENTS ..................................................................50

V.     PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON
      LIABILITY UNDER SECTION 20(A) OF THE EXCHANGE ACT.............................55

CONCLUSION.....................................................................................................................55

## TABLE OF AUTHORITIES

**PAGE**

<u>Cases</u>

*60223 Trust v. Goldman, Sachs & Co.*,
   540 F. Supp. 2d 449 (S.D.N.Y. 2007)....................................................................................21

*Acito v. Imcera Group, Inc.*,
   47 F.3d 47 (2d Cir. 1994) .......................................................................................................52

*Alaska Elec. Pension Fund v. Adecco S.A.*,
   434 F. Supp. 2d 815 (S.D. Cal. 2006).....................................................................................37

*Alaska Laborer Emp'rs Ret. Fund v. Scholastic Corp.*,
   2010 WL 3910211 (S.D.N.Y. Sept. 30, 2010)........................................................................25

*Amorosa v. Ernst & Young LLP*,
   682 F. Supp. 2d 351 (S.D.N.Y. 2010).....................................................................................24

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
   597 F.3d 330 (10th Cir. 2010) ................................................................................................25

*Avon Pension Fund v. GlaxoSmithKline PLC*,
   343 Fed. Appx. 671 (2d Cir. 2009)...................................................................................31, 32

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................................7

*Boguslavsky v. Kaplan*,
   159 F.3d 715 (2d Cir. 1998)....................................................................................................55

*Borochoff v. GlaxoSmithKline PLC*,
   2008 WL 2073421 (S.D.N.Y. May 9, 2008) ..........................................................................30

*Caiafa v. Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007)...............................................................................52, 54

*California Public Employees' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004)..............................................................................36, 37, 39, 52

*Campo v. Sears Holding Corp*,
   635 F. Supp. 2d 323 (S.D.N.Y. 2009).....................................................................................36

*Carman v. Liuski Int'l*,
   1996 WL 732825 (E.D.N.Y. Dec. 18, 1996) ..........................................................................55

**PAGE**

*Cellular Tech. Servs. Co. v. TruePosition, Inc.,*
    609 F. Supp. 2d 223 (D. Conn. 2009)....................................................27

*Chill v. General Electric Company,*
    101 F.3d 263 (2d Cir. 1996).........................................................33, 39

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.,*
    2010 WL 1029290 (S.D.N.Y. March 16, 2010) ..............................9

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group PLC,*
    655 F. Supp. 2d 262 (S.D.N.Y. 2009)...........................................52, 54

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group PLC,*
    2010 WL 309009 (S.D.N.Y. Jan. 22, 2010) ........................................53

*Coyne v. General Elec. Co.,*
    2010 WL 2836730 (D. Conn. July 15, 2010) .....................................49

*\*Dura Pharmaceuticals Inc. v. Broudo,*
    544 U.S. 336 (2005)................................................................ passim

*\*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009)...............................................29, 33, 54

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,*
    594 F.3d 783 (11th Cir. 2010) ..........................................................45

*Fort Worth Employers' Ret. Fund v. Biovail Corp.,*
    615 F. Supp. 2d 218 (S.D.N.Y. 2009)...............................................20

*Ganino v. Citizens Utilities Co.,*
    228 F.3d 154 (2d Cir. 2000)...............................................................16

*Gissin v. Endres,*
    2010 WL 3468508 (S.D.N.Y. Sept. 1, 2010)....................................49

*Gordon Partners v. Blumenthal,*
    293 Fed. Appx. 815 (2d Cir. 2008).....................................................27

*Hemi Group, L.L.C. v. City of New York, N.Y.,*
    130 S. Ct. 983 (2010)...........................................................................7

*Higginbotham v. Baxter Int'l, Inc.,*
    495 F.3d 753 (7th Cir. 2007) .....................................................4, 17, 34

*In re Am. Express Co. Sec. Litig.,*
    2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008)........................35, 39, 50

**PAGE**

*In re AOL Time Warner, Inc. Sec. Litig.*,
  503 F. Supp. 2d 666 (S.D.N.Y. 2007) ...................................................................24

*In re Bausch & Lomb, Inc., Sec. Litig.*,
  592 F. Supp. 2d 323 (W.D.N.Y. 2008) ........................................................ passim

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) .....................................................4, 30, 32

*In re Celestica Inc. Sec. Litig.*,
  2010 WL 4159587 (S.D.N.Y. Oct. 14, 2010) ......................................................40

*In re Citigroup Inc. Sec. Litig.*,
  2010 WL 4484650 (S.D.N.Y. Nov. 9, 2010) .......................................................39

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) .............................................................................45

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ....................................................25

*In re eSpeed, Inc. Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006) ................................................................31

*In re First Union Corp. Sec. Litig.*,
  128 F. Supp. 2d 871 (W.D.N.C. 2001) ...............................................................32

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) .......................................................................24, 25, 26

*In re Focus Media Holding Ltd. Litig.*,
  701 F. Supp. 2d 534 (S.D.N.Y. 2010) ................................................................49

*In re Gildan Activewear, Inc. Sec. Litig.*,
  636 F. Supp. 2d 261 (S.D.N.Y. 2009) ................................................................32

*In re Hutchinson Tech., Inc. Sec. Litig.*,
  536 F.3d 952 (8th Cir. 2008) ..............................................................................44

*In re Hypercom Corp. Sec. Litig.*,
  2006 WL 1836181 (D. Ariz. July 5, 2006) ..........................................................43

*In re IPO Securities Litigation*,
  399 F. Supp. 2d 261 (S.D.N.Y. 2005) ................................................................24

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ................................................................31

**PAGE**

*In re MBIA, Inc., Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) ..................................................................38

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) ..................................................19, 21, 27

*In re Omnicom Group, Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ......................19, 21

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ................................................................................21

*In re Rackable Sys., Inc. Sec. Litig.*,
    2010 WL 3447857 (N.D. Cal. 2010) ...................................................................36

*In re Security Capital Assur. Ltd. Sec. Litig.*,
    2010 WL 1372688 (S.D.N.Y. March 31, 2010) ..............................................27, 30

*In re Sierra Wireless, Inc., Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007) ...............................................38, 46, 49, 54

*In re Sina Corp. Sec. Litig.*,
    2006 WL 2742048 (S.D.N.Y. Sept. 25, 2006) ................................................30, 51

*In re Tellium*,
    2005 WL 2090254 (D.N.J. Aug. 26, 2005) .........................................................26

*In re Veeco Instruments Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) .........................................................................48

*In re Williams Sec. Litig. – WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) .....................................................................22, 25

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ...............................................................................34

*Joffee v. Lehman Bros., Inc.*,
    410 F. Supp. 2d 187 (S.D.N.Y. 2006) .............................................................22, 28

*Lasker v. N.Y. State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) ....................................................................................54

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) ................................................................................28

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ......................................................................... passim

**PAGE**

*Leykin v. AT & T Corp.*,
  423 F. Supp. 2d 229 (S.D.N.Y. 2006).........................................................................27

*Local No. 38 Int'l Bros. of Elec. Workers Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010).......................................................................40

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*,
  652 F. Supp. 2d 576 (E.D. Pa. 2009) .......................................................................27

*\*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 Fed. Appx. 400 (2d Cir. Feb. 26,
  2009) ................................................................................................................ passim

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ..................................................................................25

*Miller v. Champion Enters., Inc.*,
  346 F.3d 660 (6th Cir. 2003) .....................................................................................45

*National Junior Baseball League v. PharmaNet Develop. Group, Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) .....................................................................24, 28

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................................................33

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010)..................................................................39, 50

*Police & Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009).......................................................................25

*Ray v. Citigroup Global Mkts., Inc.*,
  482 F.3d 991 (7th Cir. 2007) .....................................................................................27

*Ressler v. Liz Claiborne, Inc.*,
  75 F. Supp. 2d 43 (E.D.N.Y. 1998) ...........................................................................32

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)..............................................................41, 42, 52, 55

*Ross v. Walton*,
  668 F. Supp. 2d 32 (D.D.C. 2009) ............................................................................22

*San Diego County Employees Ret. Ass'n v. Maounis*,
  2010 WL 1010012 (S.D.N.Y. March 15, 2010) .........................................................49

**PAGE**

*San Leandro Emerg. Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.*,
    75 F.3d 801 (2d Cir. 1996) ..................................................................................54

*Schuster v. Symmetricon, Inc.*,
    2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) ....................................................31

*Shushany v. Allwaste, Inc.*,
    992 F.2d 517 (5th Cir. 1993) ...............................................................................37

*\*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ...................................................................... passim

*Steinberg v. Ericsson LM Tel. Co.*,
    2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ....................................35, 37, 40, 42

*Stockman v. Flotek Indus., Inc.*,
    2010 WL 3785586 (S.D. Tex. Sept. 29, 2010) ....................................................52

*Tabor v. Bodisen Biotech, Inc.*,
    579 F. Supp. 2d 438 (S.D.N.Y. 2008) ..........................................................41, 51

*Tamar v. Mind C.T.I., Ltd.*,
    2010 WL 2802216 (S.D.N.Y. July 2, 2010) ........................................................39

*Teachers' Ret. Sys. of L.A. v. Qwest Commc'n Int'l Inc.*,
    2005 WL 2359311 (D. Colo. Sept. 23, 2005) .....................................................43

*Teamsters Allied Benefit Funds v. McGraw*,
    2010 WL 882883 (S.D.N.Y. March 11, 2010) ....................................................44

*\*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..................................................................................3, 29, 34

*The Clearing Corp. v. Fin. & Energy Exch. Ltd.*,
    2010 WL 2836717 (N.D. Ill. July 16, 2010) .......................................................41

*Waterford Twp. Gen. Emps. Ret. Sys. v. SunTrust Banks, Inc.*,
    2010 WL 3368922 (N.D. Ga. Aug. 19, 2010) .....................................................21

*Waters v. Gen. Elec. Co.*,
    2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010) ....................................................22

*Zack v. Allied Waste Industries, Inc.*,
    2005 WL 3501414 (D. Ariz. Dec. 15, 2005) ......................................................32

**PAGE**

**Statutes**

15 U.S.C. § 78u-4(b)(1) ................................................................................50

15 U.S.C. § 78u-4(b)(1)-(2) ......................................................................3, 29

15 U.S.C. § 78u-4(b)(2)(A)............................................................................29

15 U.S.C. § 78u-4(b)(4) .................................................................................18

15 U.S.C. § 78u-5(i)(1)(A)-(D).......................................................................46

15 U.S.C. § 78u-5(c)(1)(A)(i) ...................................................................44, 46

15 U.S.C. § 78u-5(c)(1)(B)(i) .........................................................................44

**Rules**

Federal Rule of Civil Procedure 9(b)......................................................1, 52, 55

Federal Rule of Civil Procedure 12(b)(6) ...................................................1, 55

**Other Authorities**

Vikas Bajaj, *Economic Clouds? Wall Street Sees Signs of Sunshine*,
    N.Y. Times, May 2, 2008 ........................................................................10

FASB Statement of Financial Accounting Standards, No. 142 ¶¶ 26, 28 ......................42

Alan Greenspan, Testimony before the United States House of Representatives,
    Committee on Government Oversight and Reform (Oct. 23, 2008) .........................12

H.R. Conf. Rep. 104-369 (1995), reprinted at 1995 U.S.C.C.A.N. 730.............................5, 45, 47

David Jolly, *Worldwide, a Bad Year Only Got Worse*, N.Y. Times, Jan. 1, 2009 ......................13

Alexandra Twin, *Wall Street Starts New Year with a Bang*
    CNNMoney.com, Jan. 2, 2009...................................................................17

Alexandra Twin, *Worst January Ever for Dow, S&P 500*
    CNNMoney.com, Jan. 30, 2009................................................................17

*\* Authorities upon which Defendants principally rely are denoted with an asterisk*

Defendants Terex Corporation ("Terex" or the "Company"), Ronald M. DeFeo, Phillip C. Widman, Thomas J. Riordan, Timothy A. Ford, and Jonathan D. Carter (the "Individual Defendants") (collectively, the "Defendants") submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Class Action Complaint For Violations of Securities Laws (the "Complaint" or "Compl.") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4, 78u-5 (the "PSLRA").

## PRELIMINARY STATEMENT

Midway through 2008, the United States bore the brunt of the most severe economic crisis since the Great Depression.  The housing market crashed, liquidity evaporated from capital markets, major investment banks failed, bankruptcies skyrocketed, and major stock indices plummeted to record lows.  The construction industry was hit particularly hard by the crisis, and Terex, a manufacturer of capital equipment used largely in the construction industry, was not immune.  As a result of the global financial crisis, Terex, like its counterparts in the construction industry, reported slowing demand, reduced its earnings guidance, recorded a goodwill impairment charge, and ultimately reported earnings that were lower than it had initially anticipated.  Not surprisingly, Terex's stock price fell and, all too predictably, this lawsuit soon followed.

While ignoring this historic economic backdrop – it goes virtually unmentioned in the 110-page Complaint – Plaintiffs, a handful of Terex shareholders, nonetheless claim that the Company's senior managers committed securities fraud from February 2008 to February 2009. The length of their Complaint notwithstanding, Plaintiffs make only three core claims, all of which are contrived and all of which lack a basis in fact and law: that Terex (i) improperly delayed taking a goodwill writedown during the Class Period, (ii) engaged in a handful of

1

improper accounting practices to mask declining revenue (such as the colorfully, but falsely alleged, "Truck-Stop-Two-Step"), and (iii) issued unduly optimistic forward-looking earnings guidance.  In making these claims, Plaintiffs not only ignore the impact of the financial crisis, which caused their losses (and not Terex senior management), but they also ignore logic and common sense.  It is inherently illogical to claim, as Plaintiffs do here, that Terex's senior executives fraudulently <u>inflated</u> Terex's stock price while, at the same time, greatly <u>increasing</u> their Terex stock holdings.

Plaintiffs' implausible fraud claims fail for multiple basic and independent reasons.

***First***, Plaintiffs do not (and cannot), as required by the Supreme Court in *Dura Pharmaceuticals Inc. v. Broudo*, 544 U.S. 336 (2005), plead "loss causation" – or show that the revelation of the supposed fraud caused a decline in Terex's stock price (and therefore their loss).  Terex's stock price declined not because of any claimed fraud but because of the effects of the global financial crisis, which impacted not only Terex but all of the major stock indices in general and the construction industry in particular.  That nothing the Defendants did caused Plaintiffs' loss is exemplified by their contrived "goodwill" claim.  Plaintiffs claim that Terex's stock price declined after the Company disclosed a goodwill impairment charge of $459.9 million on February 11, 2009.  But, by that time, Terex's stock price had <u>already</u> declined 82% from its Class-Period high, showing that the disclosure of the charge could not have caused their loss.

