UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHEET METAL WORKERS LOCAL 32    :
PENSION FUND and IRONWORKERS    :
ST. LOUIS COUNCIL PENSION       :
FUND, Individually and on       :
Behalf of All Others            :
Similarly Situated,             :
                                :
    Plaintiffs,                 :
                                :
V.                              :    Case No.  3:09-CV-2083(RNC)
                                :
TEREX CORPORATION, RONALD M.    :
DEFEO, PHILLIP WIDMAN, THOMAS   :
J. RIORDAN, TIM FORD, and       :
JONATHAN D. CARTER,             :
                                :
    Defendants.                 :


RULING AND ORDER

This is a proposed class action under the federal securities laws brought by and on behalf of purchasers of Terex Corporation ("Terex") common stock during the period February 20, 2008 through February 11, 2009 ("the class period").  The amended complaint alleges that during the class period, Terex and the individual defendants made materially false and misleading statements about the company's present and future financial situation, in violation of § 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78a, *et seq.*, and Rule 10b-5. In addition, it alleges that the individual defendants violated § 20(a) of the Act.  15 U.S.C. § 78a.  Defendants have moved to dismiss all the claims.  They argue that the amended complaint fails to identify false statements with sufficient particularity

and fails to provide facts supporting a reasonable inference that the alleged misstatements caused the plaintiffs' losses. Defendants further argue that the alleged facts do not create a strong inference of fraudulent intent on the part of the company or its officers.  They also contend that certain forward-looking statements are protected by safe harbor provisions.  Defendants submit that plaintiffs' losses were caused by the 2008 recession.

For reasons that follow, the motion to dismiss is granted in part and denied in part.  The motion is granted with regard to all the claims against the individual defendants except Thomas J. Riordan.  Unlike the allegations against Mr. Riordan, the allegations with regard to the other individual defendants do not support a strong inference of scienter.  The motion is also granted with regard to claims under § 20(b).  The motion is denied with regard to the claims against Terex and Mr. Riordan under § 10(b) and Rule 10b-5.

I. Facts

The following facts are drawn from the amended complaint and accepted as true for purposes of this motion.  The plaintiffs purchased Terex common stock during the class period.  Terex is a global manufacturer of construction products.  During the class period, it had five principal business divisions: Aerial Work Platforms ("AWP"); Construction; Materials Processing and Mining ("Mining"); Cranes; and Roadbuilding, Utility Products, and Other

("Roadbuilding").  The individual defendants served as senior directors and officers: Ronald M. DeFeo was Chairman and Chief Executive Officer; Mr. Riordan was President and Chief Operating Officer; Philip Widman was Senior Vice President and Chief Financial Officer; Jonathan D. Carter was Vice President, Controller, and Chief Accounting Officer; and Tim Ford was President of the AWP division.

According to the complaint, the defendants made statements that concealed declining demand for Terex products, which had the effect of inflating Terex's stock price.  To boost reported sales numbers, they employed various improper revenue recognition practices in violation of Generally Accepted Accounting Principles ("GAAP").  In addition, they inflated Terex's reported assets by failing to timely write down impaired goodwill.[1]  Despite signs that the slowdown was persistent, the defendants' statements continued to paint a rosy picture.  The plaintiffs suffered a loss when Terex's stock price declined following a series of partial revelations revealing the company's true financial situation.

---

[1] "Goodwill" is an intangible asset representing "the excess of the purchase price over the value of the assets acquired and liabilities assumed" following an acquisition. Fait v. Regions Fin. Corp., 655 F.3d 105, 108 (2d Cir. 2011) (citing Statement of Financial Accounting Standard No. 141, ¶ 34). It is "recorded similarly to any other asset, and any subsequent decline in its value is recorded as a loss." Id.

A. *Defendants' Statements*

The complaint includes forty pages setting forth alleged misstatements by the defendants in press releases, conference calls, and financial statements.  The alleged misstatements set forth below are representative.

At the beginning of the class period in February 2008, defendants reported that Terex's financial results for 2007 were mostly positive and expressed enthusiasm about the company's future.  In a press release, Mr. DeFeo stated that 2007 was a "very strong year in terms of financial performance" and "[g]lobal infrastructure spending continues to drive increased demand in most of our product categories."  He projected total sales between $10 and $10.5 billion for 2008, and expressed confidence that the company would reach its objective of having $12 billion in sales and a 12% operating margin by 2010 — a goal Terex officers sometimes referred to as "12 by 12 in '10."  He stated that Terex was "poised to have another record financial performance in 2008."  The press release and a subsequent Form 10-K filed with the SEC reported net sales increases in all divisions except Roadbuilding.[2]  During a conference call in Mr. DeFeo said "[w]e think the fundamentals are strong and the negative market trends in the U.S. and perhaps in some markets in

_____

[2] All Form 10-Ks were signed by defendants DeFeo, Widman, and Carter.

Europe will not overwhelm the positive momentum in our business."
Ford said "into the early part of '08, the order pattern has
actually been quite encouraging. Orders were reasonably strong in
the fourth quarter and into the early part of the first quarter."
Defendants Riordan and Widman also participated in this call.

Despite growing signs of an impending global economic
slowdown, the defendants continued to describe Terex's financial
situation in positive terms through March and April.  In March,
Mr. DeFeo maintained his projection of between $10 and $10.5
billion in sales for 2008, and stated that Terex was "on the
growth curve, probably a little ahead of the sales trajectory."
He also said "[a]ll is not doom and gloom in our markets."  An
April press release reported net sales increases in the first
quarter of 2008 in all divisions except Roadbuilding.  Commenting
on the results, Mr. DeFeo characterized the results as
"excellent" for the AWP and Cranes divisions, "favorable" for the
Mining division, and "somewhat disappointing" for the
Roadbuilding and Construction divisions.  Nonetheless, he stated
"the near term outlook is positive for the Construction segment"
and "[i]n general, we think that all of our operations continue
to have solid prospects heading into the remainder of the year."
The press release projected sales for the rest of the year of
between $10.5 and $10.9 billion and raised Terex's estimated
earnings per share.  During a conference call in which four of

-5-

the individual defendants participated,[3] Mr. DeFeo said that despite signs the U.S. housing market was in decline, "we continue to view the current market place more as an opportunity than as a near-term risk." Mr. Riordan said that the "markets continue to be reasonably strong on average as most regions continue to improve their infrastructure which drives demand for our products."