Plaintiffs cannot plead loss causation for a more basic reason as well:  Plaintiffs do not (and cannot) allege any "corrective," "curative," or "cleansing" disclosure revealing the supposed fraud to the market and a corresponding decline in Terex's stock price, as no such "corrective" disclosures exist.  With regard to their goodwill claim, Plaintiffs wrongly claim that

the February 11 announcement was "corrective," as they ignore the fact that the Company had <u>already</u> <u>disclosed</u> that it was going to take a substantial goodwill impairment charge on February 3, 2009 (8 days earlier).  At that time, Terex announced that it anticipated taking a substantially larger goodwill impairment charge – $600 million – than the charge ultimately taken on February 11 (which was $459.9 million).  In response to the February 3 announcement, Terex's stock price actually <u>increased</u>.  Likewise, with regard to their contrived improper-accounting-practices claim, Plaintiffs point to no "corrective" disclosures or a decline in Terex's stock price whatsoever.  Instead, Plaintiffs purport to identify as "corrective" certain Terex disclosures issued on days when its stock price declined.  But these supposedly "corrective" statements do not even hint that Terex had engaged in improper accounting practices, let alone reveal the "truth" of Plaintiffs' accounting fraud allegations.  For all of these reasons, Plaintiffs cannot show loss causation, and the Complaint should be dismissed on this basis alone.

*Second*, Plaintiffs' fraud claim fails because the Complaint does not plead a "strong inference of scienter" – "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); 15 U.S.C. § 78u-4(b)(1)-(2).  As the Supreme Court has explained, securities-fraud plaintiffs must plead a "cogent" and "compelling" inference of scienter.  *Tellabs,* 551 U.S. at 324.  The pleading requirements are even more exacting for forward-looking statements, as plaintiffs must plead particularized facts demonstrating <u>actual</u> <u>knowledge</u> that the statements were false at the time they were made.

There is no cogent or compelling inference of fraud here, and there can never be, because the Individual Defendants were among the biggest losers as a result of the decline in Terex's stock price during the Class Period:

| Defendant | Holdings at the Start of Class Period | Holdings at the End of Class Period | Increase in Holdings | Percentage Increase in Holdings |
|---|---|---|---|---|
| Mr. DeFeo | 714,650 | 826,928 | 112,278 | 15.71% |
| Mr. Widman | 129,674 | 171,894 | 42,220 | 32.56% |
| Mr. Riordan | 132,856 | 204,285 | 71,429 | 53.76% |
| Mr. Ford | 37,613 | 51,083 | 13,470 | 35.81% |
| Mr. Carter | 54,608 | 53,606 | -1,002 | -1.83% |
| **Total** | **1,069,401** | **1,307,796** | **238,395** | **22.29%** |

As shown above, the Individual Defendants, who collectively held over 1.3 million shares of Terex stock at the end of the Class Period, lost exponentially more than the Lead Plaintiffs, who collectively held, at most, about 1200 Terex shares.  Terex's CEO, CFO, and COO, Defendants DeFeo, Widman, and Riordan, who made most of the statements challenged in the Complaint, sold <u>no</u> <u>shares</u> whatsoever; instead, Terex's three most senior executives <u>purchased</u> 62,000 shares on the open market during the Class Period and held 225,000 <u>more</u> Terex shares at the end of the Class Period than at the beginning.  In total, the five Individual Defendants collectively increased their Terex stockholdings during the Class Period by over 22%, or nearly 240,000 shares.  These undisputed facts are not the hallmark of some fraud but instead establish the Individual Defendants' sincere optimism in the future of the Company and the absence of scienter.  *See, e.g.*, *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (increase in defendants' total stock holdings is "a fact wholly inconsistent with fraudulent intent").

In the face of these undisputed facts, Plaintiffs attempt to manufacture scienter based upon on the assertions of 31 unnamed and self-styled "confidential witnesses" (the "CWs") – mostly alleged to be purported former employees of the Company.  *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("[I]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind. Perhaps they are

4

lying. Perhaps they don't even exist").  But there can be no cogent and compelling inference of fraud derived from these unnamed and unknown claimed "witnesses" because, among other reasons, they:  (i) had virtually no contact with the Individual Defendants (and thus have no knowledge of what they knew or did not know); (ii) are primarily low-level employees who did not work at Terex's corporate headquarters (and thus have no knowledge of how Terex's financial statements and earnings guidance were prepared or the data underlying them); and (iii) make vague, conclusory and irrelevant allegations.  In short, there is simply no inference whatsoever that Defendants had actual knowledge or were reckless in not knowing that Terex's public statements were false at any time.

**Third,** the PSLRA's "safe harbor" precludes any claim concerning Terex's forward-looking statements, including any claim based on Terex's earnings guidance.  Congress designed the safe harbor to encourage companies to disclose estimates and predictions about the future, such as earnings guidance, without fear of being sued if they fail to materialize, as projections often do, particularly during severe economic downturns.  *See* H.R. Conf. Rep. No. 104-369, at 32, 43 (1995), reprinted at 1995 U.S.C.C.A.N. 730, 731, 742 (Congress intended the safe harbor "to encourage issuers to disseminate relevant information to the market without fear of open-ended liability" because companies could otherwise face lawsuits "because of changes in the economy").  Where, as here, Terex's statements were (i) identified as forward-looking, and (ii) accompanied by meaningful cautionary statements, they cannot form the basis for a securities fraud claim.  Terex repeatedly warned the market of risks that could adversely affect the future performance of the Company – including risks that were similar, if not identical, to those which caused Terex to fail to meet its earnings guidance – and the safe harbor is an absolute bar to liability.

*Fourth*, the Complaint fails to plead with particularity, as it must, that Terex made any false statements.  Rather than identify statements alleged to be false and the reason for their falsity, the Complaint resorts to improperly reprinting block quotes of nearly every statement made by Terex during the Class Period.[1]  In addition, the Complaint fails to plead facts to establish when the allegedly improper accounting took place, its amount, and its effect on the Company's financial statements and earnings guidance.  Finally, the Complaint fails to show when Terex should have recognized a goodwill impairment, for what amount, and how the alleged failure to record a charge prior to February 2009 amounts to securities fraud.  Indeed, any assertion of fraud is directly contradicted by the Company's continued close monitoring of goodwill – and the many impairment tests conducted during the Class Period – as described and disclosed in Terex's SEC filings.

In the end, the Complaint asserts nothing more than a classic "fraud-by hindsight" claim – Terex's stock priced dropped and therefore there must have been fraud.  But the unsurprising fact that Terex's stock price dropped during a global financial crisis cannot support a claim for fraud.  To the contrary, Congress enacted the PSLRA specifically to eliminate these types of abusive securities litigations and put an end to the practice of pleading fraud by hindsight. Plaintiffs have failed to plead a viable cause of action under the federal securities laws and the Complaint should be dismissed with prejudice.

---

[1] Because this style of pleading makes it impossible to determine which statements are alleged to be fraudulent, for ease of analysis, Exhibit 1 to the Declaration of Margaret Hirce, dated January 18, 2011, contains a list of the "bolded" statements found in the Complaint, which presumably give some clue as to which statements are at issue in this litigation.  Those bolded statements have been divided into two general categories:  (i) those concerning the Company's historically reported financial results, and (ii) those concerning the Company's forward-looking statements, such as earnings guidance.

# FACTUAL BACKGROUND[2]

## The Parties

***The Company.***  Terex, a Delaware corporation headquartered in Westport, Connecticut,

is a diversified global manufacturer of capital equipment focused on delivering reliable,

customer relevant solutions for the construction, infrastructure, quarrying, surface mining,

shipping, transportation, refining, and utility industries.  *See* Form 10-K, 2/27/2009, at 4 (Ex. 7);

Compl. ¶ 9.[3]  During the Class Period, Terex operated in five business segments, which

generated $9.9 billion in revenue and $71.9 million in net income:

| Segment | 2008 Net Sales |
|---------|----------------|
| Aerial Work Platforms ("AWP") | $2.1 Billion |
| Construction | $1.9 Billion |
| Cranes | $2.9 Billion |
| Materials Processing and Mining ("MPM") | $2.5 Billion |
| Roadbuilding, Utility Products, and Other[4] | $718 Million |
| **Total Net Sales** | **$9.9 Billion** |

*See* Form 10-K, 2/27/2009, at 4, 34, 41-44 (Ex. 7); Compl. ¶ 55.

As of December 31, 2008, Terex had approximately 20,400 employees working in 62

facilities located in North and South America, Europe, Australia and Asia.  *See* Form 10-K,

---

[2] For purposes of this motion only, factual allegations in the Complaint are assumed to be true.  *See Hemi Group, L.L.C. v. City of New York, N.Y.*, 130 S. Ct. 983, 986-87 (2010).  However, conclusory allegations and legal conclusions are not entitled to any presumption of truth.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("courts are not bound to accept as true a legal conclusion couched as a factual allegation").  The Court may consider the following in deciding a motion to dismiss:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon by it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 129 (D. Conn. 2007), *aff'd*, 312 Fed. Appx. 400 (2d Cir. Feb. 26, 2009).  All exhibit references, or "Ex." herein, are to the Hirce Declaration.  Unless otherwise noted, emphasis is added and internal quotations and citations are omitted throughout this brief.

[3] For the Court's convenience, the Complaint is attached to the Hirce Declaration as Exhibit 3.

[4] Beginning on January 1, 2009, the businesses within this segment, called "RBUO," were consolidated into Terex's other four business segments.

2/27/2009 at 28-29, 34 (Ex. 7).  The products manufactured by Terex include, among others, material lifts, portable aerial work platforms, heavy construction equipment, cranes, hydraulic mining excavators, drilling equipment, and concrete pavers.  *See id*. at 4-7.

*The Individual Defendants.*  The Complaint names several of Terex's current and former senior officers as Defendants:

- Ronald M. DeFeo is Terex's Chairman and Chief Executive Officer.  Compl. ¶ 10.

- Phillip C. Widman is Terex's Senior Vice President and Chief Financial Officer.  *Id.* ¶ 11.

- Thomas J. Riordan is Terex's President and Chief Operating Officer.  *Id*. ¶ 12.

- Timothy A. Ford is the President of the AWP segment.  *Id*. ¶ 13.

- Jonathan D. Carter was, during the Class Period, Terex's Vice President, Controller, and Chief Accounting Officer.  *Id*. ¶ 14.

*The Plaintiffs.*  Plaintiffs are Terex shareholders who purport to represent a putative class that purchased Terex's publicly traded common stock between February 20, 2008 and February 11, 2009 (the "Class Period").  Plaintiffs appear to have collectively held only 1,200 shares at the end of the Class Period,[5] or about 1.3 million Terex shares less than the Individual Defendants.

## Overview of Financial Crisis

As the Court is no doubt aware, 2008 was consumed by the global financial crisis, which resulted in financial dislocation unseen since the Great Depression.  The financial crisis impacted all industries, but hit the finance and construction industries (which relies on financing for purchases of heavy equipment) particularly hard.  The year was divided into two distinct halves: the first six months, which were characterized by growth and expansion, but also signs of a housing crisis and slowing economic conditions in the U.S. and Western Europe, and the second

---

[5] *See* Certifications of Ironworkers St. Louis District Council Pension Fund and Sheet Metal Workers Local 32 Pension Fund (Docket #19, Attachment 6); Certification of Sheet Metal Workers Local #218(S) Pension Fund (Docket #57, Attachment 1)).

six months, which saw the failure of Lehman Brothers, widespread economic crisis migrating

through Europe and other developed countries, and an almost overnight evaporation of liquidity

in the capital markets and credit for businesses.  Like all companies in the construction industry,

Terex suffered as a result of these global events.

**Terex's 2007 Year-End Results**

On February 20, 2008, Terex announced its year-end results for 2007:  net sales totaled

$9.1 billion and net income totaled $613.9 million.  *See* Form 8-K, 2/20/2008, at 1 (Ex. 13).  It

had been Terex's most profitable year in its history: sales were up by $1.5 billion and net income

was up by $217 million as compared to 2006.  *See id.*  Based on its historic 2007 results, the

Company was optimistic about its prospects for 2008.  As a result, Mr. DeFeo announced that

the Company projected "that Terex's total revenue for 2008 will be between $10.0 and $10.5

billion, and earnings per share in the range of $6.65 to $7.15 per share."  *Id.* at 4; Compl. ¶¶ 133,

136, 142.  Mr. DeFeo also said that "with respect to our objective of $12 billion in sales and a

12% operating margin by 2010, we feel we are ahead of our original timeline."  Form 8-K,

2/20/2008, at 2 (Ex. 13); Compl. ¶¶ 133, 135, 139, 142.  With regard to goodwill, the Company

announced the completion of its annual goodwill impairment review, finding that "[t]here were

no indicators of goodwill impairment based on this review."  Form 10-K, 2/27/2008, at F-21 (Ex.

6).[6]

While recognizing the "slowing economic conditions in North America and Western

Europe," Mr. DeFeo was nonetheless "optimistic about prospects for our business in both of

these markets and continue[d] to see very healthy indicators for continued economic expansion

---

[6] Goodwill represents the value of a company's intangible assets over and above the fair value of the company's identifiable assets and liabilities. *See City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 2010 WL 1029290, at *9 (S.D.N.Y. March 16, 2010).  Goodwill impairment occurs when the carrying amount of goodwill exceeds its fair value.  *See* Compl. ¶ 226.

from the developing markets."  Form 8-K, 2/20/2008, at 2 (Ex. 13); Compl. ¶ 134.

**The First Half of 2008**

> This past year has been like no other – the first half of the year exhibited robust growth and expansion, while the second half of the year was severely impacted by the global credit crisis and economic deterioration, which drove significant declines in customer demand in our businesses.
>
> Ronald DeFeo, February 11, 2009[7]

In early 2008, Terex, like most companies and many economists, believed that the financial and housing crisis that began in 2007 would be limited to the U.S. and Western Europe.[8]  Nonetheless, due to "[t]he downturn in the U.S. residential housing market and limited funding for infrastructure projects," Terex performed a goodwill impairment test, as of March 31, 2008, for the Roadbuilding division within its RBUO business segment.  Form 10-Q, 5/6/2008, at 14 (Ex. 25); Compl. ¶ 150.  As it disclosed to investors, Terex determined that the unit "passed the test and no impairment charge was recorded."  *Id.*

On April 23, 2008, Terex announced its results for the first quarter of 2008:  net sales were $2.4 billion, a 17% increase compared to the first quarter of 2007, and net income was $163.3 million, a 46% increase compared to the same period in 2007.  *See* Form 8-K, 4/23/2008, at 1 (Ex. 15); Compl. ¶¶ 144, 152.  However, Terex also disclosed that this growth was not evenly distributed among each of its business segments, announcing that results from its RBUO segment and Construction operations were "somewhat disappointing for the quarter."  Form 8-K, 4/23/2008, at 1 (Ex. 15); Compl. ¶ 144.  Net sales for RBUO decreased compared with the first quarter of 2007, which was "directly related to the decrease in concrete mixer truck demand

---

[7] *See* Comp. ¶ 195; Form 8-K, 2/11/2009, at 1 (Ex. 23).

[8] *See, e.g.*, Vikas Bajaj, *Economic Clouds? Wall Street Sees Signs of Sunshine*, N.Y. Times, May 2, 2008 (Ex. 34) ("Many on Wall Street, the epicenter of the credit mess, seem to think that the worst is over. . . . Many of them see a broad, sustained recovery in both the economy and the financial markets coming in the second half of this year").  All public media articles cited herein have been attached, in chronological order, as Exhibit 34 to the Hirce Declaration**.**

resulting from continued softness in the North American housing market." Form 8-K, 4/23/2008, at 5 (Ex. 15); Compl. ¶ 145.