From the beginning of the class period to May 6, 2008, Terex's stock price increased from $62.21 to $74.80. On that date, Terex filed a first quarter Form 10-Q with the SEC that revealed the Roadbuilding division did not meet its forecasted business performance.[4] The Form stated that the company had updated its forecast and performed a goodwill impairment test for the Roadbuilding division.[5] The test found that the amount of goodwill for the Roadbuilding division was $34.4 million, indicating goodwill was not impaired. On May 7, 2008, Terex's stock price declined to $71.91. Defendants' statements about Terex's financial situation were positive throughout May 2008

---

[3] Mr. Carter did not participate.

[4] All Form 10-Qs were signed by Widman and Carter.

[5] A goodwill impairment test is conducted by comparing the fair value of a company unit to its carrying value. If the fair value exceeds the carrying value, goodwill is not impaired. If the carrying value exceeds the fair value, an impairment loss is estimated by looking at present cash flow estimates. See Statement of Financial Accounting Standard No. 142, ¶ 19-22.

despite growing issues in the Roadbuilding division. Mr. DeFeo
characterized the situation as "overall, some really strong
segments and a couple that are laggards." He described strong
demand in the Construction, AWP, and Cranes divisions. He said
Terex had a "fairly strong and diversified revenue base," and
reported a net increase in first quarter income of 28% based on
17% higher sales.

Terex's stock price remained in the low $70s through May
2008 but declined to below $60 by late June 2008, and it
continued to decline thereafter. On June 25, 2008, Oshkosh
Corporation, a competitor of Terex's AWP division, announced that
it expected to report a third quarter loss. Terex's stock price
declined from $59.17 on June 25 to $53.64 on June 26. After the
Oshkosh announcement, defendants publicly maintained a positive
outlook for Terex. Mr. DeFeo reported increasing income and
revenue, and stated, regarding the 12 by 12 in '10 goal, "one
might say we're ahead of [the] course that we set out from a
revenue point of view." Regarding the Oshkosh announcement and
what it meant for Terex's AWP division, he said business "may
slow down . . . but, frankly, that's going to be more than
offset, in our view at this stage, by a very strong performance
from our Crane and Mining business."

Terex's stock price fluctuated through June and July 2008,
settling at $50.12 on July 23. On that date, Terex issued a

press release revealing its second quarter financial results, including slowdowns in the AWP and Construction divisions. During a conference call the next day, Mr. Riordan revealed that order rates had slowed for AWP sales in Europe. He also said that the company had "too much inventory" and was decreasing production in the Construction and AWP divisions "in order to get our inventories in line." Nonetheless, he said AWP had a "very solid Q2 performance" and across all divisions Terex had "a record revenue quarter in the US." Mr. DeFeo continued to maintain that strength in other divisions would "offset the obvious slow downs" in Construction and AWP, and continued to project between $10.5 to $10.9 billion in sales for 2008. Terex's stock price declined to $46.72, and it fluctuated between $43 and $50 throughout the rest of July and August.

On September 4, 2008, Terex issued a press release lowering its estimated earnings per share and its projected sales, now to between $10.2 and $10.6 billion. During a conference call, Mr. DeFeo attributed the lowered expectations to "softness" in the AWP and Construction divisions. He no longer believed the Cranes and Mining divisions would offset these declines. Despite these changes, he expressed confidence that the company would meet its 12 by 12 in '10 goal. Terex's stock price declined from $47.32 on September 3 to $38.02 on September 4. It continued to decline throughout September and October.

On October 22, Terex issued a press release announcing several negative pieces of news. The Company again revised downward its estimated earnings per share and projected sales, which were projected to be between $10 and $10.3 billion. It announced actions to reduce costs and inventories, including layoffs and reduced production. And it announced that, effective January 2009, the Roadbuilding business would be dissolved and its operations moved into the Construction and AWP divisions. During a conference call the next day, Mr. DeFeo stated that the "depression scenario for Terex would have all these segments roll over all at once and we do not see this, nor do our customers and competitors. The only group that seems to believe this is the traders of our common stock. Someone is wrong here and we do not think it is us, although we readily admit uncertainty remains in this environment." Mr. Riordan stated that the Roadbuilding division's business "continued to gradually improve, with some exceptions." Terex's stock price decreased from $16.72 on October 22 to $12.69 on October 24.

On November 3, 2008, Terex filed its third quarter Form 10-Q with the SEC. The Form noted that the world economy was in the midst of a financial crisis with "no historical precedent with which to compare," but expressed confidence that Terex's "strategy of product and geographic diversity is the right one to deliver positive shareholder returns through this period." The

Form reported net sales increases in all divisions except for AWP.  Terex's stock price increased from $15.69 on November 3 to $17.57 on November 4, and fluctuated between $10 and $20 throughout November, December, and January.

On February 3, 2008, Terex issued another press release announcing negative news.  It described layoffs, curtailed production schedules, temporary and permanent factory shutdowns, and reduced executive compensation.  It also stated that "[a]lthough not yet finalized, the Company expects to record a non-cash impairment charge of certain of the Company's goodwill, identifiable intangibles, and other non current assets principally related to its Construction, Roadbuilding and Utilities businesses," in the amount of "approximately $600 million."  Terex's stock price increased from $11.78 on February 2 to $12.59 on February 4.

On February 11, 2008, Terex issued a press release announcing a net loss for the fourth quarter of 2008 of $421.5 billion, or $4.46 per share.  The company recorded a goodwill impairment charge of $459.9 million, attributed to the Construction and Roadbuilding divisions.  Net sales had declined 20% and total sales for 2008 were only $9.89 billion.  The company also withdrew its 12 by 12 in '10 goal.