While recognizing that "uncertainties surround[] some of our end markets and increased input costs," after a strong performance in the first quarter, Terex maintained its earnings guidance and "anticipate[d] earnings per share for 2008 to be towards the middle to high end of our previously announced range, or $6.85 to $7.15 per share, on net sales of $10.5 to $10.9 billion." Form 8-K, 4/23/2008, at 1 (Ex. 15); Compl. ¶ 144. Terex also believed that, given its first quarter performance, it was still on track for "a milestone year . . . on our way to the '12 by 12 in '10' goal." Form 8-K, 4/25/2008 (Ex. 16); Compl. ¶ 146; *see also* Form 10-Q, 5/6/2008, at 27 (Ex. 25) ("Based on discussions with our customers, industry experience and knowledge of our internal improvement initiatives, we remain confident in our ability to obtain our 2010 targets of $12 billion in revenue with a 12% operating margin").

During conference calls hosted in May and June 2008, Terex further addressed the economic environment and the potential impact on its business. *See* Conf. Call 5/30/2008, at 9-10 (Ex. 30); Conf. Call 6/25/2008, at 4 (Ex. 31); Compl. ¶¶ 154, 158-60. Mr. DeFeo pointed out that, while the U.S. market was not performing well in housing-related products, 70% of Terex's sales were international. *See* Conf. Call 5/30/2008, at 2 (Ex. 30). Thus, Mr. DeFeo noted that "we have a broad and deep exposure to many of the developing markets around the globe," which was helping to insulate Terex from some of the impact of the economic decline in the U.S. *Id.*

On July 23, 2008, Terex announced its results for the second quarter of 2008: net sales were $2.9 billion, an increase of 25% from the second quarter of 2007, and net income was $236.3 million, an increase of 26% compared to the same period in 2007. *See* Form 8-K,

7/23/2008, at 1 (Ex. 17); Compl. ¶¶ 166, 169.  Mr. DeFeo attributed overall second quarter

growth to diversification in Terex's global sales and products, which "allowed the Company to

perform well despite the difficult economic conditions in the U.S., softening of the markets in

Western Europe and increasing input costs."  Form 8-K, 7/23/2008, at 2 (Ex. 17); Compl. ¶ 169.

Because of the difficult conditions affecting the Roadbuilding unit within RBUO and the

weakness of U.S. infrastructure, Terex announced that it would "continue to monitor the

estimated fair value of the Roadbuilding business for purposes of determining whether a

goodwill impairment is evidenced."  Form 8-K, 7/23/2008, at 6 (Ex. 17).  Terex also reported

that a goodwill impairment test had been performed as of June 30, 2008, the Roadbuilding unit

passed the test, and no impairment charge was recorded.  *See* Form 10-Q, 8/1/2008, at 14 (Ex.

26).

      After another strong quarter, Terex "remain[ed] confident in [its] ability to achieve [its]

previously stated goal of '12 by 12 in 10.'"  Form 8-K, 7/23/2008, at 2 (Ex. 17); Compl. ¶¶ 165,

168-70.  Terex also "maintain[ed] [its] full year 2008 guidance with a net sales level of $10.5 to

$10.9 billion and earnings per share of $6.85 to $7.15."  Form 8-K, 7/24/2008 (Ex. 18); Compl.

¶¶ 166, 169.

**The Second Half of 2008**

      It was not until the second half of 2008 that global markets finally absorbed the enormity

of the economic crisis.  As Former Federal Reserve Chairman Alan Greenspan observed, the

global economy was "in the midst of a once-in-a-century credit tsunami. . . .  This crisis . . . has

turned out to be much broader than anything I could have imagined."[9]  Global stock markets

plummeted in September and October 2008 as conditions continued to worsen.  The economic

---

[9] Alan Greenspan, Testimony before the United States House of Representatives, Committee on Government Oversight and Reform, at 1 (Oct. 23, 2008) (Ex. 34).

problems in the U.S. also spread worldwide.[10]

As worldwide markets deteriorated, on September 4, 2008, Terex announced that it had lowered its forecasted 2008 earnings per share guidance to "between $6.35 and $6.65." Form 8-K, 9/4/2008, at 1 (Ex. 19); Compl. ¶¶ 172, 181. At that time, Terex advised the market that it expected its future earnings to be affected by "continued market softening and input costs in the Aerial Work Platforms and Construction segments in Western Europe and the United States." Form 8-K, 9/4/2008, at 1 (Ex. 19).

Following its September warning, on October 22, 2008, Terex announced mixed third quarter results, reflecting the growing effects of the crisis. While net income decreased 38% compared to the third quarter of 2007, net sales increased 14.5% over the same period, to $2.5 billion. *See* Form 8-K, 10/22/2008, at 1 (Ex. 20) ("While we continue to make progress on our improvement initiatives, the current environment is challenging, marked by a continued global credit crisis and worsening economic conditions, particularly in the U.S. and Western Europe"); Compl. ¶¶ 187. In its third quarter report, Terex explained the impact that the economic conditions were having on its segments:

> The current operating environment continues to be challenging, due to unprecedented levels of instability in the financial markets that have resulted from the ongoing global credit crisis, particularly in the U.S. and Western Europe. The AWP and Construction segments and the materials processing business all have experienced weakness for many of their products in these markets.

Form 10-Q, 11/3/2008, at 27 (Ex. 27); Compl. ¶ 189 ("We have seen a credit crisis that appeared limited to the U.S. intensify into a worldwide financial crisis in September and October. The causes of this financial turbulence differ from past downturns, thus there is no historical precedent with which to compare").

---

[10] *See, e.g.*, David Jolly, *Worldwide, a Bad Year Only Got Worse*, N.Y. Times, Jan. 1, 2009, at B1 (Ex. 34).

As a result of that weakness, the Company again lowered its forecasted 2008 earnings per share guidance to between $5.69 and $5.79 and reduced its expected 2008 net sales to between $10.0 and $10.3 billion.  *See* Form 8-K, 10/22/2008, at 2 (Ex. 20); Compl. ¶ 183.  Terex also announced that, "[g]iven the near term performance," it would continue to monitor its Construction and RBUO segments for any evidence of goodwill impairment.  Form 8-K, 10/22/2008, at 7-8 (Ex. 20).  On November 3, 2008, Terex announced that a goodwill impairment test performed as of September 30, 2008 found, once again, no evidence of impairment.  *See* Form 10-Q, 11/03/2008, at 14 (Ex. 27); Compl. ¶ 189.

Global markets continued to fall through the end of 2008 and into early 2009.  Before the market opened on February 3, 2009, Terex cautioned that its full year 2008 earnings guidance would "be approximately 5% below the low end of its previous full year guidance."  Form 8-K, 2/3/2009, at 1 (Ex. 22); Compl. ¶ 192.  At that time, Terex also announced that it expected to record a non-cash goodwill impairment charge of approximately $600 million, "principally related to the Construction, Roadbuilding, and Utilities businesses."  *Id*.  As Mr. DeFeo explained:

> Our fourth quarter 2008 results were affected by the rapid change in global economic conditions more than we anticipated, as well as continued input cost pressure.  We continue to feel the negative effect that credit availability has on customer sentiment and demand for our products, particularly in our Construction, Material Processing and Aerial Work Platforms businesses, as well as our smaller crane and tower crane product lines.

Form 8-K, 2/3/2009, at 1 (Ex. 22).  Notwithstanding the news, which included the anticipated $600 million goodwill impairment charge, Terex's stock price increased on February 3, 2009 by almost 1.95%, to close at $12.01.  *See* Compl. ¶ 194.  Terex's stock price continued to rise through February 9, 2009, when it closed at $14.63 per share.  *See id*.

On February 11, 2009, Terex announced its results for the fourth quarter of 2008:  net

sales for the fourth quarter were $2.08 billion, a decrease of 20% from the fourth quarter of 2007. *See* Form 8-K, 2/11/2009, at 1 (Ex. 23); Compl. ¶ 195. The Company also reported a net loss of $421.5 million for the quarter, which included a non-cash goodwill impairment charge of $459.9 million in the RBUO and Construction segments as a result of the Company's annual goodwill impairment test. *See* Form 8-K, 2/11/2009, at 1 (Ex. 23). The Company incurred the charge as a result of "reduced estimated future cash flows for these businesses based on lower expectations for growth and profitability, primarily as a result of the current global economic downturn." Form 10-K, 2/27/2009, at 40 (Ex. 7); *see also* Form 8-K, 2/11/2009, at 2 (Ex. 23). The impairment charge was $140 million <u>less</u> than Terex estimated on February 3.

Despite the fourth quarter loss, Terex's net sales for the full-year 2008 were $9.89 billion, which was an 8.2% <u>increase</u> from 2007 (and only 1% below the Company's initial forecast of $10 billion). *See* Form 8-K, 2/11/2009, at 1 (Ex. 23); Compl. ¶ 195. However, due to the economic dislocation that occurred in the second half of 2008, Terex announced "that the '12 x 12 in 10' goals ($12 billion in revenue, with 12% margins by 2010) will not be achieved. . . ." Form 8-K, 2/13/2009 (Ex. 24); Compl. ¶ 196.

On the whole, Terex, like the markets in general and the construction industry in particular, experienced a tumultuous 2008 as the global economy rapidly deteriorated and the financial crisis grew deeper. During this time, as is clear from its disclosures, Terex diligently monitored the economic environment; warned investors of the risks of a deteriorating economy; repeatedly revised its earnings guidance as circumstances warranted; continuously monitored the need to take a goodwill impairment charge; and reported the results of that goodwill monitoring. This behavior is entirely inconsistent with a scheme to defraud, but instead shows that Terex was attempting to cope with an unprecedented global financial crisis while apprising the market of

the effects of the crisis on its business.  Indeed, at all relevant times during the Class Period, the "Big 4" accounting firm PricewaterhouseCoopers ("PwC") audited Terex's financial statements, and those financial statements have never been restated.  *See* Form 10-K, 2/27/2008, at Ex. 23.1 (Ex. 6); Form 10-K, 2/27/2009, at Ex. 23.1 (Ex. 7).

Not surprisingly, as the crisis took hold, Terex's stock price declined steadily beginning in the second quarter of 2008.  *See* Ex. 4.[11]  Indeed, even while Terex was reporting record results in the first and second quarters of 2008, its stock price declined 34%.[12]  Terex's stock price then declined dramatically in the second half of 2008 and in early 2009.  But there is no mystery why this drop occurred:  a stunning and rapid global economic downturn and financial crisis unseen since the Great Depression that hit construction-related businesses, including Terex, particularly hard.  During the Class Period, many of Terex's major competitors in the construction industry saw similar dramatic declines.[13]  The S&P Construction & Farm Machinery Index – comprised of a group of construction- and equipment-related stocks, including Terex – dropped 63%.  Broad market indices also declined in percentages unseen since the depression: the S&P 500 and the Dow Jones Industrial Average declined 39% and 36%

---

[11] The Court may take judicial notice of published stock prices. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 fn.8 (2d Cir. 2000) ("the district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment").  Exhibit 4 to the Hirce Declaration provides (i) the closing price for the stock of Terex for each day during the Class Period, and (ii) a chart showing the percentage decline in Terex's stock price for certain periods referenced in this brief.  Exhibit 5 to the Hirce Declaration provides (i) the closing price for the stock of certain competitors of Terex and major stock indices referenced herein for each day during the Class Period, and (ii) a chart showing the percentage decline of these entities and indices during the Class Period.

[12] As noted above, on April 23, 2008 and July 23, 2008, Terex reported first and second quarter results substantially above the same periods in 2007.  Nonetheless, during the same three-month period, Terex's stock price declined by 34%, from $70.66 per share to $46.74 per share.  *See* Ex. 4.

[13] Between February 20, 2008 and February 11, 2009 (the Class Period), Terex's stock price dropped approximately 78%.  Many of Terex's major competitors suffered similar declines during this period:  Oshkosh Corporation's stock price fell 78%, CNH Global N.V.'s stock price fell 81%, Manitowoc Company, Inc.'s stock price fell 87%, and AGCO Corporation's stock price fell 66%.  *See* Exs. 4 & 5.

respectively.  *See* Ex. 5.[14]

Finally, any notion that any Individual Defendants engaged in fraud is destroyed by their massive losses resulting from the downturn.  Plaintiffs offer a chart depicting sales of Terex stock primarily by <u>non-defendants</u> during the Class Period (Compl. ¶ 209), but ignore the fact that the Individual Defendants collectively <u>increased</u> their holdings of Terex stock by nearly 240,000 shares, or more than 22%, during that time.[15]  Three of the five Individual Defendants – CEO DeFeo, CFO Widman, and COO Riordan – collectively <u>purchased</u> 62,000 Terex shares on the open market during the Class Period and sold no shares whatsoever.  *See* Exs. 8-10.[16]  The minor sales by Messrs. Ford and Carter (Ford increased his holdings by 36%) were pursuant to automated Rule 10b5-1 trading plans.  *See* Exs. 11-12.  These are hardly the actions of a group bent on profiting from a fraudulent scheme.[17]

---

[14] *See* Alexandra Twin, *Wall Street Starts New Year with a Bang*, CNNMoney.com, Jan. 2, 2009 (Ex. 34) ("Wednesday brought a positive end to one of the worst years on record.  The Dow lost 33.8% in the year, the third worst in history, following a drop of 52.7% in 1931.  The S&P declined nearly 38.5% - its worst yearly performance since an earlier version of the broad stock index lost 47% in 1931"); Alexandra Twin, *Worst January Ever for Dow, S&P 500*, CNNMoney.com, Jan. 30, 2009 (Ex. 34) ("It was the worst January ever for the Dow industrials and S&P 500").

[15] The increase in the Individual Defendants' collective stock holdings is set forth in the chart contained in the Preliminary Statement.  Forms 4 reflecting the Individual Defendants' Terex stock holdings at the beginning of the Class Period, at the end of the Class Period, and any open market purchases of Terex stock during the Class Period (as well as Rule 10b5-1 sales during the Class Period) are attached as Exhibits 8-12 of the Hirce Declaration.  *See* Exs. 8 (DeFeo), 9 (Widman), 10 (Riordan), 11 (Ford), 12 (Carter).  Holdings represent the Individual Defendants' direct ownership of Terex stock.

[16] *See* Ex. 8 (DeFeo) (Form 4, Oct. 27, 2008) (26,000 shares purchased); Ex. 9 (Widman) (Form 4, Nov. 4, 2008; Form 4, Nov. 7, 2008) (11,000 shares purchased); Ex. 10 (Riordan) (Form 4, Oct. 29, 2008) (25,000 shares purchased).

[17] Plaintiffs' original complaint, filed nearly one year after the Class Period ended, was a mere 34 pages and did not contain any allegations of fraudulent accounting practices.  Recognizing the weakness of their claim, Plaintiffs now assert new theories of accounting fraud based solely on the allegations of 31 CWs, who are purportedly former Terex employees.  An unfortunate byproduct of the crisis, which was not unique to Terex, was the need to reduce the size of the Company's work force:  between December 31, 2007 and December 31, 2009, Terex laid off approximately 5,000 employees.  As courts have recognized, these types of allegations should be viewed with the utmost skepticism.  *See Higginbotham*, 495 F.3d at 757.