During a conference call the next day, Mr. DeFeo stated that the 12 by 12 in '10 goal would "not be achieved without an

unlikely miracle turnaround." He said that "[g]iven the
continued decline in customer demand and continuation of slow
market conditions, our annual impairment test in the fourth
quarter of this year indicated the need to fully impair the
goodwill" in the Construction and Roadbuilding divisions. After
these disclosures, Terex's stock declined from $13.62 on February
11 to $9.45 on February 12.

        B. *Terex's True Financial Situation*

        Despite the mostly positive public comments defendants
continued to make until near the end of the class period, Terex's
true financial situation was dire. According to confidential
witnesses ("CWs") who worked at Terex, sales began to decline
precipitously before the class period and continued to decline
throughout the class period. Defendants contend that the
information provided by the CWs should be discounted. However,
in this Circuit, plaintiffs may rely on unnamed sources to
satisfy pleading requirements. See <u>Novak v. Kasaks</u>, 216 F.3d
300, 314 (2d Cir. 2000); <u>New Orleans Emps. Retirement Sys. v.
Celestica, Inc.</u>, 455 F. App'x 10, *14 (2d Cir. 2011) (relying on
<u>Novak</u> after <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551
U.S. 308 (2007)). "In such a situation, the confidential sources
must be 'described in the complaint with sufficient particularity
to support the probability that a person in the position occupied
by the source would possess the information alleged.'" <u>In re</u>

Ambac Fin. Group, 693 F. Supp. 2d 241, 268 n.31 (S.D.N.Y. 2010)
(quoting Novak, 216 F.3d at 314).  Plaintiffs describe each CW's
position in the complaint.  When the complaint provides a basis
for inferring that a CW had personal knowledge of the facts, the
CW's allegations are credited for purposes of this motion.

In the Roadbuilding division, there were signs of trouble
before the class period began.  In 2007, Riordan hired a
"strategy expert" to analyze all five of Terex's divisions.
Based on the expert's report, Riordan secretly decided to put the
Roadbuilding division up for sale, in an effort dubbed "Project
Cowboy."  Terex received an offer between $180 million and $190
million.  Mr. Riordan and other Terex executives rejected the
offer on the ground that it was far too low to cover the $514.5
million in assets, including $78.1 in goodwill, that the company
attributed to the Roadbuilding division.  During monthly meetings
after the failed sale, George Ellis, the Vice President and
General Manager of Roadbuilding, often stated that Roadbuilding
was not an attractive business because of all the goodwill Terex
wanted to include in the selling price.

By the time the class period began, the Roadbuilding
division was at risk of collapsing.  Sales of advanced concrete
mixers, which represented 40% of Roadbuilding revenue, declined
dramatically from as much as three hundred sales per month in
prior years to just two sales per month by October 2008.  By mid-

to late-2008, sales of Reclaimer/Soil Stabilizers and asphalt plants each were down 50%.  Sales of Trashmaster compactors, which had sold for hundreds of thousands of dollars, declined so much that the company eliminated the product line.  Declining sales resulted in employees "standing around doing nothing." Factories were not operating at capacity, and eventually, as Terex announced in October 2008, assembly lines were shut down, employees were laid off, and the division was dissolved.

The fate of the Roadbuilding division was a subject of discussion among Terex's top executives.  By the first quarter of 2008, Roadbuilding executives were holding weekly meetings to figure out how to utilize excess capacity.  A CW in charge of development reported sales data up the chain to Mr. Ellis and, before he took over as General Manager of Roadbuilding in March 2008, to Dale Jones.  Mr. Riordan made multiple trips to an Oklahoma City facility and, along with Mr. DeFeo, watched Roadbuilding's financials "very closely."  A CW who was Roadbuilding's Director of Operations met with Mr. Riordan during his trips, conducted quarterly reviews of sales data, and described Mr. Riordan as "very hands on with the numbers."  Mr. Ellis told one CW that "Roadbuilding has been bleeding red ink for more than a year and we have to stop the bleeding."

Declining sales were not limited to the Roadbuilding division.  By mid-2008, sales of AWP products had "tanked."

Inventory had been building up since 2007 as employees "kept making stuff but not selling it." Employee parking lots and other property were used to store excess inventory. By summer 2008, Crane units were being returned to the company and purchasing of materials used by the Cranes division had declined 33%. Construction sales were also poor. According to a CW, because the Construction division was Mr. DeFeo's "little pet project," Terex would not eliminate the division despite consistently losing money. The annual fourth quarter impairment test found Construction's goodwill was impaired 100%.

C. *Improper Revenue Recognition Practices*

To generate the false sales numbers that the company reported throughout the class period — which, as discussed above, showed generally increasing sales with some moderate declines in the Roadbuilding and AWP divisions — Terex employees engaged in a number of improper revenue recognition practices. One such practice, dubbed the "truck-stop-two-step," involved prematurely recognizing revenue at the end of each quarter by moving products to off-site locations and reporting them as sold.[6] According to several CWs, the practice was "pervasive" in the Roadbuilding and

---

[6] Similar practices included: shipping unfinished products and counting them as sold; convincing customers to take delivery early, effectively creating a consignment arrangement; and shipping products with the "Certificate of Origin" attached, contrary to a company policy that required employees to ship the certificate separately after payment.

Mining divisions.  Instructions came from the "top down" that at
the end of each quarter, employees were to "ship and invoice
anything not bolted down."  Both Mr. Jones and Mr. Ellis told
Roadbuilding employees to ensure these products were counted as
bona fide sales.  Mr. Jones told one CW, "we need sales this
month. Get it up there and make it happen."  Mr. Riordan told Mr.
Jones and a CW, "we need these numbers to hit, we have to get
these sales," and "[a]nything we have to do we'll make it
happen."  Employees understood that these practices were meant to
"hide the inventory from the Company's auditors."