## ARGUMENT

To state a claim for relief under Section 10(b) of the Exchange Act, Plaintiffs must allege that the Defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  As discussed more fully below, the Complaint should be dismissed with prejudice because (i) it fails to plead loss causation (*infra* Section I) (ii) it fails to plead particularized facts giving rise to a strong inference of fraudulent intent (*infra* Section II), (iii) the challenged forward-looking statements are protected by the "safe harbors" of the PSLRA (*infra* Section III), and (iv) it fails to adequately plead misstatements of material fact (*infra* Section IV).

## I.   PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

### A.   Plaintiffs Must Plead Facts Demonstrating That The Alleged Fraud Caused The Investor Losses

The Complaint should be dismissed because it fails to allege loss causation – a causal link between the alleged fraud and the economic loss suffered by the plaintiff – an essential element of a securities fraud claim.  *See* 15 U.S.C. § 78u-4(b)(4); *Dura*, 544 U.S. at 342.  To properly plead loss causation, a plaintiff cannot simply allege that misstatements artificially inflated the price of the stock; instead, a plaintiff must show that the "share price fell significantly after the truth became known" to the market.  *Dura*, 544 U.S. at 347.  The loss-causation requirement ensures that plaintiffs recover only those losses proximately caused by the fraud; absent the loss-causation requirement, the securities laws would become a "downside insurance policy" for investors.  *Id*. at 348; *Lentell*, 396 F.3d at 174 ("the loss-causation

requirement . . . is intended to fix a legal limit on a person's responsibility, even for wrongful acts").

To make this showing, the Second Circuit has explained that a plaintiff must allege that its "loss [was] caused by the materialization of the concealed risk." *Lentell,* 396 F.3d at 173.  In other words, a plaintiff must show that the company's stock price declined <u>significantly</u> after the (i) issuance of a "corrective disclosure" revealing the concealed fact, or (ii) materialization of some undisclosed risk.  *Id*. at 175; *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 359 (S.D.N.Y. 2008) (loss causation shown by "alleging that the market reacted negatively to a corrective disclosure"); *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010).

Plaintiffs claim that Terex affirmatively issued false disclosures because the Company (i) allegedly failed to disclose that goodwill had been overstated in some unspecified amount for some unspecified period, and (ii) allegedly engaged in fraudulent accounting practices that masked declining revenues.  As a result, in order to plead loss causation, Plaintiffs must plead facts demonstrating that Terex's stock price declined significantly after a corrective (or "cleansing") disclosure revealing the alleged "goodwill" or "accounting" fraud and that this decline was not as a result of the "tangle of other factors" affecting share price.  *Dura*, 544 U.S. at 343.

Even assuming that Plaintiffs' contrived fraud claims were true (and they are not), the Complaint fails to plead any corrective or cleansing disclosure (because there has been none). Plaintiffs therefore do not (and cannot) plead a significant stock-price decline attributable to such a disclosure.  As such, the Complaint should be dismissed for lack of causation.  *See Lentell*, 396 F.3d at 175 ("plaintiffs [did] not allege that the subject of those false recommendations . . .  or

any corrective disclosure regarding the falsity of those recommendations, [was] the cause of the decline in stock value that plaintiffs claim as their loss"); *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009) ("the Amended Complaint does not (and cannot) identify any 'corrective disclosure' that revealed the existence of some prior alleged misrepresentation by Defendants and so caused Biovail's stock price to decline").

### B.   The Complaint Fails To Plead That The Alleged Fraud Proximately Caused Any Investor Loss

#### 1.   The Goodwill Impairment Charge Did Not Cause Investor Losses

At the start of the Class Period, February 20, 2008, Terex's stock closed at $62.21 per share.  As a result of the ensuing global financial crisis, by February 2, 2009, Terex's stock price had declined to a closing price of $11.78 per share, an 81% decline.  *See* Ex. 4.  To this point in time, Terex had never mentioned or otherwise disclosed that it would take a goodwill impairment charge.

Before the market opened on February 3, 2009, Terex announced – for the very first time – its intention to record a non-cash goodwill impairment charge of approximately $600 million. *See* Compl. ¶ 192.  That day, Terex's stock price closed at $12.01, an increase of $.23, or 2%, from the day before.  Further, in the days following the disclosure, Terex's stock price rose more than 24%:  from $11.78 on February 2 to $14.63 on February 9.  *See* Ex. 4; Compl. ¶ 194. Ignoring the February 3 goodwill disclosure (and the corresponding stock-price increase) in its entirety, Plaintiffs allege that on February 11, 2009, the Company disclosed "hundreds of millions of dollars in goodwill impairments" and that this disclosure "had a devastating effect on the price of Terex stock."  Compl. ¶ 261.

But the point here is gripping and obvious:  by the time of the supposedly "corrective" February 11 (indeed, even by the February 3) disclosure, Terex's stock price already had

declined nearly 82% from its Class Period high.  *See* Ex. 4.  Thus, as a matter of law and logic,

the February 11 disclosure of the goodwill impairment could not have caused any loss – the loss

had already occurred.  The steady and significant decline in Terex's stock price before the

allegedly "corrective" February 11 disclosure establishes that Plaintiffs' losses resulted from the

financial crisis, not revelation of the alleged fraud.  *See Merrill Lynch*, 568 F. Supp. 2d at 363-65

(S.D.N.Y. 2008) (no loss causation where class-period stock price declined 80% prior to

allegedly corrective disclosure); *60223 Trust v. Goldman, Sachs & Co*., 540 F. Supp. 2d 449, 461

(S.D.N.Y. 2007) (no loss causation where stock had declined 79% prior to the allegedly

corrective disclosure); *Waterford Twp. Gen. Emps. Ret. Sys. v. SunTrust Banks, Inc.*, 2010 WL

3368922, at *5 (N.D. Ga. Aug. 19, 2010) (no loss causation where, because of financial crisis,

"SunTrust's stock had already lost most of its value prior to the January 22 corrective

disclosure").

 Even without considering the impact of the financial crisis (like the Plaintiffs), the

Complaint still fails to plead that Plaintiffs suffered any loss associated with the supposed

"goodwill" fraud for three additional reasons.  ***First***, the February 11 disclosure revealed nothing

new and therefore nothing "corrective."  As noted above, the Company first announced on

February 3 that it anticipated taking a goodwill impairment charge of approximately $600

million.  Quite obviously, the February 11 disclosure cannot be a corrective disclosure because

the charge had already been revealed to the market eight days earlier (on February 3); a

corrective disclosure must reveal new information to the market, and not simply

"recharacteriz[e] . . .  previously disclosed facts."  *Omnicom*, 541 F. Supp. 2d at 552; *see also In*

*re Omnicom Group, Inc. Sec. Litig*., 597 F.3d 501, 511 (2d Cir. 2010) (no corrective disclosure

where "none of these matters [noted in disclosure] even purported to reveal some then-

undisclosed fact with regard to the specific misrepresentations alleged in the complaint"); *Joffee v. Lehman Bros., Inc.,* 410 F. Supp. 2d 187, 191 (S.D.N.Y. 2006) (granting motion to dismiss for failure to plead loss causation; "each of the matters that Plaintiffs claim Lehman failed to disclose had, in fact, been disclosed to the market . . . . Thus, Plaintiffs cannot contend that any subsequent disclosure . . . could have caused the decline in [the Company's] stock price").

**Second**, the February 11 disclosure revealed positive, not negative, news to the market and therefore cannot be "corrective."  The February 11 disclosure revealed the positive news that the Company would take a goodwill impairment charge of $459.9 million – $140 million less than the $600 million charge anticipated on February 3.  *See Dura,* 544 U.S. at 347; *In re Williams Sec. Litig. – WCG Subclass,* 558 F.3d 1130, 1138 (10th Cir. 2009) (no loss causation when alleged corrective disclosures "contained no negative information" and actually showed "upbeat" information); *Waters v. Gen. Elec. Co.*, 2010 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010) (no loss causation because "after the stock offering was 'disclosed' on October 1, 2008, the record is clear that the 'value of the security' was *positively* affected that day").

**Third**, the alleged "goodwill" fraud could not have caused Plaintiffs any loss because, rather than decline significantly, Terex's stock price rose after the Company disclosed its intent to take the charge on February 3.  *See Dura,* 544 U.S. at 347 (complaint failed to allege that the "share price fell significantly after the truth became known" to the market); *Waters,* 2010 WL 3910303, at *8 ("[t]he Court cannot find . . . a single section 10b-5 case in which the plaintiff has prevailed on a motion to dismiss when the stock price *increased* after an announcement revealing an alleged fraud"); *Ross v. Walton*, 668 F. Supp. 2d 32, 42 (D.D.C. 2009) (no loss causation where company's stock "enjoyed a daily gain" on the day of the alleged corrective disclosure).

2.     The Alleged Accounting Fraud
        Did Not Cause Investor Losses

The gist of Plaintiffs' fraudulent accounting practices allegations (the alleged "truck stop two step" and allegedly fraudulent intercompany transactions) is that the Company engaged in these practices to mask declining revenue, which artificially inflated the Company's stock price. *See* Compl. ¶ 254.  This claim fails because Plaintiffs do not (and cannot) allege any corrective disclosure at all – there is no allegation that any of the claimed fraudulent accounting practices were revealed to the public.  *See Dura*, 544 U.S. at 342 (requiring that a "truth make[] its way into the marketplace"); *Lentell*, 396 F.3d at 173-75.

Instead, Plaintiffs allege, in total, only a series of claimed "partial" disclosures:

- On May 6, 2008, the Company disclosed "a change in business conditions in the Company's Roadbuilding division."  Compl. ¶ 259(a).

- On June 25, 2008, the Company disclosed a "slowdown in the AWP division."  *Id*. ¶ 259(b).

- On July 23, 2008, the Company disclosed "a slowdown in the Company's AWP divisions and weakness in the Company's Construction division."  *Id*. ¶ 259(c).

- On September 4, 2008, the Company lowered earnings guidance and disclosed that "the Company's Cranes and Mining divisions were no longer expected to offset market softening in the AWP and Construction divisions."  *Id*. ¶ 259(d).

- On October 22, 2008, the Company revised downward its sales and earnings guidance. *Id*. ¶ 259(e).

- On February 11, 2009, the Company "withdrew [its] touted '12 by 12 in 10' guidance." *Id*. ¶ 261.

But these general "partial" disclosures do not resemble anything "corrective" at all. Settled Second Circuit law confirms that general disclosures about the Company's business, which do not reveal the alleged fraud, are not corrective.   For example, in *Lentell*, the court held that disclosures merely conveying bad news – there, a stock downgraded by a research analyst – could not be corrective "because they do no reveal to the market the falsity of the prior

23

recommendations."  396 F.3d at 175, n.4.  In this case, the supposedly "corrective" disclosures, like those in *Lentell*, merely revealed bad news associated with the economic downturn.

Simply put, the disclosures cited by Plaintiffs never exposed the falsity of the alleged misstatements and therefore cannot be corrective.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) (no loss causation because none "of the events revealed the truth about the subject of any of Defendants' alleged misstatements"); *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 367 (S.D.N.Y. 2010) ("[Plaintiffs'] failure to plead facts connecting specific statements made by the auditor to losses incurred by [Plaintiff] is fatal to his Section 10(b) claim under the law of this Circuit"); *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678-79 (S.D.N.Y. 2007) (no allegation that there was a corrective disclosure nor that the "financial results . . . were ever restated;"  by failing to provide a "nexus between the alleged fraud and their losses . . . plaintiffs fails to plead loss causation"); *In re IPO Securities Litigation*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) ("[A] failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect. . . .  It does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme") (emphasis in original).

Because this is an alleged accounting fraud case – where Plaintiffs allege that Defendants concealed an accounting fraud from the market – Plaintiffs must, but do not (and cannot), allege that the claimed fraudulent accounting practices were revealed to the public.  There is simply no merit to the claim that accurate and timely disclosures announcing negative business trends in the midst of the worst economic downturn since the Great Depression somehow reveals an accounting fraud.  *See National Junior Baseball League v. PharmaNet Develop. Group, Inc.,* 720 F. Supp. 2d 517, 563 (D.N.J. 2010) ("accounting manipulations" and "backlog overstatement"

never disclosed to the market and thus "[p]laintiff fails to allege that [defendant's] public disclosures informed investors of any of the so-called truths"); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *15 (C.D. Cal. Aug. 21, 2009) (plaintiffs did not identify "disclosures of wrongdoing" and demonstrated only that "the market learned of and reacted to [Defendant's] 'poor financial health' rather than any alleged fraud"); *Police & Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 228 (S.D.N.Y. 2009) (alleged corrective disclosures rejected where the statements "do not reveal with any specificity to investors that [defendant] was involved in the kind of widespread revenue recognition accounting fraud that Plaintiffs allege"). Thus, if the allegations regarding improper accounting practices were true (and they are not), Terex's stock price is still inflated as a result. *See Williams*, 558 F.3d at 1139 ("Until the fraud is revealed the purchasers actually *benefit* from the inflation and therefore have no legally compensable injury").[18]

In short, there was no corrective disclosure revealing the alleged accounting fraud to the market, and there is no loss causation. *See Alaska Laborer Emp'rs Ret. Fund v. Scholastic Corp.*, 2010 WL 3910211, at *6-7 (S.D.N.Y. Sept. 30, 2010) ("press releases upon which Plaintiffs rely did not disclose the falsity of any prior statements or any of the alleged misconduct," which allegedly included "improper recognition of revenue, failure to maintain reserves or improper accounting of goodwill").[19]

---

[18] Even Plaintiffs agree that Terex's revelation of a "slowdown" in its business did not reveal the supposed fraud and thus cannot be corrective. In this respect, Plaintiffs allege that a June 25, 2008 conference call, wherein Terex allegedly revealed a "slowdown" in its AWP division, was both a "corrective" disclosure and a misstatement in furtherance of the fraudulent scheme. *Compare*, Compl. ¶ 259(b) *with* ¶¶ 158-61. "Plaintiffs cannot have it both ways. They cannot allege that Defendants made certain misstatements . . . and simultaneously argue that the misstatement itself constituted a corrective disclosure" *Flag*, 574 F.3d at 41.

[19] *See also Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 337-38 (5th Cir. 2010) (corrective disclosure must reveal not merely defendant's "true financial condition," but "the relevant truth – the truth obscured by the fraudulent statements"), *cert. granted*, 78 USLW 3702, 79 USLW 3016 (U.S. Jan 07, 2011) (NO. 09-1403); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063-64 (9th Cir. 2008) (plaintiffs did not show that the "press release regarding earnings can be reasonably read to reveal widespread

### C.    Market Conditions Caused Terex's Stock Price To Drop

Finally and fundamentally, the Complaint must be dismissed for failure to plead loss

causation because it fails to account for the staggering market losses beginning in mid-2008 and

continuing through early 2009 as a result of the financial crisis.  As depicted in the graph below,

Terex's stock-price decline mirrored that of the market and its competitors generally (Exs. 4-5):



Where, as here, the Company's share price has declined with the market generally,

Plaintiffs must do more than point to a share-price decline following an announcement that

customer demand has decreased or that earnings may be less than forecasted.  Instead, as

required by the Supreme Court in *Dura*, Plaintiffs must plead <u>specific</u> <u>facts</u> to show that this

general decline did not cause the loss.  *See, e.g.*, *Flag*, 574 F.3d at 36 ("*Dura* requires plaintiffs

to disaggregate those losses caused by 'changed economic circumstances' . . .");  *Lentell*, 396

---

financial aid manipulation," nor did they show that "the market became aware of, and the resulting stock drop
resulted from, widespread enrollment fraud"); *In re Tellium*, 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005)
("*Dura* itself makes clear that loss causation is not pled upon allegations of drops in stock price following an
announcement of bad news that does not disclose the fraud").