Another practice employed in the Construction, Cranes, and
AWP divisions involved improperly reporting intercompany
transfers as sales.  When inventory was transferred between Terex
subsidiaries, the transfers were booked as profit-making sales.
Because Terex offered many discounts to actual customers, the
recorded prices of these sales to subsidiaries were often higher
than the prices for bona fide sales.  During the class period, at
least $350 million in booked sales were the result of
intercompany transfers, representing approximately 3.2% to 3.5%
of the company's total sales.[7]  A CW who began working in the
accounting department as a consultant in December 2008 discovered

---

[7] Terex's 2008 Form 10-K, filed on February 27, 2009,
reports $9.889 billion in sales for 2008.  Defendants had
estimated, at various times throughout the class period, that
sales would be between $10 to $10.9 billion.

this problem and reported it to Mr. Riordan and Controller Mark
Clair.[8]  Mr. Riordan responded via email expressing concern that
Terex would lose credibility if it announced that its books were
overvalued.  He did not want to go public with information
showing that the reported numbers were incorrect.  The CW told
Mr. Riordan there was "no magic" to be done and the company
should book the entries correctly and face the consequences.[9]
According to the CW, Mr. Clair reported the problem to Mr. Widman
and Terex's Executive Committee, which included all the
individual defendants.  Another CW reported the problem to the
finance department located at company headquarters.  The
department stated to the CW that the "Company understood its net
sales were not as large as they appeared" and would "take the
adjustment at year-end."

     On August 12, 2009, after the class period, the SEC filed an
action against Terex for "recording improper entries that
misstated its earnings and concealed intercompany imbalances in
its accounts."  Complaint, at 1, <u>SEC v. Terex</u>, 3:09-cv-1281(AWT)

---

     [8] The consultant also found problems with Terex's goodwill
accounting and a lack of basic documentation to substantiate at
least $10 million in accounting journal entries.

     [9] In the third quarter of 2009, after the class period, the
CW was terminated, because, according to the CW, he/she refused
to help Riordan and other executives conceal the intercompany
transfer problem.  The CW also believes that the Director of
Corporate Accounting was asked to leave in early 2009 for the
same reason.

(ECF No. 1) (August 12, 2009).[10]  As a result of these
irregularities, "Terex materially misstated its financial
condition and operating results in filings with the Commission"
between 2000 and 2004. Id. at 1-2.  On the same day the complaint
was filed, Terex agreed to settle the action without admitting
liability.  Consent, SEC v. Terex, 3:09-cv-1281(AWT) (ECF No. 3)
(August 12, 2009).

II. Discussion

    A. *Standard of Review*

    Generally, to withstand a motion to dismiss, "a complaint
must contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  All factual
allegations are accepted as true and viewed in the light most
favorable to the plaintiff.  Id.  "Threadbare recitals of the
elements of a cause of action, supported by mere conclusory
statements," are disregarded.  Id.  In addition to the complaint,
a court "may consider any written instrument attached to the
complaint, statements or documents incorporated into the
complaint by reference, legally required public disclosure
documents filed with the SEC, and documents possessed by or known

---

[10] The SEC Complaint also claims Terex aided and abetted
another company that committed accounting fraud in 2000 and 2001.

to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  A claim satisfies the plausibility standard if it is supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citations omitted).

To state a claim under Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008) (citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)). Section 20(a) makes liable "[e]very person who, directly or indirectly, controls any person liable" for violations under the securities laws "jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation." 15 U.S.C. § 78t.

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Rule 9(b) requires

plaintiffs to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  The PSLRA requires plaintiffs to (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b).  The combined effect of these two provisions is to heighten the standard with respect to pleading the first and second requirements in an action under Rule 10b-5, a material misrepresentation and scienter.  See generally ATSI, 493 F.3d at 99 (discussing Rule 9 and PSLRA standards).  Whether Rule 9(b) or the PSLRA heightens the standard for pleading loss causation is an open question.  See Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC , 797 F.3d 160, 182-83 (2d Cir. 2015) (describing question "as to the level of *particularity*" as "an open one in our Circuit"); see also Dura, 544 U.S. at 346 ("And we assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.").[11]

B. *Identification of False Statements with Particularity*

Rule 9(b) and the PSLRA heightened pleading standards

---

[11] Because plaintiffs' allegations as to loss causation are adequate under either standard, I assume without deciding that the heightened standard governs.

require that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015).  Defendants contend that the amended complaint falls short of meeting these requirements.  But the amended complaint details a great number of statements, identifies the speaker and provides the relevant dates and locations.  It also provides an adequate explanation as to why the statements were false.

The allegations here are similar to the allegations in Blanford.  In that case, the company represented to "investors that it was straining to meet an increasing demand for its products" and that business was "booming."  Id. at 301.  Actual demand for the company's products was so low that inventory was "up to the rafters."  Id.  The Blanford plaintiffs relied on numerous CWs, who were "employees from different tiers in the company – detailing the company's increasing inventory buildup." Id.  The CWs described "phony shipment[s] to temporarily conceal excess products during inventory audits" and the use of "non-mainstream accounting practices to track its inventory." Id. at 301-02.  The Court of Appeals held that the company's misstatements were alleged with sufficient particularity.  Id. at 306.

Here, as in Blanford, the amended complaint alleges that defendants' positive statements about Terex's financial condition were at odds with the true state of affairs.  The allegations as to the true state of affairs are supported by the observations of multiple CWs who worked at the company.  The financial statements defendants filed were allegedly misleading because the reported data were inflated by the use of improper accounting methods. See also Indiana Pub. Retirement Sys. V SAIC, Inc., 818 F.3d 85, 93 (2d Cir. 2016) ("Financial statements which are not prepared in accordance with GAAP are presumptively misleading or inaccurate." (citing 17 C.F.R. § 210.4-01(a)(1) (quotation marks and brackets omitted)).  If defendants' statements and reported data about current demand were misleading, it is plausible that defendants' statements about Terex's future also were misleading.  See Blanford, 794 F.3d at 305 (holding that statements about "inventory, business performance, and *growth prospects*" were alleged with sufficient particularity (emphasis added)).

Defendants argue that CW accounts are disfavored and that the accounts of the CWs referenced in the amended complaint should be discounted because they were not involved in financial reporting and had little contact with the defendants.  As discussed above, however, reliance on CWs to plead securities fraud claims is permitted in this Circuit.  The amended complaint

-21-

relies on CWs with alleged first-hand knowledge of the conditions
at Terex facilities and Terex's financial accounting, and the CWs
are described as current and former workers at those facilities
and in accounting.  It is reasonable to infer that the CWs
probably do have personal knowledge of the information pleaded
even if they were not involved in financial reporting and had
little contact with the individual defendants.