F.3d at 174 (where a "plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events"); *Gordon Partners v. Blumenthal,* 293 Fed. Appx. 815, 817 (2d Cir. 2008) ("A claimant also must show that the decline in the market price was due to the fraud, as opposed to other market factors . . . that may account for some or all of the lower price").[20]

Plaintiffs have failed to satisfy this pleading requirement; indeed, they all but ignore the sweeping market-wide decline.  As such, the Complaint must be dismissed for this reason as well.  *See In re Security Capital Assur. Ltd. Sec. Litig.*, 2010 WL 1372688, at *32 (S.D.N.Y. March 31, 2010) (no loss causation where plaintiffs had not "effectively shown that it was the incremental revelation of Defendants' fraudulent misrepresentations, and not the actions of third parties or other circumstances of the market, that caused the decline in SCA's share price over the Class Period"); *Merrill Lynch*, 568 F. Supp. 2d at 365 (no showing how alleged misstatements caused the loss, as opposed to "the collapse of the Internet sector"); *Leykin v. AT & T Corp.,* 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) (plaintiff failed to "allege facts showing that it was the claimed concealment which caused plaintiffs' losses, rather than the market-wide Internet stock collapse").

---

[20] *See also, e.g., Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 994-95 (7th Cir. 2007) (no loss causation where "the stock price of [the company's] competitors fell just as precipitously" over the same period and "the value of the . . . stock [did not] decline[] just when the alleged misrepresentations were revealed"); *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 594 (E.D. Pa. 2009) (no loss causation where "Plaintiffs make no allegations that would allow the Court to apportion any losses between Defendants' misrepresentations and the 'significant declines in market value' for mortgage-backed securities"); *Cellular Tech. Servs. Co. v. TruePosition, Inc.,* 609 F. Supp. 2d 223, 246 (D. Conn. 2009) ("Plaintiffs do not consider any changes in economic circumstances or industry-specific trends that might account for some portion of TruePosition's reduced stock value").

Plaintiffs not only fail to disentangle their supposed "fraud" losses from those losses associated with the financial crisis, they also fail to account for the bad news conveyed by Terex in each supposedly "corrective" disclosure – bad news that was unrelated to the supposed fraud. Each alleged partial disclosure contained various announcements unrelated to goodwill or allegedly fraudulent accounting practices, and these announcements all likely contributed to Terex's stock price decline.[21]  Plaintiffs have not – and cannot – plead that the disclosure of an alleged fraud caused the drop in Terex's stock price rather than issues related to its actual business performance.  *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (no causal link where statements made the same day as the alleged corrective disclosure were "much more consequential and numerous"); *PharmaNet*, 720 F. Supp. 2d at 563 ("The allegations as they stand now, only show that PharmaNet's stock price dropped predominately as a result of announcements of disappointing financial results rather than disclosures of any misrepresentations or omissions"); *Joffee*, 410 F. Supp. 2d at 191 (stock drop caused by a "tangle of factors affecting price" including "a decline in purchases of the [Company's product]").  The Complaint should be dismissed for this reason as well.

## II.    PLAINTIFFS HAVE FAILED TO PLEAD A STRONG INFERENCE OF FRAUDULENT INTENT

The Complaint should also be dismissed because Plaintiffs have failed to plead a "strong inference of scienter" – "a mental state embracing intent to deceive, manipulate, or defraud."

---

[21] *See* Form 10-Q, 5/6/2008, at 33 (Ex. 25) (decreasing net sales in the RBUO segment); Press Release: Terex Corp. at Wachovia Nantucket Equity Conf., 6/25/2008, at 4 (Ex. 31) (discussing effect of economy on RBUO segment); Form 8-K, 7/23/2008, at 4 (Ex. 17) (decreasing backlogs in the RBUO, Construction, and AWP segments); Form 8-K, 9/4/2008, at 1 (Ex. 19) (lowering full year and quarterly guidance based on changing market conditions); Press Release, Terex Inv. Analyst Meeting, 9/4/2008, at 2, 39 (Ex. 32) (forecasting declining demand for the Construction segment through 2009; discussing reduced overall sales guidance for 2008); Form 8-K, 10/22/2008, at 1-3, 5-6 (Ex. 20) (decrease in net income; decline in net sales for the AWP and Construction segments; reduction in global workforce; $18.2 million pre-tax charges; declining backlogs in RBUO, Construction, MPM and AWP segments); Form 8-K, 2/11/2009, at 1 (Ex. 23) (20% drop in sales in the fourth quarter of 2008; decline in demand in the AWP and Construction segments).

*Tellabs,* 551 U.S. at 319; 15 U.S.C. § 78u-4(b)(1)-(2).  The PSLRA requires that Plaintiffs must, "with respect to each act or omission alleged to violate [federal securities laws], state with particularity facts giving rise to a <u>strong</u> <u>inference</u> that [Defendants] acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  The Supreme Court has explained that a complaint will survive a motion to dismiss "<u>only</u> if a reasonable person would deem the inference of scienter <u>cogent</u> <u>and</u> <u>at</u> <u>least</u> <u>as</u> <u>compelling</u> <u>as</u> <u>any</u> <u>opposing</u> <u>inference</u> one could draw from the facts alleged."  *Tellabs,* 551 U.S. at 324.

This high burden can only be met by pleading particularized facts showing "either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  No such facts exist here. Plaintiffs' claim fails because (i) there is no motive to commit fraud whatsoever – to the contrary, the trading history of the Individual Defendants, who increased their Terex holdings by almost 240,000 shares during the Class Period, negates any inference of scienter; (ii) the conclusory allegations of the CWs, who had virtually no contact with the Individual Defendants, fail to show that they acted with an "extreme departure from the standards of ordinary care" with respect to Terex's historical statements; and (iii) there are no facts pled showing that the Individual Defendants had "actual knowledge" that Terex's forward-looking statements were false.[22]

A.   **The Individual Defendants' Trading Activity**
     <u>**Negates Any Inference Of Scienter**</u>

Plaintiffs' remarkable and only suggestion that the Individual Defendants had a motive to

---

[22] As noted *supra*, note 1, Exhibit 1 to the Hirce Declaration lists those "bolded" statements set forth in the Complaint, which presumably reflect the allegedly misleading statements at issue.  Those statements have been divided into two general categories:  (i) statements concerning the Company's reported historical financial statements, and (ii) forward-looking statements concerning the Company's earnings guidance.

commit fraud is by claiming that "Company insiders took advantage of" Terex's positive statements to make "more than 90% of their Class Period Terex stock sales" in the first three months of the Class Period.  Compl. ¶ 209.  But Plaintiffs neglect to mention that only one of the identified "Company insiders" is a defendant in this litigation.[23]  In fact, contrary to Plaintiffs' misleading allegation, the stock trading history of the Individual Defendants defeats any inference of scienter and affirmatively establishes their good faith.

*Significantly Increased Holdings.*  As a group, the Individual Defendants increased their Terex holdings by 238,395 shares during the Class Period, an increase of 22% over their already substantial holdings of 1,069,401 shares.   Four of the five Individual Defendants increased their Terex holdings during the Class Period.  These increases obliterate any inference of scienter.  *See Malin*, 499 F. Supp. 2d at 152 ("All of the defendants purchased stock during the Class Period and two of the defendants . . . actually *increased* their total holdings by over fifteen percent during the Class Period, 'a fact wholly inconsistent with fraudulent intent'"); *Bristol-Myers Squibb*, 312 F. Supp. 2d at 561 ("the Individual Defendants, in almost every instance, *increased* their [] holdings during the Class Period – a fact wholly inconsistent with fraudulent intent"); *In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at *12 (S.D.N.Y. Sept. 25, 2006) (inference of scienter negated because "Individual Defendants collectively held 31,532 *more* shares of [company] stock" after class period) (emphasis in original).

*No Sales by CEO, CFO, or COO.*  The fact that neither CEO DeFeo, CFO Widman, nor COO Riordan sold a single share of stock during the Class Period also destroys any inference of scienter.  *See Security Capital*, 2010 WL 1372688, at *24 ("That Defendants increased their

---

[23]  Plaintiffs' chart reflects the trading activity of nine Terex employees, only one of whom is a Defendant.  The trading of non-defendants cannot establish scienter as to the Defendants.  *See Borochoff v. GlaxoSmithKline PLC*, 2008 WL 2073421, at *8 (S.D.N.Y. May 9, 2008) ("Misconduct by non-defendants cannot be used to allege defendants' scienter without adequate factual allegations that those defendants engaged in misconduct or knew that their disclosures were false").

holdings during the Class Period, and did not sell their stock prior to a price drop suggests the absence of any nefarious motives"); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006) ("[T]he fact that neither [the Chairman] nor [the CEO] sold stock during the putative class period undermines plaintiffs' motive allegations against defendants"); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383-84 (E.D.N.Y. 2003) ("As chairman and CEO of the Company, and as the individual who actually made most of the alleged misstatements during the class period, defendant Catell, if anyone, was surely well-positioned to reap profits from insider knowledge.  His failure to do so … is thus significant").  The fact that Terex's three most senior executives – the individuals who made most of the allegedly false statements – sold no stock is wholly inconsistent with the notion that they were involved in a scheme to inflate the Company's stock price.

*CEO, CFO, and COO Made Open Market Purchases*.  Rather than sell any stock, Messrs. DeFeo, Widman, and Riordan collectively purchased 62,000 Terex shares on the open market during the Class Period.  These open-market stock purchases, coupled with the absence of any sales, establish that Messrs. DeFeo, Widman, and Riordan had a good-faith belief in the future of the Company.  No fraudulent actor engaged in a scheme to inflate a company's share price would purchase and then hold artificially inflated shares.  *See Avon Pension Fund v. GlaxoSmithKline PLC*, 343 Fed. Appx. 671, 673 (2d Cir. 2009) ("rather, defendants' purchases of even more [company] stock during the relevant period signals only confidence in the future of their company and, by extension, in the commercial success of [the product]"); *Schuster v. Symmetricon, Inc.*, 2000 WL 33115909, at *8 (N.D. Cal. Aug. 1, 2000) (purchase of stock at allegedly inflated prices "negates any reasonable inference of scienter").

### *The Only Sales Made Were Made Pursuant to Rule 10b5-1 Plan and Insignificant.*

The only two Individual Defendants who sold any stock during the Class Period – Carter and Ford – did so pursuant to automatic Rule 10b5-1 stock trading plans.[24]   Non-discretionary sales made pursuant to a Rule 10b5-1 plan cannot support a claim that trading was suspicious, let alone a compelling inference of scienter.   *See In re Gildan Activewear, Inc. Sec. Litig.,* 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (sales "were made pursuant to a non-discretionary Rule 10b5-1 trading plan, which undermines any allegation that the timing or amounts of the trades was unusual or suspicious"); *In re Bausch & Lomb, Inc. Sec. Litig.,* 592 F. Supp. 2d 323, 344 (W.D.N.Y. 2008) (sales "were made at regular intervals as part of preset trading plans under Rule 10b-5.  Accordingly, these stock sales alleged do not appear to be 'unusual' in either their amount or their timing").[25]

*   *   *

The bottom line is this:  "This trading history cannot support a 'cogent and compelling' inference of fraudulent intent."  *GlaxoSmithKline,* 343 Fed.Appx. at 673; *Zack v. Allied Waste Industries, Inc.,* 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005) ("Finally, the individual defendants increased their stock holdings during the class period, which gives rise to an inference of good faith conduct, instead of the requisite scienter"); *In re First Union Corp. Sec. Litig.,* 128 F. Supp. 2d 871, 899 (W.D.N.C. 2001) (net holdings increase during class period was "wholly inconsistent with [plaintiff's] contention that he knew undisclosed negative information

---

[24] In May 2008, Mr. Ford disposed of 5,000 of his 68,653 shares pursuant to his automatic Rule 10b5-1 stock trading plan.  *See* Ford Form 4, 5/20/2008 (Ex. 11).  In April and May 2008, Mr. Carter disposed of 2,523 shares of his 62,890 shares, or 4.01%, pursuant to his automatic Rule 10b5-1 stock trading plan.  *See* Carter Form 4, 4/22/2008 (Ex. 12); Carter Form 4, 5/7/2008 (Ex. 12).

[25] In any event, the minor sales by Mr. Ford are irrelevant because his holdings increased during the Class Period. *See Bristol-Myers Squibb,* 312 F. Supp. 2d at 561; *Ressler v. Liz Claiborne, Inc.,* 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) ("Inferences of scienter can be undermined when an insiders' sales of stock are offset by even larger stock acquisitions during the relevant time period").

about the Company").

**B.      Plaintiffs Fail To Plead Particularized Facts That Give Rise To
<u>A Strong Inference Of Conscious Misbehavior Or Recklessness</u>**

Even if the 22% increase in Defendants' Terex stock holdings during the Class Period

were ignored, there is still no "cogent" and "compelling" inference of scienter.  Plaintiffs fail to

allege "strong circumstantial evidence of conscious misbehavior or recklessness" (*ECA*, 553

F.3d at 198), or "highly unreasonable" conduct that "represents an extreme departure from the

standards of ordinary care . . . to the extent that the danger was either known to the defendant or

so obvious that the defendant must have been aware of it."  *Novak v. Kasaks*, 216 F.3d 300, 308

(2d Cir. 2000); *see also ECA*, 553 F.3d at 203 (same); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269

(2d Cir. 1996) ("recklessness must, in fact, approximate an actual intent to aid in the fraud being

perpetrated").  Plaintiffs certainly cannot meet the even higher pleading burden that results from

their failure to plead any motive to commit fraud.  *See ECA*, 553 F.3d at 199 ("[T]he strength of

the circumstantial allegations must be correspondingly greater if there is no motive"); *Malin*, 499

F. Supp. 2d at 160 (where motive is not apparent, "the strength of the circumstantial allegations

must be correspondingly greater").  There are simply no particularized facts showing that any of

the Individual Defendants engaged in "conscious misbehavior" or acted with an "extreme

departure from the standard of ordinary care" at any time.

*CW Allegations Disfavored.*  Plaintiffs' scienter allegations hinge almost entirely on

allegations attributed to 31 nameless individuals, most of whom are alleged to be purported

former employees of the Company.  But the number of these so-called "CWs" is irrelevant,

because they (i) had virtually no contact with the Individual Defendants; (ii) are primarily low-

level employees who did not work at Terex's corporate headquarters (and thus have no

knowledge of the Company's financial reporting); and (iii) make vague, general and irrelevant

allegations.  The allegations derived from these "CWs," whether standing alone or taken together, come nowhere close to demonstrating a strong inference of scienter.