 C. *Loss Causation*

 To adequately plead loss causation, a plaintiff must
"provide a defendant with some indication of the loss and the
causal connection that the plaintiff has in mind."  Dura, 544
U.S. at 347.  At a minimum, a plaintiff must show that (1) "the
loss was a foreseeable result of the defendant's conduct," i.e.,
it "was within the zone of risk concealed by the
misrepresentations and omissions"; and (2) "the loss was caused
by the materialization of the risk concealed by the defendant's
alleged fraud."  In re Vivendi, S.A. Sec. Litig., 838 F.3d 223,
261 (2d Cir. 2016); Lentell v. Merrill Lynch & Co., 396 F.3d 161,
173 (2d Cir. 2005).  In other words, a plaintiff must show "that
the misstatement or omission concealed something from the market
that, when disclosed, negatively affected the value of the
security."  Lentell, 396 F.3d at 173; see also Suez Equity
Investors, LP v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir.
2001) (plaintiff must show that the "*subject* of the fraudulent

statement or omission was the cause of the actual loss suffered"). Generally, it is sufficient to show that the company's "share price fell significantly after the truth became known." Dura, 544 U.S. at 347.

Plaintiffs have adequately pleaded loss causation with respect to defendants' statements about the historical, present, and future demand for Terex's products in the Roadbuilding, Construction, and AWP divisions. Plaintiffs claim that these statements artificially inflated Terex's stock price, and the inflation gradually came out of the price through a series of partial disclosures. The company began to publically disclose slowdowns in the Roadbuilding division in May 2008, the AWP division in June 2008, and the Construction division in July 2008. Estimated future earnings per share and projected net sales were first revised downward in September 2008. These figures were continually revised downward throughout the rest of the class period. In October 2008, the company announced layoffs and the plan to dissolve the Roadbuilding division, and in February 2008, the company finally announced a net loss and effectively abandoned the 12 by 12 in '10 goal. Terex's stock price declined after each of these disclosures, causing a loss to shareholders.

Assuming that the true sales figures and estimates were lower than reported until the final disclosure in February 2008,

the loss experienced by plaintiffs was foreseeable and the result
of a materialization of the risks concealed by defendants'
statements.  As the Seventh Circuit has explained, concealing a
company's true financial condition by inflating reported sales is
risky:

> [The defendant] may have thought that there was a
> chance that the situation regarding the two key
> products would right itself. If so, the benefits of
> concealment might exceed the costs. Investors do not
> like to think they're riding a roller coaster. Prompt
> disclosure of the truth would have caused [the
> company]'s stock price to plummet, as it did when the
> truth came out a couple of months later. Suppose the
> situation had corrected itself. Still, investors would
> have discovered that the stock was more volatile than
> they thought, and risk-averse investors (who
> predominate) do not like volatility and so, unless it
> can be diversified away, demand compensation in the
> form of a lower price; consequently the stock might not
> recover to its previous level.

Makor Issues & Rights, Ltd. v. Tellabs Inc. ("Tellabs II"), 513
F.3d 702, 710 (7th Cir. 2008).  Here, as the sales numbers in the
Roadbuilding, Construction, and AWP divisions were propped up by
improper revenue recognition techniques, there was a risk that
sales would not recover.  The risk materialized as the true
conditions at the company became known, and it was foreseeable
that the materialization of this risk would cause losses to
plaintiffs.  See Restatement (Second) of Torts § 548A, cmt. b
(1977) ("[O]ne who misrepresents the financial condition of a
corporation in order to sell its stock will become liable to a
purchaser . . . for the loss that he sustains when the facts as

to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market, because that is the obviously foreseeable result of the facts misrepresented." (quoted in part in <u>Dura</u>, 544 U.S. at 343)).  In other words, the subsequent decline in share price is attributable to defendants' misstatements because, if they had told the truth, the price would not have been inflated.  Courts have found adequate evidence of loss causation in similar cases. See <u>Alaska Elec. Pension Fund v. Flowserve Corp.</u>, 572 F.3d 221, 230 (5th Cir. 2009) (loss causation shown where defendants overstated company's earnings and guidance, and stock price fell after company revised earnings and guidance downward); <u>Freudenberg v. E*Trade Financial Corp.</u>, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (loss causation shown where defendants' misstatements about company's financial conditions caused inflated stock price and stock declined after series of partial disclosures about true conditions).

Defendants argue that plaintiffs have not shown loss causation because the amended complaint fails to plead any "corrective or cleansing disclosure" that revealed the fraudulent accounting practices.  This argument is unavailing.  The Second Circuit has recently clarified that a specific corrective disclosure is not the only method by which a plaintiff may prove losses resulting from the revelation of the truth.  <u>Vivendi</u>, 838

F.3d 261. "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events *constructively disclosing the fraud*, does not alter the basic loss-causation calculus." Id. at 262 (emphasis added). That is, a plaintiff need not show that a "specific corrective disclosure . . . exposed the precise extent of [the] alleged fraud," so long as the plaintiff's "theory of loss causation nevertheless rest[s] on the revelation of the truth." Id. In this case, defendants' partial disclosures "constructively disclos[ed] the fraud." Id.

Defendants' theory of loss causation would have the effect of insulating from liability defendants who, as alleged here, inflate a company's sales data, correct the data over time, and never admit that earlier data was inflated. See Alaska Elec. Pension Fund, 572 F.3d at 230 ("If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements."); In re Williams Securities Litig., 558 F.3d 1130, 1140 (10th Cir. 2009) ("[I]f we are too exacting in our demands for a connection between the initial misrepresentation and subsequent revelation – for instance, by imposing a mirror image requirement - then we would eliminate the possibility of 10b-5 claims altogether." (citing Lentell, 396 F.3d at 173)). An admission of guilt is not necessary: "the 'relevant truth'

required under <u>Dura</u> is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss.'" <u>Freudenberg</u>, 712 F. Supp. 2d at 202.