As an initial matter, following the Supreme Court's decision in *Tellabs*, circuit courts have held that allegations based on the claims of anonymous sources should be viewed with extreme skepticism.  *See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) ("Following *Tellabs*, courts must discount allegations from confidential sources [because] [s]uch sources afford no basis for drawing the plausible competing inferences required by *Tellabs*"); *Higginbotham*, 495 F.3d at 757 (following *Tellabs*, "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences").  Here, given that the Individual Defendants had no motive to commit fraud (just the opposite is true), allegations by unknown and unnamed individuals cannot possibly give rise to a cogent and compelling inference of scienter.  Regardless, the allegations made by the CWs fail to establish <u>any</u> inference of scienter.

***No Contact with Individual Defendants.***  The vast majority of the CWs cited in the Complaint had no contact at all with any of the Individual Defendants, and certainly no knowledge of their state of mind.  In fact, of the 31 CWs – most are low-level Terex employees at best – only two (CW 1 and CW 17) are alleged to have ever communicated with any of the Individual Defendants.  The other 29 CWs are therefore not able to provide – and are not seriously alleged to have – any factual insight as to what the Individual Defendants knew or were reckless in not knowing during the Class Period.[26]

These are the type of allegations that have been repeatedly and routinely rejected by

---

[26] *See, e.g.*, CW 4 (commodities buyer; Rock Hill, S.C.); CW 5 (cost accountant; Fort Wayne, IN); CW 7 (senior buyer; Fort Wayne, IN); CW 8 (material cost analyst; Redmond, WA) CW 9 (compactor salesperson; Oklahoma City, OK); CW 16 (inventory analyst; Fort Wayne, IN); CW 21 (secretary; no location given); CW 25 (plant operations manager; no location given); CW 27 (engineering manager; Oklahoma City, OK); CW 28 (senior project engineer; no location given); CW 29 (traffic supervisor; Oklahoma City, OK).

courts in the Second Circuit, as they should be here. *See Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (no scienter where "Plaintiff's confidential sources were mid-level managers in the United States who claim no contacts or communications with Defendants, or even with [the] European corporate headquarters"); *Bausch & Lomb*, 592 F. Supp. 2d at 342 (no scienter where none of the CWs "had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period"); *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) (same), *aff'd*, *Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010); *Malin*, 499 F. Supp. 2d at 141 (no scienter where "none of the CWs present any evidence that they communicated any of the alleged problems . . . to any of the Individual Defendants").

**No Knowledge of Financial Reporting.**   Numbers are not everything.  The Complaint purports to identify 31 unique CWs, but only cites to 25 CWs in the "substantive" allegations section.[27]  Even though the Complaint alleges accounting fraud, of these 25 CWs, not one is alleged to have had any involvement in, or first-hand knowledge of, the creation or preparation of Terex's financial statements.  Moreover, just two CWs – CW 10 and CW 17 – are alleged to have worked at Terex's corporate headquarters in Westport, where each of the Individual Defendants worked, and where the Company's financial statements were prepared.[28]

However, neither CW 10 nor CW 17 provides any specific fact pertinent to the scienter inquiry.  The Complaint does not allege that CW 10 had any contact at all with the Individual Defendants; in fact, after being introduced (Compl. ¶ 33), CW 10 is <u>never mentioned again</u>.  CW

---

[27] Six of the CWs – 10, 13, 20, 25, 28, and 31 – are introduced in the Complaint (*see* Compl. ¶¶ 33, 36, 43, 48, 51, 54), but are not otherwise referenced again in any way in the Complaint.

[28] The other 29 CWs worked at various locations other than corporate headquarters (or their locations were not alleged):  Oklahoma City, OK (CWs 1, 9, 11, 15, 27, 29) (Compl. ¶¶ 24, 32, 34, 38, 50, 52); Fort Wayne, IN (CWs 5, 7, 14, 16) (*id*. ¶¶ 28, 30, 37, 39); Rock Hill, S.C. (CWs 4, 12) (*id*. ¶¶ 27, 35); Redmond, WA (CWs 8, 20, 31) (*id*. ¶¶ 31, 43, 54); Glen Allen, VA (CW 3); (*id*. ¶ 26); and Cedar Rapids, IA (CW 30) (*id*. ¶ 53).

17's allegations are irrelevant because CW 17 did not begin working at Terex until December 2008 (Compl. ¶ 40), two months before the end of the Class Period and <u>after</u> <u>all</u> <u>of</u> <u>the</u> <u>allegedly</u> <u>false</u> <u>statements</u> <u>were</u> <u>already</u> <u>made</u>.[29]  As such, CW 17's allegations are of no probative value as to whether Mr. Riordan (the only Defendant with whom Plaintiffs claim CW17 interacted) knew, or was reckless in not knowing, that Terex's Class Period financial statements were false.  *See California Public Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 153 (3d Cir. 2004) ("Plaintiffs fail to identify with particularity any source for their accounting fraud claims that would reasonably have knowledge supporting the allegations that [the company's] financial statements were false."); *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 3447857, at *9 (N.D. Cal. 2010) ("Seven of the confidential witnesses . . . were not employed at Rackable during the Class Period, which makes it unlikely that they had personal knowledge of Defendants' relevant state of mind"); *Campo v. Sears Holding Corp*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (CW allegations did not support a finding of scienter where two of them were not employed by the company during the Class Period), *aff'd*, 371 Fed. Appx. 212 (2d Cir. 2010); *Malin*, 499 F. Supp. 2d at 138 (no inference of scienter where "[o]f the four confidential witnesses discussed in the SAC, only one . . . is alleged to have worked at [the company] during the Class Period").

    This is undoubtedly why Plaintiffs allege no facts regarding the preparation and process undertaken for the issuance of Terex's consolidated financial statements.  For example, CW 17 makes allegations with respect to alleged intercompany transfers.  *See* Compl. ¶¶ 112-17.  But the Complaint says nothing about whether or how Terex's consolidated financial statements, audited by PwC and never restated, were impacted by the allegedly inappropriate intercompany

---

[29] Plaintiffs do not allege that Terex made any false statements between November 3, 2008 and February 11, 2009, when the alleged fraud was "fully revealed."  Compl. ¶ 195.  The only disclosure cited in the Complaint during that time period is a press release that is not alleged to have any false statements (and no statements are "bolded") and for which no explanation is offered as to why any statements contained therein might be false.  *See* Compl. ¶ 192.

transfers.  *See Shushany v. Allwaste, Inc.*, 992 F.2d 517, 522 (5th Cir. 1993) (affirming dismissal of accounting fraud case where "the complaint did not identify who in particular was instructing the employees to make the arbitrary accounting adjustments, what particular adjustments were made, how these adjustments were improper in terms of reasonable accounting practices, how those adjustments were incorporated into [the defendant's] financial statements, and if incorporated, whether those adjustments were material in light of [the company's] overall financial position").[30]

Because none of the CWs have any knowledge regarding the preparation of Terex's financial statements during the Class Period, their allegations cannot give rise to a strong inference of scienter.  *See Chubb*, 394 F.3d at 152 (no scienter where "[p]laintiffs attempt[ed] to substantiate claims of accounting fraud by reference to a number of former employees who held positions that would not appear to render them privy to the company's bookkeeping practices, let alone the specific accounting that went into the company's financial reporting"); *Malin*, 499 F. Supp. 2d at 141 ("Also problematic is the fact that none of the CWs are alleged to have been involved in or to have any familiarity with the process of setting or estimating loss reserves"); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 825 (S.D. Cal. 2006) (allegations fail where confidential witnesses are "low-level employees, and the Amended Complaint does not contain any allegations indicating how they would be privy to" accounting information), *aff'd*, 256 Fed. Appx. 74 (9th Cir. 2007).

**Vague and Conclusory Allegations.**  The CW allegations also fail because they are

---

[30] *See also Steinberg*, 2008 WL 5170640, at *14 ("Plaintiff cites no evidence that Defendants had knowledge that the slowdown in purchases . . . would potentially affect the third-quarter 2007 earnings of the Company or that the downturn in revenue . . . was of such a magnitude that Defendants necessarily would or should have known that it would materially affect the Company's third-quarter performance"); *Malin*, 499 F. Supp. 2d at 142 (finding that information concerning accounting violations, "although substantial in amount, is inadequate substantively to support an inference of scienter on the part of any of the defendants").

vague, non-specific, and conclusory.  Rather than pleading specific facts demonstrating that the Individual Defendants acted recklessly with respect to Terex's financial statements, the CWs offer vague and conclusory statements about the Individual Defendants' alleged knowledge of supposedly relevant facts.  *See, e.g.*, CW 9 (if "[DeFeo] says he didn't know Roadbuilding was losing money, he's full of shit;" Comp. ¶ 69); CW 17 ("all of the Company's executives, including Riordan, DeFeo, and Widman, knew about the significant problems and absolute uncertainty in the Company's books;" Compl. ¶ 126); CW 19 ("[t]here was no way people in charge could claim they didn't know what was happening;" Comp. ¶ 66).

These vague and overly broad "he must have known" generalizations are routinely rejected.  *See In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d  566, 589 (S.D.N.Y. 2010) (rejecting "generalized statements" that the defendants "must have been aware of" problems with collateral); *Malin*, 499 F. Supp. 2d at 140 (rejecting allegation that accounting problems were "well known" to management); *In re Sierra Wireless, Inc., Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (rejecting general statement by CW that "merely parrots the conclusory allegations contained in the complaint").

***No Scienter Relating to Allegedly Fraudulent Accounting Practices.***  Although the Complaint alleges that the "Truck-Stop-Two-Step practices were ordered from the top down" (Compl. ¶ 78), there is not a single fact in the Complaint to support this bald, scurrilous, and conclusory assertion.  Indeed, there are no facts whatsoever which establish that any of the Individual Defendants had any knowledge of or connection to this alleged practice.[31]  Nor is there any evidence that the Individual Defendants "deliberately shut their eyes to these facts."

---

[31] The "Truck-Stop Two-Step" is based on the claims of CWs 1, 11, 14, 15, 16, 22, 23, 24, 26, 29, and 30.  *See* Compl. ¶¶ 72-103, 220-21.  However, none of these CWs alleges that any of the Individual Defendants knew of , or were reckless in not knowing of, or were in any way connected to this practice.  In fact, the only Individual Defendant whose name is mentioned at all in connection with these allegations is Mr. Riordan, as discussed below.

*Tamar v. Mind C.T.I., Ltd.*, 2010 WL 2802216, at *5 (S.D.N.Y. July 2, 2010) ("Even an egregious failure to gather information will not establish 10b-5 liability so long as the defendants did not deliberately shut their eyes to the facts"); *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 298 (S.D.N.Y. 2010) (same); *Am. Express,* 2008 WL 4501928, at *6.[32]

The only Individual Defendant who is even alleged to have communicated with a CW is Mr. Riordan.  But, in fact, CW 1's only alleged interactions with Mr. Riordan consisted of (i) a conversation in which Mr. Riordan apparently expressed his desire to increase sales, and (ii) their mutual attendance at meetings where the Roadbuilding division was discussed.  *See* Compl. ¶ 78 ("we need these numbers to hit, we have to get these sales"), ¶¶ 110-111.  That Mr. Riordan encouraged Terex employees to increase sales (Compl. ¶ 78) cannot possibly support a strong inference that he knew or should have known of the allegedly improper revenue recognition practices.[33]  That Mr. Riordan attended meetings where he "knew all the sales and capacity numbers" (Compl. ¶¶ 110-11) is evidence that he was an effective executive.  *See Chill*, 101 F.3d at 270 (accounting violations may establish fraud only when coupled with evidence of

---

[32]There are no particularized facts pled that the "Truck-Stop-Two-Step" practice, which was allegedly being implemented at the local facility level in Fort Wayne, Oklahoma City, and Cedar Rapids, was ever discussed with the Individual Defendants or anyone working at the Company's corporate headquarters in Westport, Connecticut. *See Chubb*, 394 F.3d at 148 ("The lack of allegations regarding how or why such employees would have access to the information they purport to possess is problematic because, as illustrated below, Plaintiffs heavily rely on former employees who worked in Chubb's local branch offices for information concerning Chubb's business on a national scale"); *In re Citigroup Inc. Sec. Litig.*, 2010 WL 4484650, at *33 (S.D.N.Y. Nov. 9, 2010) ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity"); *Malin*, 499 F. Supp. 2d at 141.

[33] Paragraph 78 of the Complaint itself is grossly misleading.  Plaintiffs allege that the "Truck-Stop-Two-Step" was ordered "from the top down" and then allege that "Riordan was involved in applying pressure to get the products shipped to the truck stops."  Compl. ¶ 78.  But the only allegations that follow this false statement relate to general discussions about increasing sales and say nothing whatsoever about "pressure," "truck stops," or improper revenue recognition practices.  Thus, the misleading, conclusory statement about Mr. Riordan not only has no basis in fact, but serves to further demonstrate the lack of connection between the CW allegations and the Individual Defendants.

"corresponding fraudulent intent"); *In re Celestica Inc. Sec. Litig.*, 2010 WL 4159587, at *6

(S.D.N.Y. Oct. 14, 2010) ("Nor can scienter be established by allegations of GAAP violations or

other accounting irregularities alone, where, as here, there is no evidence of a corresponding

fraudulent intent"); *Malin*, 499 F. Supp. 2d at 142 ("accounting deficiencies, without more, do

not violate the PSLRA").

      Moreover, as noted above, CW 17's alleged interactions with Mr. Riordan, which

purportedly concerned accounting treatment for intercompany transfers, occurred after all of the

allegedly false statements had already been made and therefore cannot be probative of scienter.

Compl. ¶¶ 116-17.[34]   In any event, (i) there are no facts whatsoever which establish that the view

of the Company's accounting, as expressed by CW 17, an alleged "consultant," was correct, and

(ii) CW 17 says nothing about the size of the alleged issue, to what divisions it pertained, or how

it was resolved.  At most, CW 17's alleged conversations show that Mr. Riordan was concerned

about the effect improper accounting would have if, in fact, any existed.  *See Local No. 38 Int'l*

*Bros. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y.

2010) ("Only [the CW] had contact with the Individual Defendants.  He prepared reports for

senior executives . . . . This is the most specific information on scienter pled in the Complaint;

still, even these averments fail to raise a strong inference that the Individual Defendants had

specific information contradicting their public statements. Notably, these allegations do not

establish what specific contradictory information the Individual Defendants received or when

they received it"); *Celestica*, 2010 WL 4159587 at *6 ("plaintiffs reliance on a confidential

witness' uncorroborated assertion that 'all the way to the top senior management had visibility of

---

[34] The alleged improper intercompany transfer claim is based on CWs 5, 17, 18, and 19, each of whom make broad and conclusory allegations (Compl. ¶¶ 112-126, 246-247), but none of whom allege that they interacted with any Individual Defendant (except CW 17, as described above).  *See Steinberg*, 2008 WL 51770640, at *13 (no scienter where "no contacts or communications with Defendants"); *Bausch & Lomb*, 592 F. Supp. 2d at 342.

what was happening' is insufficient to infer actual knowledge on the part of [the individual defendants]").[35]

**No Scienter Relating to Goodwill**.  Of the 31 CWs, only CW 17 claims to have any knowledge of an alleged overstatement of goodwill.  But CW 17 is not alleged to have been involved in determining the value of goodwill or determining whether goodwill had been impaired.  In fact, the only relevant allegations attributable to CW 17 are conclusory and wholly lacking in specific facts.  *See* Compl. ¶¶ 40, 246 (CW 17 has knowledge "of major problems with the Company's goodwill accounting").