As mentioned above, defendants argue that market conditions, not the alleged misstatements, caused plaintiffs' losses. While this may be true, "[p]laintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price." <u>Carpenters Pension Trust Fund v. Barclays PLC</u>, 750 F.3d 227, 233 (2d Cir. 2014); <u>see</u> <u>also</u> <u>Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.</u>, 343 F.3d 189, 197 (2d Cir. 2003) ("[I]f the loss was caused by an intervening event, like a general fall in the price of . . . stocks, the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."). Whether and to what extent defendants caused plaintiffs' losses is a matter of proof at trial; at this stage, plaintiff "need only allege sufficient facts to raise a reasonable inference that [defendants' fraudulent conduct] caused an ascertainable portion of its loss." <u>Fin. Gaur. Ins. Co. v. Putnam Advisory Co.</u>, 783 F.3d 395, 405 (2d Cir. 2015).[12]

---

[12] Some portion of plaintiffs' losses cannot be attributed to defendants' misstatements.  Plaintiffs cannot show, for example, that the drop in stock price from $38.02 to $16.72

Defendants rely on Second Circuit cases that are distinguishable.  In some of the cases, the alleged misstatements had only a tangential relationship to the alleged cause of the plaintiffs' losses.  See Amorosa v. AOL Time Warner., 409 F. App'x 412, 416 (2d Cir. 2009); ATSI Comms., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 106-07 (2d Cir. 2007).  Here, plaintiffs allege that defendants' misstatements about product sales and Terex's business prospects were the direct cause of the losses.  In other cases, the allegedly concealed risk was either already known to the public, see In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 512 (2d Cir. 2010), or not actually concealed because another portion of the alleged misstatement effectively disclosed the risk, see Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2006) (dismissing complaint where defendant's inaccurate data was cured by accurate "normative" statement); Lentell, 396 F.3d at 177 (dismissing complaint where defendant's inaccurate "normative" statement was cured by accurate data).  The amended complaint provides no indication that the risk concealed by the alleged misstatements was known and defendants do not suggest that it was.  In fact, they maintain that Terex's financial statements were accurate.

---

between September 4, 2008, and October 22, 2008, was caused by defendants' alleged misstatements because plaintiffs do not allege that any partial disclosures took place during that time period.

Plaintiffs have, however, failed to plead loss causation with respect to statements or omissions regarding goodwill. Plaintiffs claim that defendants failed to timely write down goodwill in the Roadbuilding division. To comply with GAAP, firms must test goodwill "annually, or more frequently if events or changes in circumstances indicate that the asset might be impaired." Statement of Financial Accounting Standard No. 142, ¶ 18; see also id. at ¶ 28 (examples of events triggering duty to conduct test). Terex generally conducted its annual tests in October.

In May 2008, defendants disclosed on a Form 10-Q that they had conducted an interim test for the Roadbuilding division, finding that "the unit passed the test and no impairment charge was recorded." Even assuming that (1) this test was improperly conducted, (2) defendants had a duty to conduct another goodwill impairment test sometime later in the class period, and (3) the results would have indicated an impairment, plaintiffs cannot show loss causation because when defendants did disclose that Terex expected to record an impairment of $600 million on February 3, 2009, Terex's stock price went up. Dura, 544 U.S. at 347 (generally must show that "*share price fell* significantly after the truth became known"). Because the risk of a $600 million goodwill impairment was disclosed to the market on February 3, it is irrelevant that Terex's stock price declined

-29-

after defendants disclosed on February 11 that Terex was recording a $459.9 million goodwill impairment.  Possible goodwill impairment was already disclosed to the market and reflected in Terex's stock price by February 11.  Cf. In re Omnicom Grp., 597 F.3d at 512 (disclosure of accounting issues not "corrective" where previous news reports "suggested" such issues).

Plaintiffs also cannot show loss causation with respect to any alleged statements about the Cranes and Mining divisions because the defendants never disclosed any problems in those two divisions.  Unlike the AWP, Construction, and Roadbuilding divisions, defendants maintained until the end of the class period that these divisions were performing well.  Even if their statements were untrue, plaintiffs cannot show loss causation because the true conditions never became known to the market.  See Lentell, 396 F.3d at 173 (plaintiff must show "that the misstatement or omission concealed something from the market that, *when disclosed*, negatively affected the value of the security" (emphasis added)).

D. *Scienter*

Rule 10b-5 requires the plaintiffs to prove that the defendants acted with an "intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976).  Under the PSLRA's heightened pleading standard, a

-30-

plaintiff must plead "with particularity facts giving rise to a
strong inference that the defendant acted with the required state
of mind." 15 U.S.C. § 78u-4(b)(2). The "inference of scienter
must be more than merely plausible or reasonable - it must be
cogent and at least as compelling as any opposing inference of
nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights,
Ltd. ("Tellabs I"), 551 U.S. 308, 314 (2007). To make this
determination, "a court must consider plausible, nonculpable
explanations for the defendant's conduct, as well as inferences
favoring the plaintiff." Id. at 324.[13]

"The requisite scienter can be established by alleging facts
to show either (1) that defendants had the motive and opportunity
to commit fraud, or (2) strong circumstantial evidence of
conscious misbehavior or recklessness." ECA, Local 134 IBEW
Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d
187, 198 (2d Cir. 2009) (citing Novak v. Kasaks, 216 F.3d 300,
307 (2d Cir. 2000)).[14] Plaintiffs have not alleged motive and

---

[13] Because the PSLRA safe-harbor provision includes an
"actual knowledge" prong, scienter with respect to forward-
looking statements is discussed separately in the next section.

[14] See also id. at 199 ("At least four circumstances may
give rise to a strong inference of the requisite scienter: where
the complaint sufficiently alleges that the defendants (1)
'benefitted in a concrete and personal way from the purported
fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew
facts or had access to information suggesting that their public
statements were not accurate'; or (4) 'failed to check
information that they had a duty to monitor.'" (quoting Novac,
216 F.3d at 311)).

opportunity to commit fraud.  Instead, they seek to establish the requisite scienter by showing conscious misbehavior or recklessness, which involves "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  Id. at 198 (quotation marks and citations omitted).  A plaintiff is not required to allege facts supporting a motive, but to raise a strong inference of scienter under the "strong circumstantial evidence" prong, the strength of the circumstantial evidence of fraud must be "correspondingly greater" if no motive is shown.  Id.