The Complaint alleges no time period describing when these alleged "problems" occurred, what the "problems" were, or whether these problems were discussed with any of the Individual Defendants.  This broad, vague, and conclusory statement cannot support an inference of scienter.  *See Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452-53 (S.D.N.Y. 2008) (plaintiffs "rely on vague and conclusory statements that are not supported by any specific factual allegations"); *Malin*, 499 F. Supp. 2d at 140 (CWs made "general, unsupported allegations that [defendant's] alleged accounting deficiencies were 'well known' in the industry. It is well-established . . . that 'generic and conclusory allegations based upon rumor or conjecture are indisputably insufficient to satisfy the heightened pleading standard").  In short, there are no facts showing that any of the Individual Defendants knew or were reckless in not knowing that goodwill was being overstated at any time (because it was not).

---

[35] CW 17 also alleges that the "Executive Committee" at Terex (which, in fact, does not exist) was told about "the Company's faulty accounts" by the Company's Controller.  Compl. ¶ 126.  This allegation not only contains multiple layers of hearsay, but is vague and conclusory as it fails to identify what information was provided to the non-existent "Executive Committee," when it was provided, in what form, and to which individuals on the "Executive Committee" the information was provided.  *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("To succeed on this claim, plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so"); *The Clearing Corp. v. Fin. & Energy Exch. Ltd.*, 2010 WL 2836717, at *4 (N.D. Ill. July 16, 2010) (plaintiff must "allege with specificity the who, what, where, and when of the fraud").

Plaintiffs attempt to show that the potential sale of Terex's Roadbuilding unit and the alleged decline in demand within that business put the Individual Defendants on notice that goodwill was being overstated. *See* Compl. ¶¶ 104-110.[36] However, at most, these allegations show that the Company was aware of indicators that goodwill should be tested for impairment, which is exactly what Terex repeatedly did and disclosed to its shareholders.[37] Terex's diligent monitoring for goodwill impairment and repeated disclosures regarding that monitoring negate any inference that the Individual Defendants acted recklessly with respect to its accounting for goodwill. *See Slayton*, 604 F.3d at 777 (performing goodwill calculation and reporting a write down "do not support an inference that American Express was trying to hide anything from investors. Rather, they suggest that . . . it was endeavoring in good faith to ascertain and disclose future losses"); *Rombach*, 355 F.3d at 176-77 (no scienter where "the company revealed problems with the . . . acquisition and the company's low earnings well in advance of the

---

[36] CWs 1, 2, 6, 9, 11, 14, 19, 21, and 26 allege general facts that demand for Roadbuilding and/or Construction products was declining. *See* Compl. ¶¶ 66-70, 171, 233. However, none of these CWs claim to have spoken with any Individual Defendant about declining demand and none have any knowledge of goodwill impairment or goodwill impairment testing. *See Steinberg*, 2008 WL 51770640, at *13; *Bausch & Lomb*, 592 F. Supp. 2d at 342. Further, any suggestion that scienter can somehow be inferred based on upon the supposed receipt of one low-ball offer for the Roadbuilding division summarily must be rejected. *See* Compl. ¶ 236. Plaintiffs fail to support this allegation with any particularity, including (i) the terms of the "Atlas" offer, (ii) the amount of the other offer Terex received, *see* Compl. ¶ 108, (iii) who reviewed these offers, (iv) how the accountants and auditors viewed the impact of these offers on goodwill, and (v) other factors impacting the determination of goodwill.

[37] Goodwill of a reporting unit must be tested on an annual basis and intervening testing is only required where "an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." FASB Statement of Financial Accounting Standards, No. 142 ¶¶ 26, 28 (Ex. 35). As noted above, in addition to performing annual goodwill impairment tests (Form 10-K, 2/27/2008, at F-21 (Ex. 6); Form 10-K, 2/27/2009, at 40 (Ex. 7)), Terex also performed mid-year goodwill impairment tests on the RBUO segment as of March 31, 2008 (*see* Form 10-Q, 5/6/2008, at 14 (Ex. 25)), June 30, 2008 (*see* Form 10-Q, 8/01/2008, at 14 (Ex. 26)), and September 30, 2008 (*see* Form 10-Q, 11/03/08, at 14 (Ex. 27)). In fact, Terex went as far as to disclose to the market that the RBUO and Construction segments were not performing as forecasted and that was reason that the Company continuously monitored goodwill during the Class Period. *See, e.g.*, Form 10-Q, 5/6/2008, at 14 (Ex. 25) ("[T]he roadbuilding reporting unit . . . did not meet the forecasted business performance used in the annual goodwill impairment test as of October 1, 2007. . . . The Company will continue to monitor the estimated fair value of the roadbuilding business"); Form 10-Q, 8/1/2008, at 14 (Ex. 26) (same); Form 10-Q, 11/3/2008, at 14 (Ex. 27) (roadbuilding and construction segments did not meet forecasted business performance). Each of the mid-year tests showed no impairment, but Terex nevertheless "continue[d] to monitor" the RBUO and Construction businesses. *See* Form 10-Q, 5/6/2008, at 14 (Ex. 25); Form 10-Q, 8/1/2008, at 14 (Ex. 26); Form 8-K, 7/23/2008, at 6 (Ex. 17); Form 8-K 10/22/2008, at 7-8 (Ex. 20); Form 10-Q, 11/3/2008, at 14 (Ex. 27).

deadline for filing its 1998 Form 10-K").

**Implausible Scheme.** In any event, when considered as a whole, Plaintiffs' alleged scheme makes little sense and cannot give rise to a "cogent" and "compelling" inference of scienter. As noted above, Terex had nearly $10 billion in revenue in 2008, spread across five business segments and five continents. The alleged fraudulent accounting practices primarily concern Terex's RBUO segment, which was the Company's smallest business segment, as it accounted for less than 8% of Terex's net sales in 2007 and 2008, and operated at a net loss in both years. *See* Form 10-K, 02/27/2009 at 40, 44 (Ex. 7).[38] Moreover, further minimizing the impact that this alleged fraud could conceivably have had on the Company's performance, Plaintiffs make allegations with respect to just three (3) of Terex's eight (8) RBUO sites (in a Company with 62 total facilities).[39]

In short, it is simply not a plausible inference that the Individual Defendants would attempt to mask declining sales by utilizing improper accounting practices at less than a handful of sites in the Company's smallest business segment, where those actions would have had such little effect on the Company's results. *See In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181, at *8 (D. Ariz. July 5, 2006) (no inference of scienter where allegations concerned "a small portion of [the company's] overall revenue"); *Teachers' Ret. Sys. of L.A. v. Qwest Commc'n Int'l Inc.*, 2005 WL 2359311, at *10 (D. Colo. Sept. 23, 2005) ("[T]he magnitude of the improper revenue recognition alleged by [plaintiff] is relatively small, compared to the revenue numbers claimed by [defendant] in the relevant quarters. The size and pervasiveness of the two alleged

---

[38] The RBUO segment was comprised of three distinct business units: Roadbuilding, Utility Products, and Other. Plaintiffs make no effort to break-out which business units were affected by the alleged improper accounting practices or in what amount.

[39] Plaintiffs' allegations concern the Oklahoma City, Fort Wayne, and Rock Hill RBUO facilities. Compl. ¶¶ 24, 27-28, 30, 32, 34, 37-39, 50, 52, 63, 70, 80-82, 87-88, 90, 120. Terex also has RBUO facilities in Canton, South Dakota, Watertown, South Dakota, Huron, South Dakota, Cachoeirinha, Brazil, and Opglabbeek, Belgium. *See* Form 10-K, 2/27/09, at 30 (Ex. 7).

manipulations undertaken by the individual defendants provide little if any support to a strong inference of scienter").  Indeed, that is no doubt why Plaintiffs make no attempt to actually quantify the size of the alleged fraud.[40]

## III.   TEREX'S FORWARD-LOOKING STATEMENTS ARE PROTECTED BY THE PSLRA SAFE HARBORS

### A.   The Reform Act's Safe Harbors Are Absolute Bars To Liability

The forward-looking statements alleged to be false in the Complaint are not actionable because they are protected by the safe harbor provisions of the PSLRA.  The safe harbor provisions immunize a party from liability under the federal securities laws for forward-looking statements so long as either (i) the statement is identified as forward-looking and is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" (15 U.S.C. § 78u-5(c)(1)(A)(i)), or (ii) the statement was made without actual knowledge that the statement was false or misleading (15 U.S.C. § 78u-5(c)(1)(B)(i)).

Because Terex's forward-looking statements (i) were identified as such and accompanied by meaningful cautionary language, and (ii) were made without "actual knowledge" that they were false, any claim of fraud based on those statements is barred by both of the PSLRA's safe harbor provisions.  *See Slayton*, 604 F.3d at 766 ("The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied

---

[40] The only other scienter allegation is Plaintiffs' nonsensical claim that the existence of an SEC investigation which covered the period from 2000 through 2004 – four <u>years</u> prior to the Class Period – somehow means that the Individual Defendants "knew" of the allegedly fraudulent accounting practices taking place during the Class Period. *See* Compl. ¶¶ 127-32; *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("The mere existence of an SEC investigation does not suggest that any of the allegedly false statements were actually false and it does not render [the President's] statements that [the company] was 'well-positioned' material nor does it add an inference of scienter"); *Teamsters Allied Benefit Funds v. McGraw*, 2010 WL 882883, at *11 (S.D.N.Y. March 11, 2010) ("[T]he government investigations cited in the Complaint [which commenced in August 2007] are irrelevant to alleged misconduct that occurred before August 2007, which accounts for most of the allegations in the Complaint").

by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading").[41]

### B.     The Forward-Looking Statements

A substantial amount of the allegedly false statements challenged in the Complaint are forward-looking, given that they relate to Terex's earnings guidance.  For example, these statements include:

- "It is our <u>expectation</u> that Terex's total revenue for 2008 will be between $10.0 and $10.5 billion, and earnings per share in the range of $6.65 to $7.15 per share. . . ."  Compl. ¶ 133.

- "Given our strong performance this quarter, balanced against the uncertainties surrounding some of our end markets and increased input costs, we now <u>anticipate</u> earnings per share for 2008 to be towards the middle to high end of our previously announced range, or $6.85 to $7.15 per share, on net sales of $10.5 to $10.9 billion."  *Id.* ¶ 144; *see also id.* ¶¶ 166, 169.

- "Construction <u>will</u> <u>stay</u> on course to improve in a challenging Western European environment, plus RBUO improvements <u>will</u> <u>continue</u>.  We feel still that the best is yet to come."  *Id.* ¶ 168.

- "We <u>expect</u> world demand for infrastructure, energy and mining products to continue, while at the same time we are positioning our businesses for the eventual recovery in the U.S. market."  *Id.* ¶ 169.[42]

Putting aside that Terex's actual numbers differed only modestly from these estimates

---

[41] Where a forward-looking statement is accompanied by meaningful cautionary statements, the state of mind of the individual making the statement is irrelevant.  *See, e.g.*, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) ("if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter"); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010); *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 678 (6th Cir. 2003) ("since we conclude that the statements . . . were both forward-looking within the meaning of the PSLRA, and that they were accompanied by meaningful cautionary language, the statements are subject to the safe harbor provisions of the PSLRA and are therefore not actionable.  No investigation of defendant's state of mind is required"); H.R. Conf. Rep. 104-369, at 44, 1995 U.S.C.C.A.N. at 743 (because the safe harbor requires meaningful cautionary language, "[c]ourts should not examine the state of mind of the person making the statement").

[42] A full list of the allegedly false forward-looking statements is attached as Ex. 1 to the Hirce Declaration.

(notwithstanding the financial crisis),[43] under the PSLRA, all of these statements are forward-looking and therefore subject to the PSLRA's safe harbors.  *See* 15 U.S.C. § 78u-5(i)(1)(A)-(D) (a "forward-looking statement" is any "statement containing a projection of revenues, income . . . earnings . . . .or other financial items," "a statement of the plans and objectives of management for future operations," "a statement of future economic performance," or "any statement of the assumptions underlying or relating" to any such statement).

The Complaint also challenges statements in which optimism was expressed regarding Terex's future performance.  *See, e.g.*, Compl. ¶ 136 ("What we know gives us confidence that we will have another great year at Terex"); Compl. ¶ 175 ("[I]n an overall context, we feel very positive about our future. . ."right).  These general optimistic statements are not only immaterial "puffery" (*see infra* Section IV), but are also inherently forward-looking and protected under the PSLRA.

### C.    All of Terex's Forward-Looking Statements Were Accompanied By Meaningful Cautionary Language

All of the challenged forward-looking statements are protected under the first safe harbor provision because they were each (i) identified as forward-looking and (ii) accompanied by meaningful cautionary language.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i); *Slayton*, 604 F.3d at 768; *Sierra Wireless*, 482 F. Supp. 2d at 380 (each statement was "identified as a forward-looking statement, and . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement").

---

[43] Actual net sales were $9.9 billion.  *See* Form 10-K, 2/27/2009, at  4 (Ex. 7).  Actual earnings per share, excluding extraordinary charges, were $5.50 per share.  *See* Form 8-K, 2/13/2009 (Ex. 24).  All of Terex's earnings guidance excluded any extraordinary charges that may be incurred.  *See, e.g.*, Form 8-K, 10/22/2008, at 2 (Ex. 20) ("The full year 2008 guidance does not include additional charges that may be required to implement further cost reduction activities").

***Statements Identified as Forward-Looking.***   In each of its communications with the market during the Class Period, Terex alerted the public to the forward-looking nature of statements in those communications.   *See, e.g.*, Form 10-K, 2/27/2008, at 3 (Ex. 6) ("Certain information in this Annual Report includes forward-looking statements . . . regarding future events or our future financial performance that involve certain contingencies and uncertainties . . . .   [T]he words 'may,' 'expects,' 'intends,' 'anticipates,' 'plans,' 'projects,' 'estimates' and the negatives thereof and analogous or similar expressions are intended to identify forward-looking statements. . . .   These statements are not guarantees of future performance"); Form 8-K, 4/23/2008, at 5 (Ex. 15) ("Safe-Harbor Statement.  This press release contains forward-looking information based on the current expectations of Terex Corporation").[44]  Thus, the market was aware that certain of Terex's statements, including its earnings guidance, were forward-looking within the meaning of the PSLRA.