When a Rule 10b-5 claim is based on alleged misstatements by senior corporate officials about the financial condition of the company, courts assess the likelihood that the statements were "the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or reckless indifference to whether the statements were misleading."  Tellabs II, 513 F.3d at 709; accord Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 197 (2d Cir. 2008).  Generally, evidence of accounting irregularities is insufficient to establish scienter with regard to a senior executive in the absence of a showing that the executive knew about them.  See Novak, 216 F.3d at 309 (stating "allegations of GAAP violations or accounting

irregularities . . . are insufficient to state a securities fraud claim" unless "coupled with evidence of corresponding fraudulent intent")).  In some circumstances, however, scienter may be established based solely on the magnitude of the company's problems.  For example, in Tellabs II the plaintiffs claimed that high level executives at the company had overstated the demand for its "flagship" product and its "heralded successor."  513 F.3d at 708.  The plaintiffs' allegations included accounts from CWs that the company had been inflating revenues by engaging in "channel stuffing": "shipping to one's distributors more of one's product than one thinks one can sell."  Id. at 709.  After weighing competing inferences, the Court found it "exceedingly unlikely" that the executives were not aware of the falsity of their statements given the importance of the two products to the company's business.  Id.

Here, plaintiffs' allegations are sufficient to establish a cogent and compelling inference of scienter with respect to Mr. Riordan's statements about the Roadbuilding division.  As discussed above, the amended complaint alleges that he made personal trips to Roadbuilding facilities and met with Roadbuilding executives.  At the time of his visits, factories were visibly not operating at capacity and employee parking lots and other properties were being used to store excess inventory. The "truck-stop-two-step" was "pervasive" in the Roadbuilding

division, and it was directed from the "top down."
Roadbuilding's executives told employees to "ship and invoice
anything not bolted down."  Mr. Riordan told the executives "we
need these numbers to hit, we have to get these sales," and
"[a]nything we have to do we'll make it happen."[15]  These
allegations are sufficient to support a strong inference of
scienter.  See New Orleans Emps. Retirement Sys. v. Celestica,
Inc., 455 F. App'x 10, *14 (2d Cir. 2011) (finding strong
inference of scienter where defendants "received information
about the inventory buildup" and "would have been alert to
information concerning increases in the company's unsold
inventory").

     The allegations also support a strong inference of scienter
with respect to Mr. Riordan's statements about the AWP and
Construction divisions.  Improperly recorded intercompany
transfers allegedly represented $350 million in sales in those
two divisions (and the Cranes division), and the amended
complaint alleges that Mr. Riordan actively concealed the
problem.  After a CW in the accounting department told him about
the problem, he stated that he did not want to disclose it

_____

[15] Defendants insist that this statement is ambiguous. While
this may be true, the Court must consider these allegations in
the light most favorable to the plaintiffs.

because Terex would lose credibility in the market.[16]

The plaintiffs have not stated with particularity facts giving rise to a strong inference of scienter with respect to the other individual defendants. The amended complaint includes no allegation that the other defendants witnessed improprieties at Roadbuilding facilities or were apprised of improper revenue recognition taking place in the Roadbuilding division. Like Mr. Riordan, the other defendants were on the Executive Committee and the amended complaint alleges that the Committee was informed by the Controller about intercompany transfers in the AWP and Construction divisions. However, the amended complaint does not allege when this meeting took place. The CW who originally relayed the information to the Controller did not begin working at Terex until December 2008, a few months before the end of the class period; thus, the Executive Committee may have been informed of the problem only at the very end of the class period or after the class period. Even if the meeting occurred before the end of the class period, there is no particularized allegation that the defendants were specifically informed of the

---

[16] Mr. Riordan may have thought that Terex's prospects eventually would improve but he wanted to avoid even a temporary drop in its stock price. See Tellabs II, 513 F.3d at 710 ("Investors do not like to think they're riding a roller coaster. . . . The fact that a gamble - concealing bad news in the hope that it will be overtaken by good news - fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." (citation omitted)).

nature and extent of the accounting problems arising from improper practices.  Unlike in <u>Tellabs II</u>, plaintiffs have not shown that Terex misstated the sales of its "flagship" product leading to an inescapable inference that they knew their statements were false.  Improper intercompany transfers accounted for only 3.2% to 3.5% of total sales, and the amended complaint does not quantify the extent to which other improper revenue recognition practices overstated Terex's sales.  <u>See Horowitz v. Green Mountain Coffee Roasters, Inc.</u>, No. 2:10-CV-227, 2013 WL 1149670, at *7 (D. Vt. Mar. 20, 2013) (dismissing complaint based on false financial reports because it included no "particularized allegation that either [individual defendant] knew or should have known of any problems with [company]'s accounting system or its revenue recognition practice").  Moreover, as defendants emphasize, most of them increased their holdings in Terex stock during the class period.  Though not dispositive, this trading history weighs against an inference of scienter.  <u>See Avon Pension Fund v. GlaxoSmithKline PLC</u>, 343 F. App'x 671, 673 (2d Cir. 2009).[17]

---

[17] Plaintiffs point to Terex's settlement with the SEC regarding improper accounting methods in the early 2000s as evidence of scienter.  They argue that although the complaint was filed after the class period ended, the fact that Terex settled with the SEC on the day the complaint was filed indicates Terex's executives were aware of the SEC's concerns and were actively negotiating the settlement.  Because the settlement occurred eight months after the class period ended, it has only limited probative value for purposes of this motion.

Because the amended complaint alleges facts supporting a strong inference of scienter with regard to Mr. Riordan, Terex may be liable for any materially false statements that can be attributed to him.  See Dynex Capital Inc., 531 F.3d at 195 ("To prove liability against a corporation . . . a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation.").