***Meaningful Cautionary Language.***   Likewise, Terex provided meaningful cautionary language to the market along with its forward-looking statements.   Under the PSLRA, cautionary language need not caution against every possible material risk or even warn against the risk which actually materialized and caused actual results to differ from predicted results.   *See Slayton,* 604 F.3d at 771 (cautionary language is not "expect[ed] to identify all factors"); H.R. Conf. Rep. 104-369, at 44, 1995 U.S.C.C.A.N. at 743 (cautionary language must only "identify

---

[44] A similar statement is made in each disclosure where an allegedly false forward-looking statement appears. *See also* Form 8-K, 2/20/2008, at 6 (Ex. 13); Form 8-K, 2/22/2008 (Ex. 14); Form 8-K, 4/25/08 (Ex. 16); Form 8-K, 7/23/2008, at 6-7 (Ex. 17); Form 8-K, 7/24/2008 (Ex. 18); Form 8-K, 9/4/2008, at 1-2 (Ex. 19); Form 8-K, 10/22/2008, at 8-9 (Ex. 20); Form 8-K, 10/23/2008 (Ex. 21); Form 8-K, 2/3/2009, at 2 (Ex. 22); Form 8-K, 2/11/2009, at 7-8 (Ex. 23); Form 8-K, 2/13/2009 (Ex. 24); Form 10-Q, 5/6/08, at 2 (Ex. 25); Form 10-Q, 8/1/08, at 2 (Ex. 26); Form 10-Q, 11/3/08, at 2 (Ex. 27); Press Release: Terex Corp. at the Citigroup 21st Annual Global Indus. Mfg. Conf., 3/4/2008, at 1, 8 (Ex. 28); Press Release: Terex Corp. at Banc of Am. Sec. BASics/Indus. Conf., 5/8/2008, at 2, 8 (Ex. 29); Press Release: Terex Corp. at Sanford C. Bernstein & Co. Strategic Decision Conf., 5/30/2008, at 1, 11 (Ex. 30); Press Release: Terex Corp. at Wachovia Nantucket Equity Conf., 6/25/2008, at 1, 7 (Ex. 31); Press Release: Terex Investment Analyst Meeting, 9/4/2008, at 1, 73-74 (Ex. 32); Press Release: Terex Corp. at Morgan Stanley Global Industrials CEO's Unplugged Conf., 9/11/2008, at 1, 10 (Ex. 33).

important factors that could cause results to differ materially – but not all factors"). Cautionary statements are sufficient if they "are not boilerplate" and if they "convey[] substantive information." *Slayton*, 604 F.3d at 772; *In re Veeco Instruments Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006) (safe harbor applies where "cautionary language is reasonably specific as opposed to generic or boilerplate so as to constitute a real warning to investors").

Terex specifically identified risk factors that could adversely affect the future performance of the Company – risks that were similar, if not identical, to those that ultimately led Terex to both revise downward and fail to meet its earnings guidance. In particular, Terex specifically warned investors that its business is "highly cyclical" (Form 10K, 2/27/2008, at 3 (Ex. 6)) and that the "highly cyclical" nature of its business meant, among other things, that: "weak general economic conditions may affect sales of our products and financial results;" and "[a]dverse economic conditions . . . may cause customers to forego or postpone new purchases in favor of repairing existing machinery" *Id.* at 3, 21. Terex provided numerous other cautionary statements as well, including that: "our business is sensitive to fluctuations in interest rates and government spending;" "the financial condition of suppliers and customers, and their continued access to capital" may impact business; and "our business is global and subject to changes in exchange rates between currencies, as well as international politics, particularly in developing markets." *Id.* at 3, 21-25. Each of the Company's quarterly and annual reports described in detail the risks laid out in the "Forward-Looking Information" and "Risk Factors" sections of those filings. *See, e.g.*, Form 10-K, 2/27/2009, at 3, 23-27 "Item 1A. Risk Factors" (Ex. 7).

As market conditions changed, Terex revised its cautionary language. In its first quarterly earnings release after the global financial crisis took hold, Terex updated the market as to potential risks as economic conditions worsened. *See., e.g.*, Form 10-Q, 11/3/2008, at 42

("Currently, the financial markets are experiencing significant turbulence, and we expect that this will slow world economic growth over the near term. . . . [T]he depth and duration of economic decline and the timing and strength of the recovery are very uncertain.  Accordingly, we anticipate that many of our customers may delay capital spending over the near term"), 50 ("Given the current economic conditions and the lack of liquidity in the global credit markets, there can be no assurance that third party finance companies will continue to extend credit to our customers as they have in the past. . . .  These economic conditions could have a material adverse effect on demand for our products and our financial condition and operating results") (Ex. 27).

Accordingly, the first PSLRA safe harbor bars Plaintiffs' claims based on forward-looking statements.  *See, e.g.*, *Gissin v. Endres*, 2010 WL 3468508, at *10 (S.D.N.Y. Sept. 1, 2010) ("defendants' use of the requisite cautionary language in their public disclosures effectively secures the protection of safe harbor for their forward-looking statements").[45]

### D.     Plaintiffs Fail To Plead Facts Establishing "Actual Knowledge" Of Falsity

In addition, all of Terex's forward-looking statements are protected under the PSLRA's second safe harbor provision because the Complaint has no particularized facts showing that any Individual Defendant made any forward-looking statement with actual knowledge of its falsity. *See Slayton,* 604 F.3d at 777 (affirming dismissal because forward-looking statement was not made with actual knowledge that it was misleading); *Coyne*, 2010 WL 2836730, at *8 ("plaintiffs have not alleged specific facts showing that the defendants' forward-looking statements regarding all financial goals and earnings projections for 1Q08 were made with actual knowledge that the statements were false or misleading"); *Gissin*, 2010 WL 3468508, at *5

---

[45] *See also In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 540-41 (S.D.N.Y. 2010) (dismissing complaint where forward-looking statements were accompanied by meaningful cautionary language); *San Diego County Employees Ret. Ass'n v. Maounis*, 2010 WL 1010012, at *15-16 (S.D.N.Y. March 15, 2010) (same); *Coyne v. General Elec. Co.,* 2010 WL 2836730, at *8 (D. Conn. July 15, 2010) ("cautionary statements did accompany forward-looking statements"); *Sierra Wireless*, 482 F. Supp. 2d at 381-82 (same).

49

("Liability under the actual knowledge prong of the safe harbor attaches only upon proof of knowing falsity – a showing of recklessness is insufficient").

As discussed above, the CWs had virtually no contact with the Individual Defendants; therefore, Plaintiffs cannot demonstrate that the Individual Defendants knew of the allegedly improper accounting practices or the alleged need to take a goodwill impairment charge sooner than the Company actually did.  Moreover, there are no particularized facts showing that <u>any</u> CW had knowledge of the preparation of the Company's earnings guidance, the data used to prepare that guidance, or that any of the alleged fraudulent accounting data was used in calculating that guidance.  As such, the CW allegations cannot support <u>any</u> inference that the Individual Defendants knew that the Company's forward-looking statements were actually false when made.  *See Am. Express*, 2008 WL 4501928 at *8 ("Plaintiffs have also failed to allege any facts showing that the confidential sources . . . had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period"); *Plumbers*, 694 F. Supp. 2d at 299 ("Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations").

## IV.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO IDENTIFY ANY FALSE STATEMENTS

*No False Statements Identified.*  Under the heightened pleading requirements of the PSLRA, plaintiffs must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  In a futile attempt to comply with this pleading requirement, Plaintiffs reproduce an unwieldy compilation of block-quotes from almost every one of Terex's disclosures during the Class Period.  *See, e.g.*, Compl. ¶¶ 133-39, 142,144-48, 150-54, 158-60, 162-70, 172-81, 183-90, 192-97.  Interspersed among the block quotations at random intervals are boilerplate, generic assertions that purport to

explain why the long list of block-quoted statements are false.  *See, e.g.*, Compl. ¶¶ 140, 142, 149, 151, 155, 161, 171, 182, 191.  These assertions are not linked to any specific statement and often lack any connection to the group of false statements to which they might refer.

The Complaint should be dismissed because, in violation of the PSLRA, Plaintiffs have made it impossible to discern which <u>specific</u> statements are alleged to be false or misleading, and the reasons why each individual statement is false or misleading.  *See Tabor*, 579 F. Supp. 2d at 453 ("Plaintiffs use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements"); *Sina*, 2006 WL 2742048, at *6 (dismissing complaint where plaintiff "sets forth large block quotes taken from public statements made by the Individual Defendants and from SEC filings, followed by generalized explanations of why the statements collectively mislead the plaintiffs").

***No Falsity Relating to Allegedly Improper Accounting Practices.***  Plaintiffs fail to properly plead that the allegedly improper accounting practices caused Terex to make false statements.  The Complaint contains general and conclusory claims that the Company issued false financial statements and earnings guidance during the Class Period due to allegedly improper accounting practices, but fails to allege:  (i) when those practices occurred, (ii) the amount of the alleged fraud on each business segment and in each quarter, and (iii) its effect on the Company's financial statements and earnings guidance.  Instead, the Complaint only makes general allegations that the Company's financial statements and earnings guidance must have been materially false.  *See, e.g.*, Compl. ¶ 112 ("As a result, Terex's sales, margin and revenue were materially overstated at all times during the Class Period").

Plaintiffs' vague and general pleading runs contrary to the particularity requirements of the PSLRA and Rule 9(b). Because Plaintiffs have not adequately pled the reason why the statements at issue were false, including the timing and the amount of the alleged fraud, the Complaint should be dismissed. *See Chubb*, 394 F.3d at 153-54 ("Nor do Plaintiffs provide any particulars regarding the amount by which reserves were distorted, or how much revenue was improperly recognized. . . . Plaintiffs' allegations do not suffice."); *Rombach*, 355 F.3d at 174 ("To succeed on this claim, plaintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so"); *Stockman v. Flotek Indus., Inc.*, 2010 WL 3785586, at *15 (S.D. Tex. Sept. 29, 2010) (plaintiffs "fail[ed] to specify the amounts by which [defendants] overstated any financial projections").

**No Falsity Relating to Goodwill.** The failure to take an impairment charge may constitute securities fraud only when the need to write down an asset is "so apparent to the defendant before the announcement, that a failure to take an earlier write-down amounts to fraud." *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group PLC*, 655 F. Supp. 2d 262, 269 (S.D.N.Y. 2009); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) (same). The "mere allegation[] that statements in one report should have been made in earlier reports do[es] not make out a claim of securities fraud." *Acito v. Imcera Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1994); *Vodafone*, 655 F. Supp. 2d at 272 ("That Vodafone ultimately would take an impairment charge in 2006 does not in itself provide an actionable basis to claim that the failure to do so earlier was fraudulent"). Plaintiffs must plead <u>specific</u> facts showing exactly when and for what amount an impairment charge should have been recorded. *See Vodafone*, 655 F. Supp. 2d at 272; *Caiafa*, 525 F. Supp. 2d at 413. No such facts are pleaded.

First, Plaintiffs fail to plead specific facts as to when the impairment charge should have been recorded.  Plaintiffs appear to allege that either the potential sale of the Roadbuilding segment, or its alleged "rapid state of decline," triggered the Company's obligation to test for possible goodwill impairment.  Compl. ¶ 233.  But Plaintiffs do not allege facts to show when impairment testing should have been conducted or when the charge should have been recorded. *See, e.g.*, Compl. ¶ 106 ("The sale discussions began within six months of Riordan's January 2007 arrival"); Compl. ¶ 140 ("[B]y no later than December 31, 2007 . . . the Company's reported goodwill . . . was materially and permanently impaired"); Compl. ¶ 233 ("[B]y no later than 2007," Terex's Roadbuilding Division "was in a rapid state of decline").

These are exactly the type of vague and conclusory claims regarding goodwill rejected by courts.  *See, e.g.*, *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group PLC*, 2010 WL 309009, at *3 (S.D.N.Y. Jan. 22, 2010) (allegation that Vodafone should have revised standards for evaluating goodwill "prior to the beginning of the Class Period" was "vague," lacking in particularity, and did "not adequately allege when the Company should have recognized loss of goodwill and incurred an impairment charge").  Plaintiffs' conclusory allegations fail to establish a false or misleading statement particularly where, as here, the Company repeatedly tested for goodwill impairment during the Class Period and disclosed the results of that testing to the market.

Second, there are no facts to show the amount of the goodwill write-down that should have been recorded earlier.  Plaintiffs only allege that goodwill should have been written down "by at least tens of millions of dollars."  Compl. ¶ 232.  But this type of pleading is too vague to support a claim of fraud.  *See Vodafone*, 2010 WL 309009, at *4 (allegations that goodwill was "impaired by tens of billions of dollars" "no later than the beginning of the Class Period" were

"vague," "lacked particularity," and "fail[ed] to approximate the amount by which the Company should have written down its goodwill value"); *Caiafa*, 525 F. Supp. 2d at 411.  That Terex "ultimately would take an impairment charge in [2009] does not in itself provide an actionable basis to claim that the failure to do so earlier was fraudulent."  *Vodafone*, 655 F. Supp. 2d at 272; *see also id.* at 269 ("management's failure to accurately forecast evolving business conditions does not equate to fraudulent conduct").

  ***Puffery Not Actionable.***  Many of the apparently challenged statements reflect mere expressions of corporate optimism concerning future earnings, demand, or projections made by Terex.  By way of example, the Complaint appears to challenge as false and misleading the following statements:

- "we're pretty confident in terms of the growth ambitions we have" (¶ 142);
- "We feel still that the best is yet to come" (¶ 168); and
- "All in all, Terex remains strong and is getting stronger" (¶ 146).

  These statements, along with 23 other statements purportedly challenged by Plaintiffs and listed in Exhibit 2 to the Hirce Declaration, reflect mere "puffery" and not any false or misleading statement.  Such statements are "too general to cause a reasonable investor to rely upon them."  *ECA*, 553 F.3d at 206; *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (statement that "business strategies [would] lead to continued prosperity" is puffery); *San Leandro Emerg. Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements that company was "optimistic about its earnings and expected Marlboro to perform well" are puffery); *Bausch & Lomb*, 592 F. Supp. 2d at 354 n.33 (statement that "[w]e are pleased with the solid results we reported today" and have "[g]ood reason to be optimistic about our future growth prospects'" is puffery); *Sierra Wireless*, 482 F. Supp. 2d at 369, 373 (statements that defendants "expect[ed] OEM to continue to be a strong

segment" and that OEM "continue[s] to be a healthy business for the foreseeable future" are puffery); *Carman v. Liuski Int'l*, 1996 WL 732825, at *3 (E.D.N.Y. Dec. 18, 1996) (statement "we are budgeting for and expecting a strong year for all of our businesses" is puffery).

## V.   PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(A) OF THE EXCHANGE ACT

Finally, Plaintiffs' Section 20(a) claim must be dismissed for two separate and independent reasons.  Compl. ¶¶ 277-80.  ***First***, for the reasons described above, Plaintiffs fail to adequately plead the predicate Section 10(b) claim.  *See Rombach*, 355 F.3d at 177-78 (Section 20(a) claim is "necessarily predicated on a primary violation of securities law").  ***Second***, and also for the reasons described above, Plaintiffs otherwise fail to plead that the Individual Defendants were "in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

## CONCLUSION

For all of the reasons stated above, the Consolidated Class Action Complaint should be dismissed with prejudice in its entirety pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA.

Dated:  January 18, 2011

Respectfully submitted,

|  | *s/ David B. Hennes* |
|---|---|
| Brian E. Moran (ct05058) | William G. McGuinness |
| ROBINSON & COLE LLP | David B. Hennes (phv03814) |
| 1055 Washington Boulevard | FRIED, FRANK, HARRIS, SHRIVER |
| Stamford, CT  06901-2249 | & JACOBSON LLP |
| Tel:  (203) 462-7500 | One New York Plaza |
| Fax:  (203) 462-7599 | New York, New York 10004-1980 |
| Email:  bmoran@rc.com | Tel:  (212) 859-8000 |
|  | Fax: (212) 859-4000 |
|  | Email:  william.mcguinness@friedfrank.com |
|  | Email:  david.hennes@friedfrank.com |