E. *PSLRA Safe-Harbor*

The PSLRA includes a safe-harbor provision for certain forward-looking statements.  Forward-looking statements include "statement[s] containing a projection of revenues, income (including income loss), [and] earnings (including earnings loss) per share"; and "statement[s] of future economic performance." 15 U.S.C. § 78u-5(i).  Under the PSLRA, defendants are not liable for forward-looking statements where: (1) the statement is "identified as forward-looking . . . and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; (2) the statement is immaterial; or (3) "the plaintiff fails to prove that the forward-looking statement . . . [was] made . . . with actual knowledge . . . that the statement was false or misleading."  Id. at § 78u-5(c).

Defendants argue that the amended complaint falls short of showing that their quantitative and qualitative forecasts about Terex's future were knowingly false. For forward-looking statements, as with statements of present and historical fact, the complaint must raise an inference of scienter that is "at least as compelling as any opposing inference." Slayton v. American Express Co., 604 F.3d 758, 773 (2d Cir. 2010) (quoting Tellabs I, 551 U.S. at 323). A showing of recklessness is insufficient: "liability . . . attaches only upon proof of knowing falsity." Id. (quoting Avaya, 564 F.3d at 274). Knowing falsity can be proved by showing that the defendants "(1) did not genuinely believe the [statement], (2) actually knew that they had no reasonable basis for making the statement, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement." Id. at 775.

For the reasons stated above, plaintiffs' allegations fail to raise a strong inference of knowing falsity with respect to forward-looking statements made by the individual defendants except for Mr. Riordan. Plaintiffs argue that because the defendants knew Terex's financial condition was overstated, it is reasonable to infer that they knew their forecasts were overstated. Because I find that plaintiffs' allegations do not raise an inference that the defendants other than Mr. Riordan were aware of Terex's true financial condition, I cannot conclude

that these defendants knew their statements about Terex's future
were false.  With regard to Mr. Riordan, plaintiffs' allegations
raise a strong inference that he knew his statements about
current sales and demand were false, and these "undisclosed facts
tend[ed] to seriously undermine the accuracy" of his statements
regarding Terex's future.  See Slayton, 604 F.3d at 775; see
Patriot Exploration, LLC v. Sandridge Energy, Inc., 951 F. Supp.
2d 331, 352-53 (D. Conn. 2013) (finding strong inference that
defendants' stated projections of return on plaintiffs'
investments in oil operation were knowingly false where defendant
misstated key historical indicators of oil production and costs).

Defendants also argue that the "meaningful cautionary
language" safe-harbor applies.  This safe-harbor was derived in
part from the pre-PSLRA "bespeaks caution" doctrine. Slayton v.
American Express Co., 604 F.3d 758, 770 n.5 (2d Cir. 2010); see
also Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d
Cir. 2002) ("[A]lleged misrepresentations . . . are immaterial as
a matter of law [if] it cannot be said that any reasonable
investor could consider them important in light of adequate
cautionary language set out in the same [statement]."). Under the
PSLRA,  defendants must identify the statement as forward-looking
and "demonstrate that their cautionary language was not
boilerplate and conveyed substantive information."  Slayton, 604
F.3d at 772 (citation omitted).  Though the defendant "need not

include the particular factor that ultimately causes its projection not to come true," id. at 773, the cautionary language must be "tailored to the specific future projections, estimates or opinions . . . the plaintiffs challenge," id. at 772 (quoting Inst. Inv. Grp. v. Avaya, 564 F.3d 242, 256 (3d Cir. 2009)).

According to defendants, they included sufficiently meaningful cautionary language along with each alleged misstatement that was forward-looking.  They point to warnings that Terex's business was "highly cyclical"; that "weak general economic conditions" could "affect sales of our products and financial results" and "cause customers to forgo or postpone new purchases in favor of repairing existing machinery"; and that "the financial condition of suppliers and customers" could impact business.  They argue that their warnings were not mere boilerplate because they became more pessimistic and specific as economic conditions worsened.

As plaintiffs point out, "cautionary language that is misleading in light of historical fact cannot be meaningful." Id. Though defendants' cautionary language was more than mere boilerplate and conveyed some substantive information about various risks facing the company, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." Rombach v. Chang, 355 F.3d 164, 137 (2d Cir. 2004).  Warnings that demand *could* decline

do not protect against liability for failure to disclose that demand has *already* declined.  Because Mr. Riordan allegedly failed to disclose this critical historical fact, the cautionary language that accompanied his statements was not meaningful.  See In re American Int'l Grp., Inc. 2008 Sec. Litig., 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." (quotation marks and citation omitted)); In re Prudential Secs. Inc P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

### F. Control Person Liability

To establish a prima facie case of control person liability under § 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  ATSI, 493 F.3d at 108 (citation omitted).  To establish culpable participation, the plaintiff must allege facts showing that the controlling person "knew or should have known that the primary violator . . . was engaging in fraudulent conduct."  In re

<u>BioScrip, Inc. Sec. Litig.</u>, 95 F. Supp. 3d 711, 741–42 (S.D.N.Y. 2015) (quoting <u>Lapin v. Goldman Sachs Grp., Inc.</u>, 506 F. Supp. 2d 221, 247 (S.D.N.Y. 2006)).

I conclude that the claims under § 20(a) should be dismissed. With regard to Mr. Riordan, plaintiffs have shown a primary violation of Section 10(b). A party may not ultimately be held liable under both Section 10(b) and Section 20(a) for the same underlying conduct. <u>In re Banco Bradesco S.A. Sec. Litig.</u>, 277 F. Supp. 3d 600, 668 (S.D.N.Y. 2017) (quoting <u>In re Alstom SA Sec. Litig.</u>, 454 F. Supp. 2d 187, 210–11 (S.D.N.Y. 2006)). With regard to the other defendants, even if they are "controlling persons," they cannot be liable under § 20(a) because, as established above, plaintiff has failed to adequately plead that they were aware of Terex's true financial condition. Plaintiffs offer no other reason to believe they were aware or should have been aware that Mr. Riordan's statements were false.

## III. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is granted in part and denied in part. All claims are dismissed except the claims against Terex and Mr. Riordan under § 10(b) and Rule 10(b)-5.

So ordered this 31st day of March 2018.



/s/<br>Robert N. Chatigny

United States District Judge